## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

COLONIAL CHEVROLET CO., INC., §
and MIKE FINNIN MOTORS, INC., §
ATCHISON AUTOMOTIVE GROUP, B. §
BOGDEWIC CHEVROLET, INC., §
BARBER BROTHERS MOTOR §
COMPANY, INC., BILTON-BEHR §
CHEVROLET, INC.,C.S.T. MOTORS, §
INC., CAMPBELL MOTORS, INC., §
CASCADE CHEVROLET COMPANY, §
COLONIAL CHEVROLET-BUICK, INC., §
CORWIN SALES & SERVICE, INC., §
CRAWFORD'S RAYTOWN JEEP- §
EAGLE CO., CROWN VOLKSWAGEN, §
INC., CUTRUBUS   MOTORS, INC., §
DEERY BROTHERS, INC., §
DUPLESSIS CADILLAC, INC., ELM §
AUTO SALES, INC., FISHER §
MOTORS, FORTUNA MOTORS, INC., §
GEORGE MOTOR COMPANY, INC., §
GIBSON CHEVROLET, INC., GRAND §
AUTO, INC., GRAVES PONTIAC- §
CHEVROLET-BUICK-CHRYSLER, §
INC., GROSSMAN CHEVROLET §
COMPANY, INC., GUETTERMAN §
MOTORS, INC., GUNNER'S §
AUTOMOTIVE CENTER, INC., §
HANSEN MOTOR CO., INC., HERB §
ADCOX CHEVROLET COMPANY, §
HILLS EDGE AUTO SALES, INC., §
HUNTINGTON CHEVROLET, INC., §
INATOME VENTURES, LLC, JACK §
DIMOND LINCOLN-MERCURY, INC., §
JOE PANIAN CHEVROLET, INC., §
JOE RICCI OF DEARBORN, L.L.C., §
JOHN THOMAS CHRYSLER DODGE §
JEEP, INC., KEETON MOTOR CO., §
INC., LAKES CHRYSLER JEEP LTD., §
LIVERMORE AUTO GROUP, L.L.C., §
LOMAN AUTO GROUP, INC., LOS §
FELIZ FORD, INC., MITCH §
CRAWFORD'S HOLIDAY MOTORS §
CO., MONICATTI MOTORS, INC., §
MOTORQUEST OF JACKSON, L.L.C., §
MULLAHEY CHEVROLET, INC., §

OLSEN IMPLEMENT, INC., PALACE          §
MOTORS, INC., PARSONS &                §
PARSONS, LC, PAUL BENTON               §
MOTORS, L.L.C., PAVLIK                 §
MOTORCARS, INC., PHILIP MOTOR,         §
INC., RALLYE AUTOPLAZA, INC.,          §
RAPP CHEVROLET, INC., RAY              §
MOTORS, INC., RAYTOWN DODGE            §
CO., RICK JUSTICE AUTOMOTIVE,          §
INC., RICKY SMITH PONTIAC, INC.,       §
RONNIE SMITH, INC., RUSSO              §
GROUP, INC., RUST AUTO CENTER,         §
INC., S.J. MARNANCE, INC.,             §
SCHOCKER AUTO, LLC,                    §
SHOEMAKER AUTO GROUP, INC.,            §
INC., SIMMS CHEVROLET MOTORS,          §
INC., SOUTHLAKE AUTO SALES,            §
INC., SOWELL AUTOMOTIVE, INC.,         §
STAGG CHEVROLET, INC.,                 §
SUNNYSIDE AUTOMOTIVE III, LLC,         §
TERRY GAGE CHEVROLET-                  §
OLDSMOBILE, INC., THE BILL             §
BERRY MOTOR COMPANY,                   §
THOMAS DODGE CORP OF NEW               §
YORK, THOMAS DODGE OF                  §
ORLAND PARK, INC., TROY AUTO           §
WORLD, INC., WILLRODT MOTOR            §
COMPANY, INC., YANKTON                 §
MOTORSPORTS, LLC, YOUNG                §
MOTOR CO., INC.,                       §
on their own behalf and on behalf of   §
a class of others similarly situated,  §
                                       §
        Plaintiffs,                    §        CIVIL ACTION FILE NO.
                                       §        10-647-C
                                       §
THE UNITED STATES,                     §
                                       §
        Defendant.                     §

## PLAINTIFFS' AMENDED COMPLAINT

COME NOW COLONIAL CHEVROLET CO., INC. ("COLONIAL") and MIKE FINNIN MOTORS, INC., ("FINNIN") on behalf of themselves and all others similarly situated ("Plaintiffs"), for their cause of action against the United States of America ("Defendant" or "USA"), state:

## INTRODUCTION

### I.

1.      This case is filed on behalf of a nationwide class of automobile dealers whose property interest in their dealerships were damaged and taken by unnecessary government action.  Plaintiffs seek just compensation from the USA for their damages to their property.  This case arises under the Tucker Act and the Takings Clause of the Fifth Amendment to the U.S. Constitution ("Takings Clause").

