No. 10-647C
(Judge Firestone)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

COLONIAL CHEVROLET CO., INC., et al.,

Plaintiff,

v.

UNITED STATES,

Defendant.

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' CLAIMS ALLEGING TAKINGS OF GENERAL MOTORS DEALERSHIP AGREEMENTS

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General

ROBERT E. KIRSCHMAN, JR.
Director

/s/ Kenneth M. Dintzer
KENNETH M. DINTZER
Deputy Director
Commercial Litigation Branch
National Courts Section
Civil Division
Department of Justice
PO Box 480
Ben Franklin Station
Washington, D.C. 20044
(202) 616-0385
Kenneth.Dintzer@usdoj.gov

Attorneys for Defendant

OF COUNSEL:

ELIZABETH M. HOSFORD
Assistant Director

JAMES P. CONNOR
DAVID A. HARRINGTON
Senior Trial Counsel

AMELIA R. LISTER-SOBOTKIN
JOSHUA A. MANDLEBAUM
MICHAEL A. RODRIGUEZ
ALISON S. VICKS
Trial Attorneys

December 7, 2015

# TABLE OF CONTENTS

TABLE OF AUTHORITIES …………………………………………………………...iii

INTRODUCTION…………………………………………………..…………………1

STATEMENT OF ISSUES…………………………………………..……….…………..4

STATEMENT OF THE CASE …… ……………………………………..…….……….4

I. Procedural History………………………………..………………………..…………4

II. Statement Of Facts…………………………..……………………….…………..……...6

A. Government's Financial Assistance To GM During The 2008 Credit Crisis….……...6

B. GM Offered Every Dealership A Participation Agreement Or A Wind-Down Agreement……………………………………...……………………….….…7

C. Only Six GM Plaintiffs' Dealership Agreements Were Rejected In Bankruptcy..........9

ARGUMENT…………………………..…………………………………….…………..10

I. Legal Standards………………………………………………….……….….….……..10

II. The Court Should Enter Summary Judgment On The Takings Claims Of The GM Dealers Who Signed A Wind-Down Agreement…………...……………………………….……….11

A. Property Cannot Be Taken By Agreement………...……………….…….……………11

B. The Wind-Down Agreements Released The United States From All Claims Related To The Termination Of The GM Dealership Agreements…..……………..……...13

III. The Court Should Grant Summary Judgment In Favor Of The United States On The Takings Claims Of Every GM Plaintiff Because Each Was Offered A Wind-Down Agreement………………………………………………………………………………14

CONCLUSION…..……………………..…………………………………...…………17

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*A&D Auto Sales, Inc. v. United States*,
748 F.3d 1142 (Fed. Cir. 2014) ........ *passim*

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ........ 10

*BMR Gold Corp. v. United States*,
41 Fed. Cl. 277 (1998) ........ 11, 12

*Brace v. United States*,
72 Fed. Cl. 337 (2006) ........ 11

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ........ 10

*Cienega Gardens v. United States*,
503 F.3d 1266 (Fed. Cir. 2007) ........ 3, 15, 16

*Colonial Chevrolet Co. v. United States*,
106 Fed. Cl. 619 (2012) ........ 4

*Colonial Chevrolet Co. v. United States*,
123 Fed. Cl. 134 (2015) ........ 2, 4, 15, 17

*Gen. Motors v. Bill Kelley, Inc.*
2012 WL 5966527 (N.D.W. Va. Nov. 29, 2012) ........ 12

*Gen. Motors v. Rapp Chevrolet, Inc.*,
2013 WL 2245472 (D.S.D. May 21, 2013) ........ 12

*George Hyman Constr. Co. v. United States*,
832 F.2d 574 (Fed. Cir. 1987) ........ 13

*Gortney v. Norfolk & W. Ry. Co.*,
216 Mich. App. 535, 549 N.W.2d 612 (1996)........13

*Henderson Cty. Drainage Dist. No. 3 v. United States*,
53 Fed. Cl. 48 (2002) ........ 13

*In re Gen. Motors Corp.*,
407 B.R. 463 (Bankr. S.D.N.Y. 2009) ........ *passim*

*In re Gen. Motors Corp.*,
409 B.R. 24 (Bankr. S.D.N.Y. 2009) .......................................................................... 7

*In re Gen. Motors Corp.*,
2009 WL 2033079 (S.D.N.Y. July 9, 2009) ......................................................................... 17

*In re Motors Liquidation Co.*,
430 B.R. 65 (S.D.N.Y. 2010)……………………………………………………………….6

*Johnson, Drake & Piper, Inc., v. United States*
209 Ct. Cl. 313 (1976)………………………………………………………………….14