## JURISDICTION

### II.

2.      This Court has exclusive subject matter jurisdiction pursuant to 28 U.S.C. § 1491 because the United States is the defendant, the amount being sought by Plaintiffs COLONIAL and FINNIN, individually, and every member of the Class, defined below, exceeds $10,000, and these claims have been brought within six years.

## VENUE

### III.

3.      Washington D.C., the seat of this Court, is the appropriate venue pursuant to 28 U.S.C. § 1491, with no other place being more appropriate given the wide diversity of citizenship.

PARTIES

III.

4.      Individual and Representative Plaintiff COLONIAL is a corporation organized under the laws of the state of Mississippi. COLONIAL is a United States citizen and a legal resident of the state of Mississippi. COLONIAL is one of thousands of automobile dealerships who held a franchise agreement with General Motors Company ("old GM") in effect on October 3, 2008.

5.      Individual and Representative Plaintiff FINNIN is a corporation organized under the laws of the state of Iowa. FINNIN is a United States citizen and a legal resident of the state of Iowa. FINNIN is one of hundreds of automobile dealerships who held a franchise agreement with Chrysler LLC ("old Chrysler") in effect on October 3, 2008.

6.      The following entities are named as additional Plaintiffs, but not as class representatives, and share common issues of law and fact with the named class representatives:  Atchison Automotive Group was at all relevant times an entity duly organized and authorized to do business in the state of Kansas. B. Bogdewic Chevrolet, Inc. was at all relevant times an entity duly organized and authorized to do business in the state of Pennsylvania. Barber Brothers Motor Company, Inc. was at all relevant times an entity duly organized and authorized to do business in the state of Utah. Bilton-Behr Chevrolet, Inc. was at all relevant times an entity duly organized and authorized to

do business in the state of South Carolina. C.S.T. Motors, Inc. was at all relevant times an entity duly organized and authorized to do business in the state of Colorado. Campbell Motors, Inc. was at all relevant times an entity duly organized and authorized to do business in the state of Oregon. Cascade Chevrolet Company was at all relevant times an entity duly organized and authorized to do business in the state of Washington. Colonial Chevrolet-Buick, Inc. was at all relevant times an entity duly organized and authorized to do business in the state of Alabama. Corwin Sales & Service, Inc. was at all relevant times an entity duly organized and authorized to do business in the state of Pennsylvania. Crawford's Raytown Jeep-Eagle Co. was at all relevant times an entity duly organized and authorized to do business in the state of Missouri. Crown Volkswagen, Inc. was at all relevant times an entity duly organized and authorized to do business in the state of Kansas. Cutrubus Motors, Inc. was at all relevant times an entity duly organized and authorized to do business in the state of Utah. Deery Brothers, Inc. was at all relevant times an entity duly organized and authorized to do business in the state of Iowa. Duplessis Cadillac, Inc. was at all relevant times an entity duly organized and authorized to do business in the state of Louisiana. Elm Auto Sales, Inc. was at all relevant times an entity duly organized and authorized to do business in the state of New Jersey. Fisher Motors was at all relevant times an entity duly organized and authorized to do business in the state of North Dakota. Fortuna Motors, Inc. was at all relevant times an entity duly organized and authorized to do business in the state of California. George Motor Company, Inc. was at all relevant times an entity duly organized and authorized to do business in the state of Kansas. Gibson Chevrolet, Inc. was at all relevant times an entity duly organized and authorized to do business in the