*L.L. Nelson Enters. v. Cnty of St. Louis*,
673 F.3d 799 (8th Cir. 2012) ......................................................................................... 11

*Lucas v. S.C. Coastal Council*,
505 U.S. 1003 (1992) ......................................................................................................... 3

*Mann v. United States*,
334 F.3d 1048 (Fed. Cir. 2003) ...................................................................................... 10

*Norman v. United States*,
429 F.3d 1081 (Fed. Cir. 2005) ......................................................................... 2, 11, 12

*Penn Cent. Transp. Co. v. City of N.Y.*,
438 U.S. 104 (1978) ........................................................................................... 3, 14, 15

*Ruckelshaus v. Monsanto Co.*,
467 U.S. 986 (1984) ....................................................................................................... 11

*Skotak v. Vic Tanny Intern., Inc.*
203 Mich. App. 616 (1994)……………………………………………………………14

*Turntable Fishery & Moorage Corp. v. United States*,
52 Fed. Cl. 256 (2002) ............................................................................................ 11, 12

*Wyatt v. United States*,
217 F.3d 1090 (Fed. Cir. 2001)……………………………………………………….....11

**Other**

*Consolidated Appropriations Act of 2010*
Pub. Law 111-117, 123 Stat. 3034 (2009)…………………………………………………8

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| COLONIAL CHEVROLET CO., INC. et al., | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 10-647C |
| | ) | (Judge Firestone) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' CLAIMS ALLEGING TAKINGS OF GENERAL MOTORS DEALERSHIP AGREEMENTS**

Pursuant to Rule 56 of the Rules of United States Court of Federal Claims (RCFC), defendant, the United States, respectfully requests that the Court grant the Government summary judgment on the takings claims asserted by former General Motors Company (GM) car dealers. Those former dealers (the GM plaintiffs) allege that the United States took their ownership interest in dealership agreements with GM. The undisputed facts – including the terms of the "Wind-Down Agreements" offered to all GM dealers – defeat the GM plaintiffs' takings claims and demonstrate that the Government is entitled to judgment as a matter of law.

**INTRODUCTION**

This case involves takings claims brought by former owners of dealerships that sold cars manufactured by GM and Chrysler Group, LLC (Chrysler). The premise of the GM plaintiffs' claims is their allegation that the United States "compelled" and "coerced" GM to reject dealership agreements in bankruptcy. According to the GM plaintiffs, but for the Government's involvement (and the tens of billions of dollars in financial assistance that came with it), GM would have either survived or conducted an orderly wind-down in bankruptcy, such that their dealership agreements would have retained value.

There are a host of fatal flaws in the GM plaintiffs' takings claims. This motion addresses the three most obvious defects, each of which compels entry of summary judgment in favor of the Government on the GM plaintiffs' claims: (1) most of the GM plaintiffs agreed to the termination of their dealership agreements; (2) most of the GM plaintiffs released the United States from liability relating to these dealership terminations; and (3) all of the GM plaintiffs were offered the very benefits they now claim the Government took from them.

First, although the GM plaintiffs claim that the Government "forced cancellation of their franchise agreements" in bankruptcy, *Colonial Chevrolet Co. Inc. v. United States*, 123 Fed. Cl. 134, 136 (2015), the vast majority of the GM plaintiffs' dealership agreements were *not* cancelled or rejected in bankruptcy. Rather, 59 of the 65 GM plaintiffs in this case *agreed* to terminate their dealership agreements as part of "Wind-Down Agreements" with GM. These GM dealers agreed to "voluntar[ily] terminat[e]" their dealership agreements in exchange for significant consideration, including a cash payment. A3.[1] Because property cannot be "taken" by agreement, *Norman v. United States*, 429 F.3d 1081, 1089 (Fed. Cir. 2005), the takings claims of the GM plaintiffs that signed Wind-Down Agreements fail as matter of law. *Id.*

Second, the Wind-Down Agreement signed by most GM plaintiffs included broad release language immunizing the United States from all claims arising out of the dealership terminations, including the takings claims in this lawsuit. Specifically, nearly every GM plaintiff in this case "release[d], settle[d], cancel[ed], discharge[d], and acknowledge[d] to be fully satisfied any and all claims" arising out of the termination of their dealership agreements. A6. Having released the United States from claims relating to their dealership agreements, the GM plaintiffs cannot maintain a lawsuit alleging a taking of their dealership agreement. As a result, the Court should enter summary judgment in favor of the Government on the claims of the GM plaintiffs that

[1] "A__" refers to the appendix attached to this motion.

signed Wind-Down Agreements and released the United States from claims arising out of the termination of their dealerships.