state of Delaware. Grand Auto, Inc. was at all relevant times an entity duly organized and authorized to do business in the state of Colorado. Graves Pontiac-Chevrolet-Buick-Chrysler, Inc. was at all relevant times an entity duly organized and authorized to do business in the state of Tennessee. Grossman Chevrolet Company, Inc. was at all relevant times an entity duly organized and authorized to do business in the state of Minnesota. Guetterman Motors, Inc. was at all relevant times an entity duly organized and authorized to do business in the state of Illinois. Gunner's Automotive Center, Inc. was at all relevant times an entity duly organized and authorized to do business in the state of Wyoming. Hansen Motor Co., Inc. was at all relevant times an entity duly organized and authorized to do business in the state of South Dakota. Herb Adcox Chevrolet Company was at all relevant times an entity duly organized and authorized to do business in the state of Tennessee. Hills Edge Auto Sales, Inc. was at all relevant times an entity duly organized and authorized to do business in the state of South Dakota. Huntington Chevrolet, Inc. was at all relevant times an entity duly organized and authorized to do business in the state of Delaware. Inatome Ventures, LLC. was at all relevant times an entity duly organized and authorized to do business in the state of Michigan. Jack Dimond Lincoln-Mercury, Inc. was at all relevant times an entity duly organized and authorized to do business in the state of Texas. Joe Panian Chevrolet, Inc. was at all relevant times an entity duly organized and authorized to do business in the state of Delaware. Joe Ricci of Dearborn, LLC. was at all relevant times an entity duly organized and authorized to do business in the state of Michigan. John Thomas Chrysler Dodge Jeep, Inc. was at all relevant times an entity duly organized and authorized to do business in the state of Oklahoma. Keeton Motor Co., Inc. was at all

relevant times an entity duly organized and authorized to do business in the state of Arkansas. Lakes Chrysler Jeep Ltd. was at all relevant times an entity duly organized and authorized to do business in the state of New Hampshire. Livermore Auto Group, LLC. was at all relevant times an entity duly organized and authorized to do business in the state of Delaware. Loman Auto Group, Inc. was at all relevant times an entity duly organized and authorized to do business in the state of New Jersey. Los Feliz Ford, Inc. was at all relevant times an entity duly organized and authorized to do business in the state of Delaware. Mitch Crawford's Holiday Motors, Co. was at all relevant times an entity duly organized and authorized to do business in the state of Missouri. Monicatti Motors, Inc. was at all relevant times an entity duly organized and authorized to do business in the state of Michigan. Motorquest of Jackson, LLC. was at all relevant times an entity duly organized and authorized to do business in the state of Michigan. Mullahey Chevrolet, Inc. was at all relevant times an entity duly organized and authorized to do business in the state of California. Olsen Implement, Inc. was at all relevant times an entity duly organized and authorized to do business in the state of South Dakota. Palace Motors, Inc. was at all relevant times an entity duly organized and authorized to do business in the state of South Dakota. Parsons & Parsons, LC. was at all relevant times an entity duly organized and authorized to do business in the state of Virginia. Paul Benton Motors, LLC. was at all relevant times an entity duly organized and authorized to do business in the state of Tennessee. Pavlik Motorcars, Inc. was at all relevant times an entity duly organized and authorized to do business in the state of West Virginia. Philip Motor, Inc. was at all relevant times an entity duly organized and authorized to do business in the state of South Dakota. Rallye Autoplaza, Inc. was at all

relevant times an entity duly organized and authorized to do business in the state of New York. Rapp Chevrolet, Inc. was at all relevant times an entity duly organized and authorized to do business in the state of South Dakota. Ray Motors, Inc. was at all relevant times an entity duly organized and authorized to do business in the state of Arkansas. Raytown Dodge Co. was at all relevant times an entity duly organized and authorized to do business in the state of Missouri. Rick Justice Automotive, Inc. was at all relevant times an entity duly organized and authorized to do business in the state of Mississippi. Ricky Smith Pontiac, Inc. was at all relevant times an entity duly organized and authorized to do business in the state of Massachusetts. Ronnie Smith, Inc. was at all relevant times an entity duly organized and authorized to do business in the state of Tennessee. Russo Group, Inc. was at all relevant times an entity duly organized and authorized to do business in the state of Michigan. Rust Auto Center, Inc. was at all relevant times an entity duly organized and authorized to do business in the state of Illinois. S.J. Marnance, Inc. was at all relevant times an entity duly organized and authorized to do business in the state of South Dakota. Schocker Auto, LLC. was at all relevant times an entity duly organized and authorized to do business in the state of Wisconsin. Shoemaker Auto Group, Inc. was at all relevant times an entity duly organized and authorized to do business in the state of Pennsylvania. Simms Chevrolet Motors, Inc. was at all relevant times an entity duly organized and authorized to do business in the state of Michigan. Southlake Auto Sales, Inc. was at all relevant times an entity duly organized and authorized to do business in the state of Indiana. Sowell Automotive, Inc. was at all relevant times an entity duly organized and authorized to do business in the state of California. Stagg Chevrolet, Inc. was at all relevant times an