Third, the Court should enter summary judgment in favor of the United States on all GM plaintiffs' takings claims because the Wind-Down Agreement offered the GM plaintiffs the same benefits they now claim the Government took from them, meaning that they cannot show any economic loss as a result of the alleged Government action. The GM plaintiffs contend that their dealerships would have maintained value absent the Government's financial assistance by "selling remaining inventory and servicing cars on the road during a liquidation process [in bankruptcy.]" *Colonial Chevrolet*, 123 Fed. Cl. at 146. But the Wind-Down Agreements offered every GM plaintiff these precise benefits, including the opportunity to (1) sell remaining inventory; (2) purchase GM service parts; and (3) "perform warranty service and other normal service operations." A8, 43, 120, 153. The presence of this "available alternative" is thus fatal to the GM plaintiffs' takings claim. *Cienega Gardens v. United States*, 503 F.3d 1266, 1286-87 (Fed. Cir. 2007) (vacating judgment in favor of plaintiff asserting takings claim because trial court failed to consider "benefits that actually were offered to the plaintiffs.").

Accordingly, because every GM plaintiff was offered (and in most cases received) the same benefits they now claim were taken by the Government, the GM plaintiffs cannot demonstrate economic loss as a result of Government action, a necessary element of any takings claim. *A&D Auto Sales, Inc. v. United States*, 748 F.3d 1142, 1157 (Fed. Cir. 2014) (citing *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978) and *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015 (1992)). The Court should therefore grant summary judgment in favor of the United States on the takings claims of all GM plaintiffs.

## STATEMENT OF THE ISSUES

1. Whether the Government is entitled to summary judgment for the takings claims asserted by GM plaintiffs that signed Wind-Down Agreements, agreed to the termination of their dealerships, and released the United States from liability relating to the dealership terminations.

2. Whether the Government is entitled to summary judgment on the takings claims of all GM plaintiffs, when the Wind-Down Agreement offered plaintiffs the same benefits – the opportunity to sell remaining inventory and service GM cars on the road – that plaintiffs now claim they were denied because of Government action.

## STATEMENT OF THE CASE

### I. Procedural History

Colonial Chevrolet Company, Inc. (Colonial) filed suit in September 2010. Suing on behalf of itself, other individually-named plaintiffs, and a putative class, Colonial alleged that the Government took property interests in plaintiffs' GM and Chrysler dealership agreements without just compensation. *A&D Auto Sales*, 748 F.3d at 1149. Of the named plaintiffs, 65 allege a taking of a GM dealership. Am. Compl. 2-14; A1-2. Following the Court's 2012 denial of our initial motion to dismiss the takings claims, the Court certified the issue for interlocutory appeal of that year. *Colonial Chevrolet Co., Inc. v. United States*, 106 Fed. Cl. 619, 622 (2012). In April 2014, the Federal Circuit issued its decision on interlocutory appeal. *A&D Auto Sales*, 748 F.3d 1142. Although the Federal Circuit affirmed this Court's denial of the Government's motion to dismiss, it held that plaintiffs' complaint was deficient because it "contain[ed] no allegations regarding the but-for economic loss of value of the plaintiffs' franchises." *A&D Auto Sales*, 748 F.3d at 1158. The Federal Circuit remanded the cases to allow plaintiffs the opportunity to cure this deficiency by amending the complaint. *Id.*

The Colonial plaintiffs did so in September 2014, and they posited three scenarios under which their GM dealership agreements would have had value but for the Government's financial assistance. *Colonial Chevrolet*, 123 Fed. Cl. at 140-146. The Government moved to dismiss the amended complaint because all three scenarios were either implausible or barred by the Federal Circuit's *A&D Auto Sales* decision. Although the Court denied our motion, it rejected two of the three "but-for" scenarios posited by the plaintiff GM dealers. *Id*. The Court first rejected plaintiffs' scenario that the Government would provide loans without requiring termination of the dealerships, as that scenario was precluded by the Federal Circuit's *A&D Auto Sales* decision. *Id*. at 141. The Court also rejected plaintiffs' second scenario that another entity would have purchased GM's assets but for the Government's financial assistance. *Id*. at 144-145. This scenario was rejected because it contained only "conclusory assumptions, with no supporting facts." *Id*. at 145.

The Court held that the GM plaintiffs could proceed only under their third "but-for" scenario, which involved the dealerships remaining open "during [an] orderly wind-down" of GM in bankruptcy. *Id*. at 146. Absent the Government's financial assistance, the GM plaintiffs allege their dealerships would have retained value by remaining open during GM's orderly liquidation to sell remaining inventory and service cars on the road. *Id*. This is the only scenario that the GM plaintiffs may rely upon to demonstrate economic loss, a necessary element of any takings claim. *Id.* ("The Colonial plaintiffs who allege a taking of a GM dealership may only seek to establish the economic value of their franchise agreements, and the loss of that value as a consequence of the government's action, based upon the franchise's alleged value in selling remaining inventory and servicing cars on the road during a liquidation process."); *A&D Auto Sales*, 748 F.3d at 1157.