entity duly organized and authorized to do business in the state of Massachusetts. Sunnyside Automotive III, LLC. was at all relevant times an entity duly organized and authorized to do business in the state of Ohio. Terry Gage Chevrolet-Oldsmobile, Inc. was at all relevant times an entity duly organized and authorized to do business in the state of Arkansas. The Bill Berry Motor Company was at all relevant times an entity duly organized and authorized to do business in the state of Colorado. Thomas Dodge Corp of New York was at all relevant times an entity duly organized and authorized to do business in the state of New York. Thomas Dodge of Orland Park, Inc. was at all relevant times an entity duly organized and authorized to do business in the state of Illinois. Troy Auto World, Inc. was at all relevant times an entity duly organized and authorized to do business in the state of Michigan. Willrodt Motor Company, Inc. was at all relevant times an entity duly organized and authorized to do business in the state of South Dakota. Yankton Motorsports, LLC. was at all relevant times an entity duly organized and authorized to do business in the state of South Dakota. Young Motor Co., Inc. was at all relevant times an entity duly organized and authorized to do business in the state of Kansas.

7.      Each Plaintiff has standing to raise their claim since all have suffered an injury in fact, proximately caused by the actions of the USA, which are redressable in this forum, as additionally alleged below.

8.      The defendant is the USA.

<u>FACTUAL BACKGROUND</u>

IV.

9.      COLONIAL, FINNIN and the listed Plaintiffs were some of thousands of automobile dealerships who held franchise agreements or contracts with old GM/old Chrysler in effect on October 3, 2008 (the "covered dealerships").

10.     The Dealer Day in Court Act, 15 U.S.C. § 1221, *et seq*., and the vast majority of state statutes regulating automobile manufacturer's, prohibited unilateral cancellation of any and all of the franchise agreements held by the covered dealerships, including the time period between October 3, 2008 and ending on December 31, 2010.

11.     The franchise agreements or contracts between the covered dealerships and either old Chrysler or old GM did not provide for unilateral cancellation by either old Chrysler or old GM.

12.     In 2008 GM and Chrysler reported that they were in serious financial difficulty.

13.     The USA provided interim financing for both corporations.

14.     The Troubled Asset Relief Program ("TARP") is a program of the United States to purchase assets and equity from financial institutions to strengthen the financial sector and became effective October 3, 2008.

15.     As part of TARP, the Automotive Industry Financing Program ("AIFP") was created on December 19, 2008, to require the United States Department of Treasury ("Treasury") to invest in the automakers and their financing arms and to provide a specific federal role in restructuring the auto industry.

16.     Under AIFP, Treasury committed to provide new GM and new Chrysler with financing from the TARP funds pursuant to loan agreements, both dated December 31, 2008. Treasury committed $80.7 billion through AIFP to facilitate restructuring of the

companies and the auto industry and to support new GM and new Chrysler and their financing arms.

17.    Under their loan agreements, GM and Chrysler were required to submit to Treasury restructuring plans to satisfy the conditions precedent and subsequent of the USA as to how they would use federal money to achieve long-term viability.

18.    On February 15, 2009, President Obama announced the creation of an interagency Presidential Task Force on the Auto Industry ("Task Force") that was to review the restructuring plans submitted by General Motors Company and Chrysler LLC as a requirement of loan agreements with the United States.

19.    The Executive branch then created a U.S. Treasury Auto Team ("Auto Team"), to evaluate restructuring plans submitted by GM and Chrysler.

20.    The "Task Force" and "Auto Team" were unqualified to make those economic evaluations.

21.    The Task Force determined and dictated the conditions for further federal assistance to GM and/or Chrysler.

22.    The Task Force and the Auto Team decided that the federal government should engage in central economic planning as a matter of political policy to restructure the American automobile industry.

23.    As part of its central economic planning process, the Auto Team reviewed the restructuring plans and proposals submitted by GM and Chrysler and rejected them, *inter alia*, because as a condition of financing, it demanded that substantially more dealerships (all of whom at that time had property rights in their then current franchise

agreements) than proposed by the manufacturers must be terminated to satisfy the federal government's regulatory plan.

24.    To provide a basis to justify their collective business judgment to enable the bankruptcy courts to terminate the plaintiffs, GM, Chrysler USA and the USA presented and or allowed to be presented materially false and misleading information concerning the negative economic impact that dealers have on the manufacturers.

25.    One of the key arguments made to justify the terminations of the dealers is the false claim that it cost the auto manufacturers billions of dollars per year to support its dealer network.

26.    The negotiations between GM, Chrysler, and the USA were not the type of negotiations which normally occur between debtors, creditors, and potential financiers.

27.    Instead, these negotiations were essentially political negotiations and the decisions demanded by the USA from the bankruptcy court were principally based on politics, not economics.

28.    The bankruptcy courts admitted in their decisions that their decisions were based on fear, *407 BR 463, 477*, politics, *405 BR 84, 104*, and that the need for such extraordinary speed to finish the bankruptcy process *407 BR 463, 485* made the idea "ludicrous" that that the normal due process of bankruptcy occur.  Id., fn 16.