## II. <u>Statement of Facts</u>

The material and undisputed facts that support this motion for summary judgment are set forth below.

### A. <u>Government's Financial Assistance To GM During The 2008 Credit Crisis</u>

In the fall of 2008, a historic recession and global credit crisis crippled the financial liquidity markets. *A&D Auto Sales*, 748 F.3d at 1147. Loans to automobile dealers and consumers came to an abrupt halt and automobile sales plummeted, falling to a 26-year low in 2008. *Id.;* Am. Compl. ¶ 70. GM suffered a steep drop in revenue and a dramatic loss of liquidity, putting its future in "grave jeopardy" and making its ability to continue operations "more and more uncertain with each passing day." *In re Gen. Motors Corp*, 407 B.R. 463, 476 (Bankr. S.D.N.Y. 2009), *aff'd, In re Motors Liquidation Co.*, 430 B.R. 65 (S.D.N.Y. 2010) (*GM Sale Op'n*) ("By any standard, there can be no doubt GM [was] insolvent.").

As a result, GM's chief executive appeared before Congress in December 2008 and requested financial assistance from the Government in the form of loans and lines of credit. *Id*. Later that month, the Secretary of the United States Department of the Treasury created the Automotive Industry Financing Program. *A&D Auto Sales*, 748 F.3d at 1147. Using authority under the Emergency Economic Stabilization Act of 2008, the Government promptly provided $13.4 billion in bridge loans to GM in December 2008 because GM otherwise would have been required to cease operations. *Id*. In exchange for these Treasury loans, GM agreed to submit a viability plan demonstrating that the company could achieve financial stability with the help of Government funds. *Id.*

GM submitted its viability plan in February 2009. *Id*. By March 2009, GM reported liabilities of $172 billion, with only $82 billion in assets.[2] *GM Sale Op'n*, 407 B.R. at 475. After a Presidential Task Force on the Auto Industry reviewed GM's proposed viability plan, President Obama announced that the plan was not satisfactory and did not justify a new investment of taxpayer dollars. *Id.* at 478-79. Rather than allowing GM to liquidate in bankruptcy, however, the President stated that the Government would provide assistance to GM, conditioned upon GM substantially reducing its debt and submitting a more aggressive business plan. *Id.* at 479. The Treasury then lent more money to GM, enabling it to survive until June 1, 2009, when it filed for bankruptcy protection under chapter 11 of the Bankruptcy Code. *Id.*

### B. GM Offered Every Dealership A Participation Agreement Or A Wind-Down Agreement

On June 1, 2009 – the same day that it filed for bankruptcy – GM filed a motion in the bankruptcy court requesting approval to sell substantially all of its assets under a Master Sale and Purchase Agreement (Sale Agreement) to a new entity, Vehicle Acquisition Holding, LLC, or "New GM." *GM Sale Op'n*, 407 B.R. at 473-474. To facilitate the sale, the United States and Canada agreed to provide debtor-in-possession financing, with Treasury providing $30.1 billion in financing to support GM through its bankruptcy and restructuring. *Id.* at 473-474, 479.

As part of the Sale Agreement, GM offered Participation Agreements to approximately 4,100 of the 6,000 GM dealerships. *Id.* at 476; A36, 114, 120. These agreements allowed signatories to continue to serve as dealers for New GM, with certain modifications to the existing dealership agreements designed to make GM more competitive. *Id*. Over 99 percent of the GM

[2] The liquidation value of these assets would have been "less than 10% of that $82 billion amount." *GM Sale Op'n*, 407 B.R. at 476; *In re Gen. Motors Corp.*, 409 B.R. 24 (Bankr. S.D.N.Y. 2009) (holding that the proceeds available in a liquidation would be "between $6.5 billion and $9.7 billion.").

dealers that were offered the Participation Agreement signed the agreement. *GM Sale Op'n*, 407 B.R. at 476; A71, 113.