29.    The Bankruptcy Court specifically did not make a finding concerning the propriety of the actions of the USA: "The extent to which a governmental entity should be involved in protecting certain industries is a political decision, and the Court does not express a view as to the Governmental Entities' involvement here." Id.

30.     The Bankruptcy court held that although there was government coercion involved in these arrangements it was the good kind of coercion, appropriate"… to achieve a common good."

31.     The former head of the Auto Task Force boasted:

"But Harry and Matt decided to try to do better.  **In the fine print** of the $33.3 billion of debtor-in-possession financing that we'd extended to the company, **they set a deadline of July 10**.  At the end of that time – a scant forty days! – either the Treasury would have to extend its financing or GM would be forced to liquidate.  **This was the financial equivalent of putting a gun to the heads of the bankruptcy judge, GM's stakeholders**, and of course, Team Auto itself."  (emphasis supplied)  *"OVERHAUL - An Insider's Account of the Obama Administration's Emergency Rescue of the Auto Industry" Steven Rattner, 2010.*

32.     The sole auto dealer complaint about the government's role was relegated to a conclusion of law without any fact finding.

33.     No plaintiff could have been properly advanced a takings claim in the bankruptcy proceedings because the exclusive jurisdiction for such claims is in this court and because the USA has not waiver sovereign immunity in bankruptcy court claims related to takings under 11 USC 106(a).

34.     Additional necessary funding from the USA to new GM and new Chrysler was conditioned on their resubmitting plans that they manipulate the bankruptcy courts to terminate dealership franchise agreements to re-shape the auto industry into the model deemed to be the most efficient from the point of view of the USA.

35.     Based on the financing mandate of the Treasury's finding that its "pace" of planned dealership terminations was too slow and an obstacle to its viability, and that the government had re-shaped the future structure of the dealership organization to a

model that is forcibly endorsed, new GM substantially accelerated its terminations.  GM wanted to close 300 dealers per year to eventually reach a total of 1,650 dealers by 2014.  The Auto Team rejected GM's proposals. As dictated by the "Auto Team," GM instead identified 1,454 dealerships to be terminated by 2010 through bankruptcy proceedings.

36.    For the same reasons, Chrysler also accelerated its dealership terminations.  Chrysler had planned to reduce its network of dealerships from 3,181 in 2009 to about 2000 dealerships by 2014 and identified 789 dealerships to be immediately terminated through bankruptcy proceedings.

37.    GM and Chrysler substantially accelerated their dealership termination timetables.

38.    GM responded to Treasury's decision and imposed conditions by terminating 1,454 covered dealerships' ability to acquire new GM vehicles and giving these 1,454 dealerships only until October 2010 to wind down operations completely.  For Chrysler (which also had originally planned to terminate dealers over five years), its acceleration was even more abrupt, with Chrysler terminating 789 dealerships (25 percent of its network) within 22 days.

39.    The Auto Team unilaterally decided that GM's and Chrysler's best chance of success required manipulating the bankruptcy code.

40.    Chrysler declared bankruptcy on April 30, 2009.  GM declared bankruptcy on June 1, 2009.

41.    Prior to and subsequent to the bankruptcy filings, the United States was an investor in and also a major creditor of GM and Chrysler by virtue, *inter alia*, of its lending activities, operation of tax law, and operation of federal pension laws.

42.    After GM and Chrysler filed bankruptcy, as a condition of providing additional financing and fundamentally restructuring the auto industry, the USA became the majority shareholder of GM, and through collateralization, became the largest secured creditor for the automakers.

43.    As another condition of providing funding for GM and Chrysler, the U.S. Department of the Treasury ("Treasury"), through its Troubled Asset Relief Program ("TARP") and the actions of the Auto Task Force ("ATF") compelled the automakers to terminate the rights of individuals, partnerships, and corporations which owned auto dealer franchises, either to end their commercial existence or to transfer their property to other dealers without compensation to the owners and without cost to the anointed favorites.

44.    GM and Chrysler, at the direction of and as required by Treasury, selected dealerships for termination and obtained bankruptcy orders for the divestment of the ownership interests of the Plaintiffs.

45.    Congress enacted the Consolidated Appropriations Act, 2010, P.L. 111-117, HR 3288, and §747 of the Act directed the automakers, as agents of the USA, to participate in arbitrations for the sole purpose of deciding which, if any, of the terminated dealerships, would be eligible for potential reinstatement.   The arbitrations were required to be conducted by arbitrators from the American Arbitration Association Regional Panels.   The arbitrations were arbitrarily and prejudicially conducted

inconsistent with the statute.  No express provision was made by the Congress or the Executive for any review of the arbitrations by a neutral, independent Article III court.