Also on June 1, 2009, GM offered the remaining 1,900 dealerships, including all of the GM plaintiffs in this case, Wind-Down Agreements or Deferred Terminations Agreements (collectively Wind-Down Agreements). *Id.*; *A&D Auto Sales*, 748 F.3d at 1149; A43, 120. GM offered these Wind-Down Agreements as an alternative to rejecting the dealership agreements in bankruptcy under Section 365 of the Bankruptcy Code. *GM Sale Op'n*, 407 B.R. at 476, 514; A3, 71, 153-54. The agreements provided a "softer landing" than rejection and provided for an "orderly" wind-down of the dealers' operations. *Id.* at 476, 514. For example, the agreement allowed dealers to remain in business for 17 months (from June 2009 through October 2010) to sell remaining new cars, purchase GM parts, and service GM cars. A8, 36-37 (Declaration of GM Chief Executive Officer Frederick A. Henderson) ("GM has offered the Wind-Down Dealers the opportunity to accept 'wind-down' agreements that will allow them to stay in business until October 2010 so that they can – in an orderly fashion – sell down their inventory and provide warranty service to customers with the continued support of GM."), A43 (Mr. Henderson's June 12, 2009 Congressional Testimony).

The Wind-Down Agreement also included a cash payment, which for most dealers was $1,000 for each car in their inventory and reimbursement for eight months of remaining rent. A4-5, 153. For example, one of the GM plaintiffs asserting claims in this case, Serra Chevrolet, Inc., signed a Wind-Down Agreement pursuant to which GM agreed to pay Serra Chevrolet $582,723, a quarter of which ($145,680) was paid immediately.[3] A14-15. The Wind-Down

[3] After the Wind-Down Agreements were signed, Congress passed legislation authorizing GM dealers, including those that signed a Wind-Down Agreement, to seek reinstatement to the GM dealer network through binding arbitration. *See* § 747 of the Consolidated Appropriations Act 2010, Pub. Law 111–117, 123 Stat. 3034 (2009). Serra

Agreements also allowed the dealers to continue to participate in GM's marketing programs and acquire used vehicles at the company's auctions. A120. Recognizing the significant benefits of these agreements, the bankruptcy court determined that the agreements were "valid and binding contracts" and provided "good and sufficient consideration" to the GM dealers. A71, 86 (Sale Order). Over 98 percent of the dealers that were offered the Wind-Down Agreement signed the agreement. *GM Sale Op'n*, 407 B.R. at 476, A36, A71, 114, 121.

### C. Only Six GM Plaintiffs' Dealership Agreements Were Rejected In Bankruptcy

The bankruptcy court approved the Sale Agreement between Old GM and New GM in July 2009. *GM Sale Op'n*, 407 B.R. at 473-475. By that point, the Wind-Down Agreements and Participation Agreements had already been signed by the GM dealers. *Id*. at 476. Given the widespread acceptance of these agreements, the Unofficial GM Dealer Committee[4] did not object to the Sale Agreement, and New GM assumed the Wind-Down Agreements and Participation Agreements as part of the sale transaction. *Id.* at 512-513.

On July 6, 2009, the day after the bankruptcy court approved the Sale Agreement, Old GM filed a motion to reject the dealership agreements of the small number of dealers that did not sign a Participation Agreement or a Wind-Down Agreement. A103-137. In total, although GM's dealership network included over 6,000 dealers, Old GM sought to reject just 38 dealers in

---

Chevrolet filed an arbitration claim and the arbitrator agreed that Serra Chevrolet should be reinstated, which required it to return the wind-down payment to GM. A27-31. Even though Serra Chevrolet was reinstated as a dealer – and continues to serve as a GM dealer to this day (http://www.serrachevy.com/) – Serra Chevrolet is still suing the United States for a taking of its GM dealership agreement. Am. Compl. 12.

[4] There was no official GM dealers committee. The Unofficial GM Dealers Committee was "formed to act as a voice for the dealer body's collective interests in connection [with] GM's restructuring efforts." *GM Sale Op'n*, 407 B.R. at 512. The Committee was formed by the GM National Dealer Council in coordination with the National Automobile Dealers Association. *Id.*

bankruptcy.[5] A114, 134-137. The bankruptcy court granted GM's motion to reject the following month, in August 2009, leaving the dealers whose contracts were rejected with unsecured breach-of-contract claims against GM. A45-52; *GM Sale Op'n*, 407 B.R. at 513-515; *A&D Auto Sales*, 748 F.3d at 1149; 2 NORTON BANKR. L & PRACT. 3d § 46:23. Only six named GM plaintiffs had their dealership agreements rejected in bankruptcy; the other 59 named GM plaintiffs voluntarily agreed to terminate their GM dealership agreements as part of a Wind-Down Agreement. A1-4, 50-52.

## ARGUMENT

### I. Legal Standards

Summary judgment is "not a disfavored procedural short cut, but rather an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). Summary judgment must be granted where "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." RCFC 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Mann v. United States,* 334 F.3d 1048, 1050 (Fed. Cir. 2003). A "material fact" is one "that might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. Irrelevant or unnecessary factual disputes, however, do not preclude the entry of summary judgment. *Id*. The moving party must identify the legal and factual bases for its motion and specify those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. The claims at issue may then be resolved by summary judgment unless the responding party establishes there is a factual dispute that must be tried. *Anderson*, 477 U.S. at 247-48.