46.     Section 747 limited the Auto Dealers to raising only the question of whether their property should be taken from them and prohibited any arbitral order providing a financial remedy for those takings.

47.     Plaintiffs and each member of the Class categorically owned the following assets ("the assets"):

  a.     franchise contracts, all of which were distinct investment-backed expectation assets;

  b.     other distinct investment-backed expectation assets which were necessary to perform their contractual obligations including but not limited to: (i) real property; (ii) enhancements to real property; (iii) buildings; (iv) fixtures; (v) specialized tools; (vi) signage; (vii) inventory of parts; (viii) inventory of new and used vehicles; and (ix) debt collateralization and/or other specialized floor plan financing;

  c.     other specific distinct investment-backed expectation assets which were customary, ordinary, taxable, insurable, and recognized by GAAP including but not limited to: (i) blue sky; (ii) good will; and (c) present and future profits from sales of insurance, financing, new and used cars, and retail and wholesale parts.

48.     The assets were taken in a process which began with the USA creation of central economic planning to restructure the auto industry and which decided, without any factual basis, that the plaintiffs should lose their property rights so that the auto

manufacturers would have a greater likelihood of economic survival; in essence, they were required to "take one for the team". The Federal Court of Claims is the forum available to provide an adequate remedy for the damages suffered by the Plaintiffs as a result of these unconstitutional takings.

49.     Plaintiffs' amended complaint does not allege that the USA committed a tort against them.

## CLASS ACTION ALLEGATIONS

### V.

50.     This action is brought and may be properly maintained as a class action pursuant to RCFC 23(a)(1-4) and RCFC 23(b)(2-3).   This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority prerequisites of Rule 23.   The named class representatives seek to maintain this case as an opt-in class action on behalf of a class ("the Class") as defined as follows:

> The Class is defined as any person or entity that is a "covered dealership," under section 747 of the Consolidated Appropriations Act, 2010 (the "Act"), which is defined under the Act as an automobile dealership that had a franchise agreement for the sale and service of vehicles of a brand or brands with a "covered manufacturer" under the Act in effect as of October 3, 2008, and such franchise agreement was terminated, not assigned in the form existing on October 3, 2008 to another "covered manufacturer" in connection with an acquisition of assets related to the manufacture of that vehicle brand or brands, not renewed, or not continued during the period beginning on October 3, 2008, and ending on December 31, 2010.

> The class definition excludes "covered dealership" owned by a "covered manufacturer."

51.     The Class is divided into subclasses within the same class definition above.   These two subclasses are comprised of a subclass of "covered dealerships"

which had a franchise agreement with GM, and a subclass of "covered dealerships" which had a franchise agreement with Chrysler. COLONIAL shall serve as class representative for the GM subclass, and FINNIN shall serve as class representative for the Chrysler subclass.  Plaintiffs reserve the right, with leave of Court if necessary, to expand the Class as may be appropriate based upon the evidence discovered during the course of discovery.

52.    The Class is comprised of more than a 1,000 new car and truck dealers within the United States, making joinder impractical.  As of the date of the first filing of this action, more than 1,000 "covered dealerships," members of the Class, have had their franchise agreements terminated between October 3, 2008 and December 31, 2010.  The disposition of the claims of these class members in a single class action will provide substantial benefits to all parties and to the Court.  There is a well defined community of interest among members of the Class.

53.    The proposed Class meets the prerequisites of RCFC 23(a).  First, the proposed Class is so numerous that the individual joinder of all members is impracticable.  While the exact number and identities of the members of the Class are unknown at this time and can be ascertained only through appropriate discovery, Plaintiff believes that the class consists of more than 1,000 members.

54.    As required by RCFC 23(a)(2), common questions of law and fact exist as to all members of the Class and predominate over any questions affecting only individual members of Class.  Plaintiffs, like all class members, had their franchise agreements unilaterally terminated as a part of a restructuring plan dictated and

directed by, controlled by, and orchestrated by the USA.  Among the questions of law and fact common to the members of the Class are the following:

a.   Whether the actions of the United States damaged the property of and/or constituted a taking of property from members of the Class without just compensation;

b.   Whether the actions of the USA are compensable under the Tucker Act;

c.   Whether the Treasury required GM and Chrysler to submit to Treasury restructuring plans to show how GM and Chrysler would use assistance from Treasury;

d.   Whether Treasury conditioned financial assistance to GM and Chrysler upon the unilateral termination of the franchise agreements of the members of the Class;