[5] The 38 dealers had 70 dealership agreements, as several dealers had multiple dealership agreements with GM. A134-137.

## II. The Court Should Enter Summary Judgment On The Takings Claims Of The GM Dealers Who Signed A Wind-Down Agreement

The premise of the GM plaintiffs' takings claim is that the Government forced GM to reject the plaintiffs' dealership agreements in bankruptcy. The uncontested facts disprove this premise for one simple reason: the vast majority of the GM plaintiffs' dealership agreements were not rejected in bankruptcy. Rather, those GM plaintiffs agreed to the termination of their dealerships as part of the Wind-Down Agreement, which also released the United States from liability relating to the termination of the dealership agreements. Given these undisputed facts, the Court should enter summary judgment in favor of the United States on the takings claims of the GM plaintiffs that signed the Wind-Down Agreements.

### A. Property Cannot Be Taken By Agreement

The Takings Clause of the Fifth Amendment provides that private property shall not "be taken for public use, without just compensation." U.S. Const. amend. V. It is well-established that no taking exists when an owner conveys its property voluntarily by agreement. *See Norman*, 429 F.3d at 1089 (holding that a voluntary transfer of property is "not a proper basis on which to premise a takings claim"); *Wyatt v. United States*, 217 F.3d 1090, 1097 (Fed. Cir. 2001); *BMR Gold Corp. v. United States*, 41 Fed. Cl. 277, 283 (1998) (no taking where plaintiff granted military consent to cross its land); *Turntable Fishery & Moorage Corp. v. United States,* 52 Fed. Cl. 256, 263 (2002) (no taking where plaintiff voluntary transferred common facilities to government in exchange for continued use of marina); *Brace v. United State*s, 72 Fed. Cl. 337, 360-362 (2006) (holding that a voluntary consent decree cannot give rise to a taking); *cf. Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1007 (1984) ("a voluntary submission of data by an applicant in exchange for the economic advantages of a registration can hardly be called a taking."); *L.L. Nelson Enters. v. Cnty. of St. Louis, Mo.*, 673 F.3d 799, 806 (8th Cir. 2012)

("When a person voluntarily surrenders liberty or property, the State has not deprived the person of a constitutionally-protected interest[]" under the Takings Clause or the Due Process Clause.) (citation and emphasis omitted).

The GM plaintiffs claim that the property interests taken by the Government were their dealership agreements with GM. *A&D Auto Sales*, 748 F.3d at 1152. According to the GM plaintiffs, the Government "required" GM to "obtain[ ] bankruptcy orders for the divestment of the ownership interests [in the dealership agreements]." Am. Compl. ¶ 67. For the vast majority of GM plaintiffs, however, no bankruptcy court order "divest[ed]" them of any ownership interest in a dealership agreement. Rather, in exchange for significant consideration, the GM plaintiffs agreed to the termination of their dealership agreements as part of the Wind-Down Agreement. A3-4. Specifically, each Wind-Down Agreement stated: "Dealer hereby terminates the Dealer Agreement by written agreement . . . [with] such termination to be effective on October 31, 2010," in exchange for a cash payment and 17 months for the plaintiff GM dealers to wind-down their operations. A4; *see also Gen. Motors, LLC v. Rapp Chevrolet, Inc.*, 2013 WL 2245472, at *2-3 (D. S.D. May 21, 2013); *Gen. Motors, LLC v. Bill Kelley, Inc.*, 2012 WL 5966527, at *2 (N.D. W. Va. Nov. 29, 2012). Indeed, the Wind-Down Agreement itself states that the termination of the GM dealership agreements was "voluntary." A3.

Because the GM plaintiffs that signed the Wind-Down Agreement agreed to the termination of their dealership agreements, their claims that the Government took their property interest in that agreement fails as a matter of law. *Norman*, 429 F.3d at 1089; *BMR Gold Corp*, 41 Fed. Cl. at 283; *Turntable Fishery*, 52 Fed. Cl. at 263. Accordingly, the Court should enter summary judgment in favor of the United States on the claims of the 59 GM plaintiffs that

signed the Wind-Down Agreement and agreed to the termination of their dealership agreements. A1 (list of GM plaintiffs that signed the Wind-Down Agreement).