e.   Whether Treasury rejected the restructuring plans of GM and Chrysler because those plans failed to unilaterally terminate the franchise agreements of the members of the Class;

f.   Whether GM and Chrysler unilaterally terminated the franchise agreements of the members of the Class at the direction of and/or insistence of Treasury as a condition of financial assistance;

g.   Whether Treasury imposed conditions on GM forcing it to terminate more than 1,000 covered dealerships' ability to acquire new GM vehicles;

h.   Whether Treasury imposed conditions on Chrysler forcing it to terminate more than 700 covered dealerships' ability to acquire new Chrysler vehicles;

i.   Whether the USA decided that GM and Chrysler were required to manipulate the Bankruptcy Court to unnecessarily and drastically reduce the number of their dealerships.

j.   Whether GM and Chrysler, at the direction of and as required by Treasury, selected dealerships for termination and obtained bankruptcy orders for the divestment of the ownership interests of Plaintiffs and the members of the Class.

k.   Whether Congress, through § 747, admitted that the Article II Executive had combined with the Article I Bankruptcy Court to unnecessarily damage the property rights of the Plaintiffs;

l.   The appropriate nature of class-wide relief; and

m.   Whether the USA is liable for damages to Plaintiffs and members of the Class.

55.   As required by RCFC 23(a)(3), Plaintiffs' claims are typical of the claims of the members of the Class, as all such claims arise out of the actions of the USA in damaging and/or taking the property of the members of the Class without just compensation, and the consequent injuries they suffered as a proximate result of USA's common course of conduct as alleged herein.  Both COLONIAL and FINNIN had their franchise agreements terminated with GM and Chrysler, respectively, which were "covered manufacturers" between October 3, 2008 and the date of this filing.

56.     As required by RCFC 23(a)(4), Plaintiffs will fairly and adequately protect the interests of the members of the Class and have no interest antagonistic to those of members of the Class.  Plaintiffs have retained counsel experienced in the litigation of class actions, arbitrations and in the representation of automobile dealers.

57.     This action is maintainable as class action pursuant RCFC 23(b)(1) because the USA acted or refused to act on grounds generally applicable to the Class, conduct making the subject of this action a common course of conduct involving standardized documents, regulations, policies, and actions applicable to the Class as a whole.

58.     As required by RCFC 23(b)(2), the questions of law or fact common to members of the Class predominate over any questions affecting only individual members.  In this regard the common question, among other common questions, of whether the actions of Treasury, in demanding that GM and Chrysler unilaterally terminate franchise contracts of Plaintiffs and members of the Class, predominate over any questions affecting only individual members.  There are no individualized issues of law.   No franchise agreement permitted unilateral termination of the franchise agreement.  The Dealer Day in Court Act is federal law.  The claims made herein are predicated on the Tucker Act and/or the Fifth Amendment of the United States Constitution, the provisions of which apply to members of the Class in all fifty states.

59.     Further, a class action is superior to other available methods for the fair and efficient adjudication of this controversy, since individual joinder of all members of the Class is impracticable.  Furthermore, the expense and burden of individual litigation would make it difficult or impossible for individual members of the Class to redress the

wrongs done to them.  The cost to the court system of adjudicating such individualized litigation would be substantial.  While the individual claims are large, many of the members of the Class are unable to pursue their individual claims due to the financial hardship caused by the loss of their automobile dealerships.

60.    The conduct of this action as a class action presents fewer management difficulties, conserves the resources of the parties and the court system, and protects the rights of each member of the Class.  Notice of the pendency and any resolution of this action can be provided to members of the Class by a combination of publication and individual notice, based upon records maintained by the United States and/or third party "covered manufacturers."

## THE CLAIMS FOR DAMAGES AND/OR TAKINGS

### VI.

61.    Paragraphs 1 through 60 are incorporated by reference as though fully set forth in this cause of action.

62.    The Fifth Amendment to the United States Constitution provides "[N]or shall private property be taken for public use without just compensation."

63.    The Tucker Act, 28 U.S.C. § 1491(a)(1), provides exclusive jurisdiction in the United States Claims Court for any claim against the Federal Government to recover damages founded on the Constitution, a statute, a regulation, or an express or implied-in-fact contract.

64.    The Bankruptcy Courts are not Article III courts ---they are created by the legislative branch and are Article I courts.

65.     The orders of the Bankruptcy Courts terminated the franchise contracts of Plaintiffs and the members of the Class.

66.     The orders of the Bankruptcy Court terminating the franchise contracts of Plaintiffs and the members of the Class constituted legislative takings of property.