**B. The Wind-Down Agreements Released The United States From All Claims Related To The Termination Of The GM Dealership Agreements**

The broad release language in each Wind-Down Agreement also defeats the takings claims of the GM plaintiffs who signed the agreement. Specifically, the Wind-Down Agreement signed by nearly every GM plaintiff in this case "release[d], settle[d], cancel[ed], discharge[d], and acknowledge[d] to be fully satisfied any and all claims" arising out of the termination of the GM plaintiffs' dealership agreements. A6. The released parties included old GM, as well as the "363 Acquirer, their Affiliates, or any of their respective members, partners, venturers, stockholders," or other affiliate parties. *Id*. The "363 Acquirer" referred to New GM, the acquirer of Old GM's assets under the Sale Agreement, which was approved by the bankruptcy court under section 363 of the Bankruptcy Code. *Id*.; *GM Sale Op'n*, 407 B.R. at 473, 485-86. It is undisputed that the United States was a stockholder of New GM, meaning that it was a released party under the Wind-Down Agreement. *GM Sale Op'n*, 407 B.R. at 482 ("Treasury will own 60.8% of New GM's common stock," and $2.1 billion of New GM's Series A Preferred Stock.); *A&D Auto Sales*, 748 F.3d at 1149 (same). Accordingly, the GM plaintiffs that signed the Wind-Down Agreement released the United States from all claims relating to the termination of their dealership agreements, including the takings claims in this lawsuit.

Releases are interpreted in accordance with their plain language under both Federal law and Michigan state law, which governs the Wind-Down Agreement. *Henderson Cnty. Drainage Dist. No. 3 v. United States*, 53 Fed. Cl. 48, 54 (2002) (citing *George Hyman Constr. Co. v. United States*, 832 F.2d 574, 579 (Fed. Cir. 1987)); *Gortney v. Norfolk & W. Ry. Co.*, 216 Mich. App. 535, 540, 549 N.W.2d 612, 614 (1996). Here, there is no question that the release bars

claims against the United States related to the termination of the GM plaintiffs' dealership agreements. Indeed, the fundamental bargain of the Wind-Down Agreements was that the dealers would "voluntar[ily] terminate[ ]" their dealership agreements and release all claims related to that termination, in exchange for receiving "certain monetary consideration," and the ability to sell remaining inventory and service GM cars through October 2010. A3-8, 43, 114, 153. Given their release of claims, the GM plaintiffs that signed the Wind-Down Agreements are barred from pursuing takings claims against the United States, because those claims arise out of the termination of the dealership agreements and the United States is a released party as a stockholder of New GM. *Skotak v. Vic Tanny Int'l, Inc.*, 203 Mich. App. 616, 617-620 (1994); *Johnson, Drake & Piper, Inc. v. United States*, 209 Ct. Cl. 313, 330, 531 F.2d 1037, 1047 (1976). The Court should therefore enter summary judgment in favor of the United States on the claim of the GM plaintiffs that signed the Wind-Down Agreement.

## III. The Court Should Grant Summary Judgment In Favor Of The United States On The Takings Claims Of Every GM Plaintiff Because Each Was Offered A Wind-Down Agreement

The Court should also enter summary judgment on the takings claims of all GM plaintiffs, including those that chose not to sign the Wind-Down Agreement. As described above, the Wind-Down Agreement was offered to all GM dealers and provided substantial benefits, including a cash payment, and the ability to (1) sell remaining inventory, (2) purchase GM service parts, and (3) "perform warranty service and other normal service operations" for 17 months. A8, 120. This is unquestionably more than the GM plaintiffs would have received had GM been liquidated in an orderly bankruptcy proceeding, the only "but-for" scenario that survived the Government's motion to dismiss the GM plaintiffs' claims for failure to adequately plead the economic loss prong of the *Penn Central* test. *Penn Cent. Transp. Co. v. City of New*

*York*, 438 U.S. 104, 124, 137 (1978); *Colonial Chevrolet*, 123 Fed. Cl. at 146 (GM plaintiffs may only seek to show economic loss "based upon the franchise's alleged value in selling remaining inventory and servicing cars on the road during a liquidation process.").

Specifically, the GM plaintiffs claim that their dealership agreements would have maintained value during a GM liquidation because they would have retained the right to "sell existing inventory [and] parts" and "service and repair vehicles on the road." *Colonial Chevrolet*, 123 Fed. Cl. at 145. But the Wind-Down Agreement either offered or provided to the GM plaintiffs these same benefits, in addition to a cash payment.[6] A8, 36, 43, 120-121, 153. As a result, the GM plaintiffs cannot show economic loss as a result of the alleged Government action. *A&D Auto Sales*, 748 F.3d at 1157 ("economic loss requires a plaintiff to show what use or value its property would have but for the government action."). Because the GM plaintiffs cannot show economic loss – a necessary element of any takings action – their claims fail as a matter of law. *Id.*