67.     In the alternate, the orders of the Bankruptcy Courts that terminated the franchise contracts, to the extent they are considered either judicial or quasi-judicial, constitute judicial or quasi-judicial takings.

68.     Congress, through its enactment of §747, admitted that the Article II Executive had combined with the Article I Bankruptcy Court to unnecessarily damage the property rights of the Plaintiffs, but its limited remedies did not provide for damages for those who were adversely affected by those combined actions the Article I court's takings.

69.     Congress' enactment of §747 was unconstitutional, discriminatory, confiscatory and unreasonable, and was not a lawful exercise of police power.

70.     Section 747 violates the Takings clause of the Fifth Amendment to the Constitution of the United States because, *inter alia,* Plaintiffs and the members of the Class have been totally deprived of the use of their property for business and commercial purposes of operating new car franchises.

71.     Treasury and the ATF, using their Executive powers acting under Article II of the Constitution, after having re-shaped the dealership organization into a model of its own choosing for its own use and for the use of dealers other than Plaintiffs, dictated, forced, directed and compelled GM and Chrysler to manipulate the Bankruptcy Court into terminating the franchise contracts of the Plaintiffs and the members of the Class.

GM and Chrysler manipulated the Bankruptcy Court into approving the termination of the franchise contracts.   The USA never understood that the only customers who buy automobiles from new GM and new Chrysler are the auto dealers themselves: by requiring the termination of dealers the USA was requiring the termination of the only customers of GM and Chrysler.  As a result, these terminations were not necessary in order to successfully refinance the auto makers.

72.     These decisions and the actions of the USA, being the direct, natural and probable result of the government's actions, proximately caused the Plaintiffs and the members of the Class to have been in fact injured because their property is variously either (a) of no value; (b) of little value; and/or (c) of limited value because it can no longer be used for commercial purposes which provided non-speculative profits, cash flows, and other tangible and intangible economic values as stated above.

73.     Consequently, Plaintiffs and the members of the Class have been arbitrarily and unreasonably prohibited from carrying on the same activities as the owners of other auto dealerships that were permitted to survive.

74.     Consequently, without adequate compensation, Plaintiffs and the members of the Class have been damaged by the USA without necessity, had their assets, as defined above, taken, seized, extinguished, nullified, terminated, and/or transferred, rights that were previously clearly established with respect to abrogation of executor contracts.

75.     The Tucker Act provides that Plaintiffs and the members of the Class be fully compensated for their property that was damaged and/or the subject of the takings described above.

76.     In the alternate, to the extent, if any, Congress withdrew availability of Tucker Act relief or otherwise limited its scope, the Fifth Amendment provides a remedy for Plaintiffs and the members of the Class for the unconstitutional takings as described above.

## PRAYER

WHEREFORE, Plaintiffs and the putative members of the Class seek judgment against the United States as follows:

1.     That the Court certify this case as an opt-in class action under RCFC 23(b);

2.     That the Court declare the rights and duties of the parties consistent with the relief sought by Plaintiffs;

3.     That Plaintiffs and each of the putative members of the Class recover compensatory damages in amount equal to the value of their economic losses, each individual claim being more than $10,000.00;

4.     That Plaintiffs and the putative members of the Class recover an award of reasonable attorney's fees, costs, and expenses; and

5.     Such other additional relief as the interests of justice may require.

DATED:  February 21, 2011

Respectfully submitted,

**BLUME, FAULKNER
SKEEN &NORTHAM, PLLC**

/s/ Richard D. Faulkner

_____
Richard D. Faulkner
Louisiana State Bar No. 05470
rfaulkner@bfsnlaw.com
James D. Blume
Texas State Bar No. 02514600
jblume@bfsnlaw.com
111 W. Spring Valley Rd., Suite 250
Richardson, Texas 75081
(214) 373-7788     Telephone
(214) 373-7783     Facsimile


**BUCHANAN & BELLAN, L.L.P.**


/s/ G. Kevin Buchanan

_____
G. Kevin Buchanan
Texas State Bar No. 00787161
courtfilings@bbllplaw.com
900 Jackson Street
Dallas, Texas 75202
(214) 378-9500     Telephone
(214) 365-7220     Facsimile


**HARRY ZANVILLE**
Harry W. Zanville, Attorney at Law
500 West Harbor Drive, Suite 1201
San Diego, California  92101
(619) 269-9227     Telephone


## CERTIFICATE OF FILING

I hereby certify that on February 21, 2011, a copy of "Plaintiff's Amended Complaint" was filed electronically. I understand that notice of this filing will be sent to all

parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Richard D. Faulkner

_____

Richard D. Faulkner