The Federal Circuit's *Cienega Gardens* decision mandates this result. 503 F.3d at 1286-87. In that case, owners of low-income housing units alleged that the United States took their property by enacting legislation that prevented them from pre-paying their federally subsidized mortgages, thus barring them from removing certain regulatory restrictions on the use of their property. *Cienega Gardens*, 503 F.3d at 1270. The trial court agreed with plaintiffs that the enactment of these statutes constituted a taking, but the Federal Circuit vacated that decision, holding that the trial court erred by "fail[ing] to consider the offsetting benefit that the statutory scheme afforded which were specifically designed to ameliorate the impact of the prepayment restrictions." *Id.* at 1282-1283 (citing *Penn Cent.*, 438 U.S. at 137). The benefits included the

---

[6] As unsecured creditors, the GM plaintiffs would have received "nothing" had GM liquidated in bankruptcy. *GM Sale Op'n*, 407 B.R. at 474-75, 481.

opportunity to (1) sell the property, or (2) enter into a use agreement that allowed the property owners the "right to earn higher dividends, rent increases from current tenants, repair and capital improvement loans," and other benefits. *Id.*

Indeed, the Federal Circuit held that, so long as the benefits were offered, it did not matter whether those benefits were actually accepted. *Id*. at 1283 (failure to consider offsetting benefits "affects all of the plaintiffs," including those that declined the benefits.). For example, the Court held that the sale option should have been considered in the takings analysis for all plaintiffs as it was "plainly an available alternative because many owners in fact elected to sell their property." *Id*. at 1286. As a result, the Court concluded that the option should have been considered in analyzing the takings claims of all plaintiffs, including those that had not availed themselves of the option. Specifically, the Court determined that that "available offsetting benefits must be taken into account generally [in a takings analysis], along with particular benefits that were actually offered to the plaintiffs." *Id.* at 1287.

As required by *Cienega Gardens*, this Court must consider the benefits offered to and received by the GM plaintiffs, including the terms of the Wind-Down Agreement, in any takings analysis. It is undisputed that the Wind-Down Agreement was offered to every GM plaintiff, and that most GM plaintiffs signed the agreement. *GM Sale Op'n*, 407 B.R. at 476; A43, 71, 114, 120-121. In addition to a cash payment, the Wind-Down Agreement permitted plaintiffs to sell down their inventory and service GM cars during an orderly wind-down period. A8, 43, 114, 120-121, 153. Because these are the same benefits the GM plaintiffs claim they were deprived of by the Government, the GM plaintiffs cannot show economic loss and their takings claim fails as a matter of law. *Id.* at 1287; *A&D Auto Sales*, 748 F.3d at 1157. As a result, the Court should enter summary judgment in favor of the United States.

*　　*　　*

The Government's unprecedented financial assistance to GM saved a deeply insolvent company. There is no dispute that GM would have been liquidated in bankruptcy had the Government not intervened, as it is the only "but-for" scenario at issue in this case. Am. Compl. ¶ 70b; *Colonial Chevrolet*, 123 Fed. Cl. at 140-146. This case, therefore, boils down to nothing more than the GM plaintiffs suing the United States for saving GM. The consequences of not doing so, of course, would have been "appalling" for GM's "creditors, employees, and our nation." *In re Gen. Motors Corp.*, 2009 WL 2033079 (S.D.N.Y. July 9, 2009). The GM plaintiffs were not forced to experience those consequences, but instead were offered (and in most cases signed) Wind-Down Agreements on generous terms. There is no reason to undergo a lengthy discovery process when the GM plaintiffs (1) are suing for benefits they already received or were already offered, and (2) are asserting claims that the vast majority of the plaintiffs have released. Accordingly, the GM plaintiffs' claims fail as a matter of law, and the Unites States is entitled to summary judgment.

## CONCLUSION

For these reasons, the Court should grant summary judgment in favor of the United States on the takings claims of the GM plaintiffs.

Respectfully submitted,

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General

/s/ Robert E. Kirschman, Jr.
ROBERT E. KIRSCHMAN, JR.
Director

/s/ Kenneth M. Dintzer
KENNETH M. DINTZER
Deputy Director
Commercial Litigation Branch
National Courts Section
Civil Division
Department of Justice
PO Box 480
Ben Franklin Station
Washington, D.C. 20044
(202) 616-0385
Kenneth.Dintzer@usdoj.gov

OF COUNSEL:

ELIZABETH M. HOSFORD
Assistant Director

JAMES P. CONNOR
DAVID A. HARRINGTON
Senior Trial Counsel

AMELIA R. LISTER-SOBOTKIN
JOSHUA A. MANDLEBAUM
MICHAEL A. RODRIGUEZ
ALISON S. VICKS
Trial Attorneys

December 7, 2015

Attorneys for Defendant