# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Nos. 10-647C, 11-100C, and 12-900C
(Filed: March 7, 2016)
**CONSOLIDATED**

| | | |
|---|---|---|
| COLONIAL CHEVROLET CO., INC., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | No. 10-647C<br>(Judge Firestone)<br>(Lead Case) |
| ************************************<br>ALLEY'S OF KINGSPORT, INC., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | No. 11-100C<br>(Judge Firestone) |
| ************************************<br>SPITZER MOTOR CITY, INC., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | No. 12-900L<br>(Judge Firestone) |

**GM PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR RELIEF UNDER RCFC 56(d)**
**and, in the alternative,**
**GM PLAINTIFFS' BRIEF IN RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Richard D. Faulkner
BLUME, FAULKNER & SKEEN, PLLC
111 W. Spring Valley Rd., Suite 250
Richardson, TX 75081
P: (214) 373-7788

Harry Zanville
500 West Harbor Dr., Suite 1201
San Diego, CA 92101
P: (619) 400-7164

Joe Kendall
Jody Rudman
KENDALL LAW GROUP, PLLC
3232 McKinney Ave.
Suite 700
Dallas, TX 75204
P: (214) 744-3000

Steven J. Eagle
3301 Fairfax Dr.
Arlington, VA 22201
P: (703) 993-8054

Date: March 7, 2016

ATTORNEYS FOR PLAINTIFFS

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........ v

INTRODUCTION ........ 1

QUESTIONS PRESENTED ........ 2

AUTHORITIES INVOLVED ........ 2

SUMMARY OF ARGUMENT ........ 3

FACTUAL BACKGROUND ........ 5

ARGUMENT AND AUTHORITIES ........ 8

I. The Defendant's Motion Should be Abated and Discovery Should Proceed. ........ 8

A. The Defendant's Summary Judgment Motion Is Premature. ........ 8

B. A Motion under RCFC 56(d) Should Be Liberally Granted to Respond to a Premature Summary Judgment Motion. ........ 9

C. The GM Plaintiffs Are Entitled to Discovery. ........ 11

D. Full Merits Discovery on Liability Issues Should Proceed. ........ 18

II. The Defendant's Motion Should be Denied because Genuine Issues of Material Fact Preclude Summary Judgment. ........ 19

A. There Are Genuine Issues of Material Fact regarding whether the Wind Down Agreements Are Effective, and against Whom. ........ 21

B. There Are Genuine Issues of Material Fact regarding whether the Wind-Down Agreements and Releases Are Valid under Michigan Law. ........ 21

C. The Mere Offer of a Wind Down Agreement Does Not Mean No Economic Loss Was Suffered. ........ 24

CONCLUSION ........................................................................................................................ 26

PRAYER FOR RELIEF ........................................................................................................ 27

# TABLE OF AUTHORITIES

## Cases

*A & D Auto Sales, Inc. v. U.S.*,
748 F.3d 1142 (Fed. Cir. 2014) .......... 13

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) .......... 8, 19, 20

*Baron Servs., Inc. v. Media Weather Innovations, LLC*,
717 F.3d 907 (Fed. Cir. 2013) .......... 10

*Brooks v. Holmes*,
413 N.W.2d 688 (Mich. Ct. App. 1987) .......... 22

*CCA Assocs. v. U.S.*,
667 F.3d 1239 (Fed. Cir. 2011) .......... 25

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) .......... 9, 20

*Cienega Gardens v. U.S.*,
503 F.3d 1266 (Fed. Cir. 2007) .......... 16, 20, 25

*Clear Creek Cmty. Servs. Dist. v. U.S.*,
100 Fed. Cl. 78 (2011) .......... 18

*Denton v. Utley*,
86 N.W.2d 537 (Mich. 1957) .......... 22

*Dunkin' Donuts of Am., Inc. v. Metallurgical Exoproducts Corp.*,
840 F.2d 917 (Fed. Cir. 1988) .......... 8

*Gonzalez v. U.S.*,
87 Fed. Cl. 242 (2009), *aff'd*, 358 F. App'x. 170 .......... 20

*Grzebok v. Kerr*,
283 N.W.2d 654 (Mich. Ct. App. 1979) .......... 22

*Hobbs v. Brush Elec. Light Co.*,
42 N.W. 965 (Mich. 1889) .......... 21

*Jade Trading, LLC v. U.S.*,
60 Fed. Cl. 558 (2004) .......... *passim*

*Long Island Sav. Bank, FSB v. U.S.*,
503 F.3d 1234 (Fed. Cir. 2007) ........ 20

*Louisiana-Pac. Corp. v. U.S.*,
656 F.2d 650 (Ct. Cl. 1981) ........ 23

*McGuire v. U.S.*,
97 Fed. Cl. 425 (2011) ........ 20

*Metro. Life Ins. Co. v. Bancorp Servs., LLC*,
527 F.3d 1330 (Fed. Cir. 2008) ........ 8, 9, 11

*Nat'l Life Ins. Co. v. Solomon*,
529 F.2d 59 (2d Cir. 1975) ........ 9

*Niagara Mohawk Power Corp. v. U.S.*,
525 F. 2d 1380 (Fed. Cir. 1975) ........ 20

*Opryland USA, Inc. v. Great American Music Show, Inc.*,
970 F.2d 847 (Fed. Cir. 1992) ........ 10

*Petrie v. Jones Transfer Co.*,
No. 191806, 1997 WL 33343979 *1 (Mich. Ct. App. Oct. 24, 1997) ........ 22

*Resolution Trust Corp. v. N. Bridge Assocs.*,
22 F.3d 1198 (1st Cir. 1994) ........ *passim*

*Sharpe v. Taber*,
No. 244040, 2004 WL 316175 (Mich. Ct. App. Feb. 19, 2004) ........ 22

*Tahoe Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*,
535 U.S. 302 (2002) ........ 20

*Thiesen Vending Co. v. U.S.*,
58 Fed. Cl. 194 (2003) ........ 10, 11

*Trongo v. Trongo*,
335 N.W.2d 60 (Mich. Ct. App. 1983) ........ 22

*Weiser v. Welch*,
70 N.W. 438 (Mich. 1897) ........ 21, 22

**Statutes**

*Consolidated Appropriations Act of 2010*,
Pub. L. No. 111-117, § 747, 123 Stat. 3034 (2009) ........ 8

**Rules**

Fed. R. Civ. P. 56(f) ........ 9

RCFC 26 ........ 3

RCFC 26(a)(1)(B) ........ 3

RCFC 26(d) ........ 3

RCFC 56 ........ 2, 9, 11

RCFC 56(c) ........ 19

RCFC 56(d) ........ 2, 5, 9

RCFC 56(f) ........ 9, 10

RCFC Appendix A, Section II ........ 3

## INTRODUCTION

This takings lawsuit was originally filed on September 27, 2010. The General Motors ("GM") Plaintiffs consist of certain named class representative plaintiffs, additional named plaintiffs, and putative class members. *See generally* Dkt. 101 (Plaintiff's Second Amended Complaint) at ¶¶ 2, 4, 5, 7-11, 72-82.[1] To date, no discovery has been conducted. *See* App. 1-20. This is through no fault of the GM Plaintiffs; the Defendant has sought for years to forestall it.

In brief summary: after two extensions to answer the original complaint, the Defendant filed its first and then second motion to dismiss. *See* Dkt. 11 and 24. The Defendant lost both. Dkt. 43. The Defendant sought an interlocutory appeal to the Federal Circuit, during which proceedings were stayed, over the objections of the Plaintiffs. Dkt. 53, 76, 80, 82, 83, 84, 94. The Defendant lost its appeal, in a decision handed down on April 7, 2014. Dkt. 95.

The Plaintiffs then filed an amended complaint. Dkt. 101. Once again, the Defendant moved to dismiss. Dkt. 104. Once again, the Defendant lost. Dkt. 127.

The Order of this Court denying the Defendant's most recent motion to dismiss was issued on September 9, 2015. A mere three weeks after filing its answer, and before the required early meeting of counsel, before Rule 26 disclosures, and before a single discovery request was – or even could be – issued, the Defendant has now moved for summary judgment against the GM Plaintiffs on a skeletal and undeveloped record. Dkt. 136. The motion is premature, discovery is needed to respond to it, and the issues in it are deeply mired in questions of fact.

[1] This lawsuit also alleges claims and a putative class action on behalf of certain Chrysler dealers. *Id., seriatim*. To that extent, this case has been consolidated with two other lawsuits alleging similar takings claims on behalf of other Chrysler dealers. Dkt. 135. None of the Chrysler plaintiffs or Chrysler-specific claims are at issue in the Defendant's pending motion or this response.

## QUESTIONS PRESENTED

1. Whether the Court should grant the GM Plaintiffs discovery under RCFC 56(d).

2. Whether the GM Plaintiffs are entitled to conduct full merits discovery given the fact that many of the issues for which discovery is needed to respond to the Defendant's motion cannot easily be segregated from other merits discovery in this and the Chrysler lawsuits, as well as the age of this lawsuit and the fact that the Plaintiffs have been, to date, continually forestalled by the Defendant from developing their claims through the discovery process.

3. Whether the Court should deny the Defendant's Motion for Summary Judgment at this time, given the existence of genuine issues of material fact.

## AUTHORITIES INVOLVED

RCFC 56 states, in relevant part:

(a) **Motion for Summary Judgment or Partial Summary Judgment.** A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. . . .

. . .

(b) **Procedures.**

(1) **Supporting factual positions.** A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

(A) citing to particular parts of materials in the record . . .; or
(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

(2) **Objection that a Fact is not Supported by Admissible Evidence.** A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.

. . .

(c) **When Facts Are Unavailable to the Nonmovant.** If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
(1) defer considering the motion or deny it;

(2) allow time to obtain affidavits or declarations or to take discovery; or
(3) issue any other appropriate order.

. . . .

RCFC 26(d) states:

(d) **Timing and Sequence of Discovery.**

(1) **Timing.** A party may not seek discovery from any source before the parties have conferred as required by Appendix A ¶ 3, except in a proceeding exempted from initial disclosure under RCFC 26(a)(1)(B), or when authorized by these rules, by stipulation, or by court order.

## SUMMARY OF ARGUMENT

The Defendant's motion for summary judgment was filed before a single document has been exchanged – or could even have been sought – in discovery. Other than service of the Defendant's Rule 26 disclosures (which occurred after the Defendant's motion was filed), no discovery has taken place in this five-year-old lawsuit.[2] No interrogatories, no depositions, no requests for admission nor requests for the production of documents have yet been made, or could have been served. The Defendant's pending motion was filed before the parties even had their Early Meeting of Counsel pursuant to RCFC 26.[3]

Aside from being entirely premature, the Defendant's motion concerns matters that are anchored in genuine issues of material fact, and which certainly cannot be responded to or resolved in an early summary judgment proceeding and without a developed factual record. For example,

[2] During the past almost-six years, the Plaintiffs have repeatedly requested that the Defendant voluntarily produce specific documents that were provided to others including the Office of the Inspector General for the Troubled Asset Relief Program ("SIGTARP") in connection with SIGTARP's report, "Factors Affecting the Decisions of General Motors and Chrysler to Reduce their Dealership Networks," July 19, 2010. The government never produced them nor provided a reason for refusing to do so. *See* App. 10-20. *See also* Dkt. 78 (outlining Plaintiffs' numerous efforts to get documents from the government).

[3] *See* RCFC 26; RCFC Appendix A, Section II ("Early Meeting of Counsel"). The Defendant's post-motion initial disclosures hardly suffice for the level of discovery needed to litigate the issues in this case or respond thoroughly to the issues asserted in the Defendant's motion.

the Defendant contends the GM plaintiffs were offered wind down agreements and that those offers preclude their takings claims. Yet the wind down agreements present a myriad of fact-specific issues. Who signed them, who appealed a wind down decision nonetheless, who sought arbitration to be reinstated to the GM dealer network, who was reinstated, and the effect of any of that on any wind down agreements that were in fact signed, are just some such issues. Similarly, the Defendant contends the wind down agreements released the Defendant from this takings claim. Yet issues of fact exist, including whether the releases are valid, whether the wind down agreements were signed under duress, whether there was misrepresentation or the releases were fraudulently induced, and whether a release of the United States from this Constitutional takings claim even occurred, or could have occurred under these facts.

Indeed, the Defendant seems to have forgotten its earlier acknowledgement in this very lawsuit that these issues are fact-bound. In the parties' Joint Preliminary Status Report filed on June 29, 2012, (Dkt. 57), the Defendant admitted that discovery would be needed before an anticipated dispositive motion. The Defendant further stated that "[r]elevant factual and legal issues include . . . whether plaintiffs' participation in arbitration and/or acceptance of wind-down agreements bars their claims under principles of release, accord and satisfaction, payment and set-off, failure to exhaust administrative remedies, or others" and "whether plaintiffs executed releases of their claims" (*Id.* at 6-8), *i.e.,* the very issues on which it now seeks a judgment without any discovery at all. The Defendant's previous admission that these very issues present material facts and require discovery warrants an abject denial of the Defendant's motion at this time.

Finally, the Defendant contends that the mere offer to the GM Plaintiffs of a "soft landing" in wind down, *i.e.*, the ability to sell down inventory and service cars on the road for a certain period of time, precludes their takings claims. This, too, presents a fact-specific inquiry. It cannot

be responded to or adjudicated without development of the record and even expert testimony regarding what could have happened in a more traditional bankruptcy process or wait-and-hold scenario, as opposed to what was offered. The argument also rests on factual issues of whether the mere unilateral offer suffices given the circumstances that accompanied these alleged wind down offers, and what the involvement of the Defendant was.

The Court should defer the Defendant's motion and grant the GM Plaintiffs relief pursuant to RCFC 56(d) because the GM Plaintiffs cannot, without a developed record, present facts essential to their opposition. Furthermore, for the sake of efficiency and economy of the Court's judicial resources, to avoid costly and protracted disputes about limits on discovery topics, and given the age of this case and the intertwined nature of issues in the consolidated lawsuits, discovery should not be limited to the matters set forth in the Defendant's motion but should proceed as full merits discovery on liability.

## FACTUAL BACKGROUND

As part of the Troubled Asset Relief Program ("TARP"), the Automotive Industry Financing Program was created on December 19, 2008, to permit the U.S. Department of Treasury to loan money to, and invest in, American automakers. *See* Office of the Inspector General for the Troubled Asset Relief Program, "Factors Affecting the Decisions of General Motors and Chrysler to Reduce their Dealership Networks," July 19, 2010 ("SIGTARP"), at App. 21-65. In 2009, the Obama Administration created a Treasury Auto Team (the "Auto Team") which reported to the Presidential Task Force on the Auto Industry and was responsible for reviewing and evaluating the restructuring plans submitted by General Motors and Chrysler as a requirement to receiving federal bailout money. *Id.* at App. 26-27. The Auto Team was also responsible for negotiating the terms of any further financial assistance. The Auto Team was led by two advisors, Ron Bloom

and Steven Rattner. Bloom was a former investment banker and head of collective bargaining for the United Steelworkers Union. Rattner was the co-founder of a private equity firm. The Team included Treasury employees and reported to Treasury Secretary Timothy Geithner and National Economic Council Director Lawrence Summers. *Id.* at App. 26.

In February 2009, GM and Chrysler submitted restructuring plans, which were required as a precondition to receiving additional bailout funds.[4] GM's plan called for reducing the number of its dealerships through the process of attrition and a gradual restructuring from 2009 to 2014. *Id.* at App. 27-28. The Auto Team rejected GM's proposal in late March. The Auto Team demanded a more rapid pace for GM to close dealerships as a condition to receiving more money. "GM was given 60 days to submit a 'more aggressive plan' overall, including planning for their dealership terminations. . ." App. 37.

The Auto Team knew that dealerships were protected by state franchise laws, which would make closing dealerships involuntarily more costly. App. 31. The Auto Team, together with its legal adviser Matt Feldman, therefore engineered a scheme for GM to utilize the bankruptcy system as a means of usurping state franchise laws and creating a cheaper, faster path to the smaller dealer network which the Auto Team was demanding.[5] *Id. See also* "Overhaul: An Insider's Account of the Obama Administration's Emergency Rescue of the Auto Industry" by Steven Rattner, ed. 2011, First Mariner Books. The Auto Team deemed it a "waste of taxpayer resources" for GM to exit bankruptcy before reducing its dealership network. App. 37. Importantly, though Ron Bloom acknowledged that the dealership terminations *could have been left out of the*

[4] Since the pending motion for summary judgment only concerns the GM Plaintiffs, the remaining focus of this discussion and this brief will be on GM and its dealers.

[5] Tellingly, when asked by SIGTARP what GM would save by closing any particular dealership, one GM official responded the answer is usually "not one damn cent." App. 49.

*restructurings altogether*, he felt that doing so was not what the government required; it "would have been inconsistent with the President's mandate for 'shared sacrifice.' " App. 57.

A Treasury document describes the Defendant's novel use of the bankruptcy system as a "quick and surgical" way for GM to " 'make it easier for Chrysler and General Motors to clear away old liabilities.' " App. 37. "In an internal memo, Auto Team officials reiterated that their goal was to take advantage of the bankruptcy code to reject dealership franchise agreements without significant up-front costs." *Id.* The Team described it as a " 'unique opportunity to reconfigure the dealer network outside the confines of restrictive state franchise law.' " *Id.*

GM declared bankruptcy on June 1, 2009. App. 42. It then notified 1,454 dealerships that they would be wound down and terminated. App. 40. Wind down agreements were sent in early June. App. 43. To receive any compensation at all these dealerships had a mere few days – until June 12, 2009 – to read, understand, evaluate, sign and submit wind-down agreements. *Id.* There was no negotiating the terms; dealers were required to sign and receive a pittance of value, or suffer the death of one's franchise. Compensation was determined according to a formula,[6] but again with no negotiation. And indeed, certain valuable assets such as parts, equipment, franchise value, exclusive customer lists, and land were not part of the formula at all. App. 66-70. *See also* Dkt. 118 (listing Plaintiffs' valuable property). On June 3, 2009, the United States Senate Committee on Commerce, Science and Transportation held a hearing in which GM's CEO Fritz Henderson testified in the face of heavy criticism and outcry. App. 71-204.[7] Under outside

[6] According to the SIGTARP report, the formula considered dealership rent, sales, and new vehicle inventory as of late May 2009. App. 43.

[7] As noted, the Defendant has provided a small subset of documents to the plaintiffs in its RCFC 26 disclosures, which were served after the pending motion was filed. Those documents include the transcript from the referenced Senate Committee hearing.

pressure, GM put in place an appeals process, of which 935 dealers availed themselves. Sixty-four were granted reversals. App. 43-44.

In December 2009, Congress enacted legislation to allow dealerships to file for a unique species of arbitration regarding wind down decisions. *See* Dkt. 136 at 8 n. 3 (citing *Consolidated Appropriations Act of 2010*, Pub. L. No. 111-117, § 747, 123 Stat. 3034 (2009)). *See also* App. 47. A significant number of terminated GM dealers took that opportunity. 1,169 GM dealerships filed for arbitration. *Id.* GM offered reinstatement to 666 of them, including 216 "complete wind down" dealerships. *Id.*

With 935 GM dealers appealing termination decisions, 1,169 GM dealers seeking arbitration, and 666 reinstated, it is readily apparent that the releases and wind down payments on which the Defendant now relies are of dubious force and effect, and certainly that further development of the record is needed before the existence of these agreements can be deemed preclusive as a matter of law.

## ARGUMENT AND AUTHORITIES

### I. The Defendant's Motion Should be Abated and Discovery Should Proceed.

#### A. The Defendant's Summary Judgment Motion Is Premature.

The Defendant's motion is improper because it is premature. "Under the Federal Rules of Civil Procedure, the parties must be afforded adequate time for general discovery before being required to respond to a motion for summary judgment." *Metro. Life Ins. Co. v. Bancorp Servs., LLC*, 527 F.3d 1330, 1336-37 (Fed. Cir. 2008) (citations omitted). *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986) (requiring nonmovant to present affirmative evidence to defeat a properly supported motion for summary judgment *so long as* nonmovant "has had a full opportunity to conduct discovery"); *Dunkin' Donuts of Am., Inc. v. Metallurgical Exoproducts Corp.*, 840 F.2d 917, 919 (Fed. Cir. 1988) ("summary judgment is inappropriate unless a tribunal

permits the parties adequate time for discovery"); *Nat'l Life Ins. Co. v. Solomon*, 529 F.2d 59, 61 (2d Cir. 1975) (stating summary judgment is improper when the opposing party has not conducted pretrial discovery). Indeed, the Federal Circuit has vacated a district court's grant of summary judgment and remanded for discovery where a motion for summary judgment was filed before a discovery schedule was established, and before any significant discovery had occurred. *Metro. Life*, 527 F.3d 1330. *See also Resolution Trust Corp. v. N. Bridge Assocs.*, 22 F.3d 1198 (1st Cir. 1994) (vacating and remanding grant of summary judgment and denial of motion for discovery). In light of this precedent, the Defendant's motion should be denied at this time. *See* App. 1-20.

B. A Motion under RCFC 56(d) Should Be Liberally Granted to Respond to a Premature Summary Judgment Motion.

When, as here, a party files a summary judgment motion before adequate time for discovery permits a sufficient record for a response, RCFC 56(d), like its predecessor RCFC 56(f),[8] authorizes the Court to defer consideration or deny the motion, or allow time for discovery. *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986) (stating Rule 56(f) protects nonmovants from being "railroaded" by premature summary judgment motions).

Motions for discovery under RCFC 56(d) are granted upon the showing of the nonmovant that for specified reasons it cannot present facts essential to justify its opposition. RCFC 56(d). Importantly, where, as here, "there has been no adequate initial opportunity for discovery, a strict showing of necessity and diligence that is otherwise required" when a party requests additional discovery "does not apply." *Metro. Life*, 527 F.3d at 1337 (citations omitted).

Former RCFC 56(f) was long recognized as generally favored. This Court has advised that a Rule 56 request for discovery should be "liberally granted." *Jade Trading, LLC v. U.S.*, 60 Fed.

[8] The Rule's Advisory Committee notes accompanying the 2011 amendment state that RCFC 56 was entirely rewritten to conform to Rule 56 of the Federal Rules of Civil Procedure. RCFC 56(d) is substantially similar to former RCFC 56(f) and former Fed. R. Civ. P. 56(f).

Cl. 558, 565 (2004) (citing *Thiesen Vending Co. v. U.S.*, 58 Fed. Cl. 194, 197 (2003) (further citation omitted). *See also Resolution Trust*, 22 F.3d at 1203 ("Consistent with the salutary purposes underlying Rule 56(f), district courts should construe motions that invoke the rule generously, holding parties to the rule's spirit rather than its letter.") (Internal citations omitted.). Indeed, the Defendant itself successfully sought the protections of Rule 56(f) when it deemed an opponent's pre-discovery motion for summary judgment to be premature. In *Jade Trading, LLC v. U.S.*, Cause No. 1:03-cv-2164-MCW, at Dkt. 11, the United States successfully moved for relief under RCFC 56(f) in response to the plaintiffs' motions for summary judgment. It argued, "All three motions for partial summary judgment are grossly premature and, pursuant to RCFC 56(f), should be refused by the Court; or, in the alternative, either proceedings with respect thereto should be continued until after the completion of discovery, or such other relief should be granted as necessary to provide defendant with an adequate opportunity to respond to the motions." App. 220.

The Federal Circuit has deemed it an abuse of discretion for the district court to deny a litigant's RCFC 56 request to delay ruling on a premature summary judgment motion where discovery was sought to address the issues. *See Baron Servs., Inc. v. Media Weather Innovations, LLC*, 717 F.3d 907, 914 (Fed. Cir. 2013). Even the dissent in *Baron Services* recognized that "parties generally should be permitted to develop the record, obtain claim construction, and engage in discovery prior to consideration of summary judgment"). *Id.* at 919 (Reyna, J. dissenting). *See also Opryland USA, Inc. v. Great American Music Show, Inc.*, 970 F.2d 847, 853 (Fed. Cir. 1992) (reversing summary judgment where nonmovant was deprived of opportunity to develop discovery after showing its need to do so in order to respond adequately to motion).

The Court has previously embraced a five-prong test to determine whether a nonmovant is

entitled to Rule 56 discovery relief. The nonmovant must: (1) specify the particular factual discovery sought; (2) explain how the results of the discovery are reasonably expected to engender a genuine issue of material fact; (3) provide an adequate factual predicate for the assertion that there are discoverable facts sufficient to raise a genuine issue of material fact; (4) recite previous efforts to obtain those facts; and (5) demonstrate grounds for the failure to have discovered the essential facts sooner. *Jade Trading*, 60 Fed. Cl. at 565 (citing *Thiesen*, 58 Fed. Cl. at 198). Given the procedural posture of this case, a strict showing is not required. *See Metro. Life*, 527 F.3d at 1337. *See also Resolution Trust*, 22 F.3d at 1203 (stating, "one or more of the requirements may be relaxed, or even excused, to address the exigencies of a given case"). The GM Plaintiffs easily meet the five-factor test.

C. The GM Plaintiffs Are Entitled to Discovery.

This case presents fact-specific allegations about the Defendant's rejection of GM's viability plan in February 2009, which contained a plan and process for the gradual attrition of dealers from GM's dealer network. In the course of such rejection, the Defendant demanded a tighter timetable for terminating dealers. As discussed *supra*, the Defendant through its Auto Task Force and Treasury Department officials engineered a way for GM to avoid state franchise laws which protected dealers, and coerced GM into filing a so-called "surgical" bankruptcy to enable GM to shed such obligations quickly and relatively inexpensively. All the while, the terminated dealers had a mere few days to respond to a completely unilateral "wind-down" agreement which would give them a fraction of what they were entitled to, and deny them the protections of state franchise laws and the opportunity to participate in a more traditional bankruptcy process, at the peril of losing everything under the Defendant's "quick and surgical" bankruptcy plan. This wind down agreement neither made full and complete disclosure as to just who was being released and

from what claims, nor permitted negotiation, time for reflection, or even a contemporaneous process to discuss alternatives.

The motion filed by the Defendant asserts that "most" of the GM Plaintiffs "agreed to the termination of their dealership agreements." The motion contends "most" of the GM Plaintiffs "released the United States from liability related to these dealership terminations." Finally, the motion argues that "all" of the GM Plaintiffs "were offered the very benefits they now claim the Government took from them." Dkt. 136. Innumerable issues of fact inhere in each of these pronouncements.

First, the Defendant submits insufficient factual support to prove that "59 of the 65 GM Plaintiffs in this case *agreed* to terminate their dealership agreements." Dkt. 136 (emphasis added). The motion attaches one, *unsigned* wind-down agreement as if that proves the point. This attachment not only fails to prove that the identified dealer, Serra Chevrolet, signed the wind down agreement, but also that any of the GM plaintiffs signed them, let alone actually *voluntarily* agreed to lose their businesses. Named Plaintiff and putative class representative Colonial Chevrolet did not sign a wind down agreement at all. App. 66-70. Furthermore, if any terminated GM dealers did sign wind down agreements, the motion does not specify which dealers who signed them appealed their terminations, which dealers filed claims in arbitration, and whether any received any money. The motion does not address what effect an appeal or arbitration would have had on the wind down agreements, and the legal effect on these wind down agreements of the legislation providing for arbitrations has never been decided. Nor does the motion even attach signed agreements from the 59 GM dealers who allegedly signed them.

Most glaringly, the motion fails to recognize that, whether it is sustainable as a class action or not, this case has been and currently is pled as such. This means *every one* of the absent

members of the GM class is a terminated GM dealer, and they number in the hundreds. The subclasses include GM dealers who did not accept wind down agreements (Dkt. 101 at ¶ 73a); GM dealers who signed wind down agreements but participated in arbitration and lost (*Id.* at ¶ 73c); GM dealers who signed wind down agreements but participated in arbitration and settled (*Id.* at ¶ 73d); and GM dealers who prevailed in arbitration (*Id.* at ¶ 73e). There is also a claim for temporary takings, even for reinstated dealers who signed wind down agreements. The existence and effect of wind down agreements on the claims of each of these subclasses of GM dealers are factual issues which must be developed in discovery before a full and fair response and adequate record can be articulated to contravene the motion's broad claim that this entire lawsuit is precluded. *See* App. 1-20. As well, the degree of the Defendant's involvement in the wind down decisions, the releases, and the wind down offers are issues which must be developed in discovery before a full and fair response and adequate record can be compiled. *Id.*

The motion is further deficient in that it relies on pleadings in the GM bankruptcy case, an affidavit from 2009 which predates this litigation, and 2009 testimony before Congress of GM's CEO Fritz Henderson. All of these should be stricken.[9] Furthermore, as to none of these submissions have the GM Plaintiffs had the chance to explore through cross examination the one-sided assertions made. The Defendant's presentation of one side of these highly contested issues

---

[9] Bankruptcy pleadings are not only contested, but also irrelevant. So, too, are the findings of the bankruptcy courts. *A & D Auto Sales, Inc. v. U.S.,* 748 F.3d 1142, 1156 (Fed. Cir. 2014) (Circuit Court in this case stating, "Whatever the bankruptcy court found is immaterial. Its findings on good faith are not collateral estoppel on the issue of coercion."); Dkt. 127 at 18 (this Court stating, "However, the plaintiff franchisees in this case were not parties to the bankruptcy proceedings and are not bound by its conclusions," and citing Judge Hodges' statement that "[T]he Government cannot use rulings issued in a bankruptcy proceeding to control prospective legal and factual findings in the Court of Federal Claims in a separate proceeding involving different causes of action."). GM CEO Fritz Henderson's 2009 affidavit and testimony are hearsay.

simply highlights that they are mired in questions of fact, and a full, fair and robust response by the GM Plaintiffs can only be submitted after an opportunity to develop the issues through discovery. *See* App. 1-20.

Having presented insufficient information to prove the GM Plaintiffs even signed or are bound by wind down agreements, the Defendant then leaps to the conclusion that the GM Plaintiffs' claims are barred by the inclusion of "broad release language immunizing the United States." Here, the record is devoid of the necessary factual predicate to demonstrate who -- voluntarily, knowingly, and willfully -- actually released the United States from a takings claim. Other issues of fact include (i) what disclosures were made to gain these releases; (ii) were the GM Plaintiffs sufficiently informed at the time regarding who was the "363 Acquirer," and were they informed as to who was being released and from what potential claims; (iii) when were those disclosures made, if they ever were, via-a-vis the twelve-day time period between the issuance of wind down agreements and deadline for signatures; (iv) again, whether the releases are even effective, against whom, and for what claims; and (v) whether the United States complied with applicable Executive Orders requiring it to analyze the Constitutional takings implications of its actions, what the results of that analysis were, and who participated in it.

These issues preclude any judgment on this issue at this time and require discovery before an adequate response can be submitted. Discovery on these issues would permit the GM Plaintiffs to develop defenses of duress, fraud and/or misrepresentation; voidness of the releases; inapplicability of the wind down agreements and releases to certain GM dealer plaintiffs; the consequences of the Defendant's failure to comply with Executive Orders mandating it to consider the takings implications of its actions; the constitutionality of requiring citizens to give up valuable rights and claims in circumstances of a duress-infused take-it-or-leave-it scenario. Each

development of each issue enumerated above is critical to defending the motion, and currently there is simply no adequate record on these issues. App. 1-20.

Finally, ignoring altogether the allegations contained in the Second Amended Complaint, and relying on self–serving allegations in contested pleadings in the GM bankruptcy case (which should be stricken), the Defendant claims it offered the GM Plaintiffs the benefits they now claim were taken. Again, these are contentions mired in issues of fact. For example, the Defendant's motion states that the wind down payment "for most dealers" was $1000 for each car in inventory and eight months' rent reimbursement. Dkt. 136 at 8. The Defendant goes on to claim that GM dealers were permitted to sell existing inventory and service cars on the road for a period of months. These are not, in fact, the full measure of the value of the GM dealerships as pled. *See also* Dkt. 118.

Nonetheless, to respond adequately to the Defendant's assertions about benefits allegedly offered, facts must be developed including what exact benefits were actually offered and to which dealers and what was the Defendant's role in that process (since this is a takings case against the United States); how were the offers calculated, and was what the Defendant's role in that; how did wind down offers compare to the value of each GM dealership asserted as of the taking, and by whom were they offered. Facts must be developed including what additional inventory was available but denied to these dealers to sell and service; how a more traditional bankruptcy would have compared to the benefits allegedly offered to the terminated GM dealers; and how a hold-and-wait strategy would have played out. *E.g.,* App. 10-20. Facts must be developed including which GM dealers accepted wind down offers, and how the offers were impacted by arbitrations won and lost, settlements, and reinstatements to the GM dealer network. All of these facts impact the potential preclusive effect of wind down offers.

The Defendant's reliance on *Cienega Gardens v. U.S.,* 503 F.3d 1266 (Fed. Cir. 2007), to suggest that a mere offer of wind down benefits precludes a takings claim and trumps the development of a factual record is misplaced. That case simply does not say that taking offsetting benefits into account obviates the need to develop a factual record regarding such offers and their ameliorative impact. To the contrary, in remanding for a consideration of the impact of offered offsetting benefits, the Federal Circuit in that case ordered the district court to "allow both sides to supplement the record with additional relevant evidence if they wish to do so." *Id.* at 1291.

In short, factual discovery regarding, *at a minimum*, the following topics is needed to respond to the Defendant's pending motion:

- Out of all of the terminated GM dealers, who signed wind down agreements; who appealed a wind down decision; who sought arbitration to be reinstated to the GM dealer network; who was reinstated; who settled during arbitration; who lost arbitration; and the effect of any of that on any wind down agreements that were in fact signed;

- What was the Defendant's involvement in drafting wind down agreements; choosing the terms of wind down agreements; and choosing the benefits offered under wind down agreements;

- What was the Defendant's involvement in selecting dealers for termination from the GM dealer network; selecting the number of dealers to be terminated; and/or selecting the timeframe for wind down;

- Who was told what information and by whom when the wind down agreements were offered, responded to, and signed; what was the purpose of the release language in the wind down agreements; to what extent did the Defendant control that information; whether it was purposely kept vague that the United States would take the position that the releases would negate Constitutional takings claims;

- Whether the United States complied with applicable Executive Orders requiring it to analyze the Constitutional takings implications of its actions, and what the results of that analysis were, as well as who participated in it;

- Who made the decision to give the dealers less than two weeks to sign the wind down agreements; why twelve days was the limit on GM dealers signing wind down agreements; whether there was any negotiation of the terms of the wind down agreements or the time frame for signatures; who made that decision; who from the United States participated in that decision;

- The degree and extent of control exercised by the Defendant over GM during the bailout and bankruptcy processes;
- Which outside counsel were used and for what purposes;
- Who was paid wind down money and in what amounts;
- How wind down payments affect and Plaintiff's claims (if at all);
- Who operated a dealership, and in what capacity during wind down and how his/her business would have differed in a traditional bankruptcy or hold-and-wait scenario;
- Whether and how it was disclosed that the Defendant was a shareholder in the 363 Acquirer in GM's bankruptcy; why the Defendant did not specifically name itself as an allegedly released party; and whether that was disclosed to the bankruptcy court or on the public record;
- What disclosures were made to gain the releases signed;
- Did any GM dealers modify the release language;
- How, if at all, do the releases apply to this takings case;
- How the circumstances of the wind down agreements and releases constitute duress;
- How there was misrepresentation or fraud in the inducement;
- Whether the releases are void, invalid, or otherwise ineffective for any reason based on the facts and circumstances;
- Whether the payments offered were the equivalent to damages sought in this takings case, including temporary takings damages;
- Whether the payments offered were less than could have been achieved in a traditional bankruptcy process or other scenario;
- Whether the timetable for wind-down payments was sufficient and adequate compared to the timeframe which would have applied in a normal bankruptcy.

App. 1-20.

Discovery on these issues is reasonably expected to engender genuine issues of material fact because it cuts straight to the actuality and validity of the wind down agreements and releases,

the very issues on which the Defendant's motion is premised. Such discovery will provide not only factual information necessary to defend the motion and illuminate genuine issues of material fact which preclude summary judgment altogether, but also the factual underpinnings for legal defenses of duress, fraud in the inducement, voidness, insufficient consideration, and breach of contract, among others. *See* also App. 1-20; App. 66-70; *Resolution Trust*, 22 F.3d at 1207 (stating, "the facts that the movant seeks to discover must be foreseeably capable of breathing life into his claim or defense" and that the materiality threshold with regard to unknown facts and unadjudicated issues is "necessarily low"). These are material issues. They are, in fact, dispositive. The fact that previous efforts to obtain these facts have not occurred lies in no fault of the GM plaintiffs, but due entirely to the efforts of the Defendant to avoid and forestall discovery in this litigation. App. 10-20; Dkt. 78. This premature motion is just the latest example of that.

For all of these reasons, the Court should deny the Defendant's motion at this time, and defer any dispositive motions until a complete record is developed. *Clear Creek Cmty. Servs. Dist. v. U.S.*, 100 Fed. Cl. 78 (2011) (plaintiff entitled to discovery in order to respond to defendant's motion for summary judgment on plaintiff's breach of contract and takings claim where plaintiff specified discovery sought and otherwise met five-factor test).

D. Full Merits Discovery on Liability Issues Should Proceed.

In *Jade Trading*, on the motion of the United States, this Court declined to limit discovery to matters essential to oppose the plaintiffs' early summary judgment motions. *Id.*, 60 Fed. Cl. at 566. Among other things, the Court noted that continuing the parties' "hairsplitting" debates about what discovery was, and was not, essential to respond to the summary judgment motions "would be a waste of the parties' time in the context of this complex case." *Id.* at 566 n. 8. The Court noted that such a limit would be imprudent, and that a full picture of what had transpired was

necessary to resolve the action "in any posture." *Id.* at 566.

That is precisely the case here. Should the Court order discovery limited to the issues raised in the Defendant's motion, as broad as those are what is likely to ensue is a costly, protracted, and inefficient battle over what discovery is and is not within those parameters. This is particularly the case where, as here, no discovery has yet occurred, and the Chrysler Plaintiffs with the Chrysler claims stand ready to initiate their own discovery. Much of that discovery will dovetail with GM discovery on central takings matters, since the same Auto Task Force engineered both bankruptcies and made decisions that affected both GM and Chrysler-terminated dealers, and the same key players were involved in these takings. Of additional note, this case is already over five years old.

For these reasons, the Court should permit the parties to pursue full merits discovery. While the categories of discovery to be sought are not insignificant, the GM Plaintiffs have already proposed a schedule to the Court that contemplates a reasonable, indeed aggressive, time period. *See* JPSR, Dkt. 148, filed on February 17, 2016. Wide-ranging, unfocused discovery is not contemplated, not efficient, and not in the GM Plaintiffs' best interests. The issues have been defined by this Court and the Federal Circuit, and the salient facts all took place within a finite period of time, by a finite number of people. Thus, absent intransigence by the Defendant or unnecessary delay caused by objections and other arguments over what is or is not discoverable, necessary merits discovery should be completed within a reasonable period of time.

## II. The Defendant's Motion Should be Denied because Genuine Issues of Material Fact Preclude Summary Judgment.

Alternatively, the Defendant's motion should be denied on the merits. Summary judgment is only appropriate where there is no genuine dispute as to any material fact. RCFC 56(c); *see also* *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A motion for summary judgment

cannot be granted where there are disputed factual issues which must first be resolved on the merits. *Niagara Mohawk Power Corp. v. U.S.*, 525 F.2d 1380 (Fed. Cir. 1975).

The burden of showing the absence of genuine issues of material fact is upon the movant. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *McGuire v. U.S.*, 97 Fed. Cl. 425, 437 (2011). A "material" fact is one that " 'might affect the outcome of the suit,' and a dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *McGuire*, 97 Fed. Cl. at 437 (citing *Anderson*, 477 U.S. at 248; *Long Island Sav. Bank, FSB v. U.S.*, 503 F.3d 1234, 1244 (Fed. Cir. 2007)). Doubts must be resolved against the moving party, and all favorable inferences and presumptions favor the nonmovant. *Gonzalez v. U.S.*, 87 Fed. Cl. 242 (2009), *aff'd*, 358 F. App'x. 170.

This lawsuit alleges takings. The Takings Clause of the Fifth Amendment to the United States Constitution bars private property from being "taken for public use, without just compensation." U.S. CONST. amend V. A takings case is analyzed according to a two-step inquiry: (i) the Court looks at what was taken and inquires whether a plaintiff has a legally cognizable property interest in it; and (ii) if he does, the Court determines whether the property interest was indeed "taken." *McGuire*, 97 Fed. Cl. at 437-38 (citations omitted).

The Defendant's current motion contends none of the GM Plaintiffs is entitled to relief as a matter of law because wind down agreements were signed by some; and offers were made to all. The motion must be denied because it is steeped in genuine issues of material fact. *E.g.*, *Cienega Gardens,* 503 F.3d at 1278 (stating that the regulatory takings analysis is 'characterized by an essentially *ad hoc,* factual inquir[y]' . . . designed to allow 'careful examination and weighing of all the relevant circumstances'") (citing *Tahoe Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 322 (2002)) (further citations omitted). The Defendant fails to carry the

burden of showing otherwise, and the requisite presumptions which favor the GM Plaintiffs as nonmovants only make the case for denying the Defendant's motion that much stronger.

A. There Are Genuine Issues of Material Fact regarding whether the Wind Down Agreements Are Effective, and against Whom.

The United States contends that GM dealers who signed wind down agreements voluntarily agreed to the termination of their dealerships and released the Defendant from takings liability. The Defendant claims 59 GM plaintiffs signed them. Yet it does not provide any such proof.[10] This alone presents a genuine issue of material fact.

Regardless, 59 GM Plaintiffs merely signing a wind down agreement is hardly the equivalent of the absence of genuine issues of material fact as to them, or any other terminated GM dealers. No matter how many signed wind-down agreements, 935 GM dealers appealed their termination decisions, and 1169 sought to participate in arbitration. Some settled their claims in arbitration; some won at arbitration; some lost. According to the SIGTARP report, 666 were eventually reinstated to the GM dealer network. Genuine issues of material fact regarding the validity and effect of wind down agreements, and against which GM dealer Plaintiffs, preclude summary judgment at this time.

B. There Are Genuine Issues of Material Fact regarding whether the Wind-Down Agreements and Releases Are Valid under Michigan Law.

The sample wind down agreement submitted with the Defendant's motion states it is to be interpreted in accordance with Michigan law. Dkt. 136-1 at A11. Michigan courts have long recognized that releases may be "attacked for fraud, mistake, surprise, duress, or total want of consideration." *Hobbs v. Brush Elec. Light Co.*, 42 N.W. 965, 966 (Mich. 1889); *see also Weiser*

---

[10] The Defendant submits an unauthenticated, unsworn-to list of "GM Plaintiffs with Signed Wind-Down Agreements." Dkt. 136-1 at A1. The list should be stricken. It is not competent summary judgment evidence.

*v. Welch*, 70 N.W. 438 (Mich. 1897) (holding a release obtained by duress and fraud did not bar the plaintiff's suit). Under Michigan law, a release is valid only if it is fairly and knowingly made. *Brooks v. Holmes*, 413 N.W.2d 688 (Mich. Ct. App. 1987) (citing *Denton v. Utley,* 86 N.W.2d 537 (Mich. 1957); *Trongo v. Trongo,* 335 N.W.2d 60 (Mich. Ct. App. 1983), lv. den. 417 Mich. 1100.32 (1983)). A release is not valid if the releasor was acting under duress; or there was misrepresentation as to the nature of the release agreement; or there was fraudulent or overreaching conduct to secure it. *Brooks,* 413 N.W.2d at 688 (citing *Weiser,* 70 N.W. 438;) *Trongo,* 335 N.W.2d 60). *See also Sharpe v. Taber*, No. 244040, 2004 WL 316175 (Mich. Ct. App. Feb. 19, 2004). Michigan courts considering the validity of a release also assess "whether the release was signed in haste, the amount of money involved in the agreement, and the circumstances surrounding the release's execution, including the conduct and intelligence of the parties involved." *Petrie v. Jones Transfer Co.*, No. 191806, 1997 WL 33343979 *1 (Mich. Ct. App. Oct. 24, 1997). Furthermore, a release covers only the claims intended to be released. *Grzebok v. Kerr*, 283 N.W.2d 654 (Mich. Ct. App. 1979) (citation omitted).

No matter how many GM dealer signatures appear on wind down agreements, each and every one of these defenses to their validity rests on genuine issues of material fact, which precludes summary judgment for the Defendant. First, there can be no question but that the releases were forced on the dealers in haste, and under a situation of duress. According to the Defendant's own summary judgment submissions, notification was sent to the dealers no earlier than June 1, 2009, the day GM filed bankruptcy. Signatures were required a mere twelve days later. *See* Dkt. 136-1 at A13; App. 66-70. Indeed, in the outcry that followed, several United States Senators recognized the untenable situation of duress and coercion in which the GM dealers found themselves. In a hearing of the Committee on Commerce, Science and Transportation

conducted immediately after GM sent such notices, Senator Olympia Snowe noted:

> And I got a copy of the wind-down agreement last night. It's 12 pages, single spaced. It would take a team of lawyers that obviously devised it, to make it as difficult and as dense as possible, so no one could possibly make a decision within the 10 days they were required to make a decision. They have to sign it within the 10 days or they close down with no assistance whatsoever.

*See* Transcript of Hearing before the Committee on Commerce, Science, and Transportation, United States Senate, One Hundred Eleventh Congress, First Session, June 3, 2009, App. 85.[11] Senator Mark Begich expressed similar concern over the coercive nature of the wind down agreement process, as GM's CEO Fritz Henderson responded to questioning:

| | |
|---|---|
| Senator BEGICH. | If I could interrupt, it's kind of a no choice deal? |
| Mr. HENDERSON. | It is, but in our judgment, the benefits that are provided in the agreement are vastly superior to the alternatives. |
| Senator BEGICH. | Which is death versus life support? |
| . . . | |
| Senator BEGICH. | OK. Let me ask it, and again, I am going to run out of time here. I can feel it. The—in the time lines that have been granted, the June 12th time line, if I got that right, is there any opportunity to expand that; yes or no? |
| Mr. HENDERSON. | In our case, Senator, no. |
| Senator BEGICH. | OK. In the parts of the appeal process that they have before June 9 or 12, whatever that date is again, on appeal process, is there any opportunity to extend that beyond the target date of when they have to sign? |
| Mr. HENDERSON. | No. |

App. 139-40.

Not only would such duress render the releases void under Michigan law, but in this Circuit as well; summary judgment has been deemed precluded where there was an issue whether a contract was illegally induced by duress. *Louisiana-Pac. Corp. v. U.S.*, 656 F.2d 650 (Ct. Cl. 1981).

[11] Senator Snowe's comments also make short shrift of the Defendant's assertion that the dealer terminations were really "voluntary." Dkt. 136 at 12.

Second, if the wind down agreements permitted the GM dealers who signed them to sell inventory and service cars for a certain period of time as the Defendant contends, there are genuine issues of material fact regarding whether that was sufficient consideration. As this Court heard in oral argument on the Defendant's last motion to dismiss, there are over 100 million GM and Chrysler cars on the road, not including 1.9 million rental vehicles and 640,000 vehicles owned by the Federal Government. *See* Transcript of Argument on Defendant's Motion to Dismiss, May 5, 2015, App. 272-78. Yet the wind down offers only permitted the servicing of vehicles for a limited period of time. Other valuable assets were excluded altogether. *See* Dkt. 118.

Third, and assuming *arguendo* their existence and effect, before the Defendant may wave the releases in signed wind down agreements as a bar to any GM Plaintiff's claim, genuine and material factual issues of whether those releases were secured by fraud or misrepresentation must be resolved. The agreement purports to release a "363 Acquirer." Dkt. 136-1 at A6. Yet issues of the sufficiency of the disclosure of who was such acquirer, how the Defendant was involved, and what claims were being released, preclude summary judgment on this skeletal record. Certainly the releases were presented in a one-sided, hasty, overreaching climate of fear and dire predictions, issues which are also pertinent to their validity under Michigan law.

The factual underpinnings of each and every one of these defenses are genuine and material. Therefore, the Defendant's motion for summary judgment must be denied.

C. The Mere Offer of a Wind Down Agreement Does Not Mean No Economic Loss Was Suffered.

The Defendant argues that all of the GM Plaintiffs are precluded from asserting takings claims because each was *offered* a wind down agreement. According to the Defendant, and with zero factual support in the record, the financial terms offered were "unquestionably more than the GM plaintiffs would have received had GM been liquidated in an orderly bankruptcy proceeding."

Dkt. 136 at 14. The Defendant argues that since the GM Plaintiffs were offered the right to sell existing inventory and service cars on the road, they cannot show economic loss as a matter of law.

The Defendant is wrong. The mere offer of some benefit does not *per se* extinguish a takings claim, and the Defendant fails to show otherwise. Its reliance on *Cienega Gardens,* 503 F.3d 1266, is misplaced; the case does not support such a proposition. To the contrary, *Cienega Gardens* confirms that the effect of offsetting benefits is assessed according to a factual determination and a developed factual record. *Id.* at 1291 (remanding and instructing Court of Federal Claims to permit parties to supplement record with additional relevant evidence if they so wished). Indeed, the issue of economic loss is a highly fact-specific one requiring not only factual development of damages suffered but also expert testimony of alternative scenarios available in bankruptcy or otherwise. *E.g., Resolution Trust*, 22 F.3d at 1208 (stating, "We do not believe it is either necessary or desirable for a court to attempt to probe sophisticated issues on an undeveloped record"); *Cienega Gardens*, 503 F.3d at 1278 (stating, "whether a compensable taking under the Fifth Amendment has occurred is a question of law that is based on factual determinations") (citation omitted). Moreover, the burden of establishing that offsetting benefits rebuts economic harm lies with the government. *CCA Assocs. v. U.S.*, 667 F.3d 1239, 1245 (Fed. Cir. 2011). The government can hardly be said to have carried this burden here, when issues of fact including: how wind down offers can be said to have justly compensated the GM dealers when they failed to include many valuable assets; how wind down offers can be said to have justly compensated the GM dealers when other options were available; and how wind down offers can be said to have justly compensated the GM dealers when those offered benefits limited the amount of cars that

could be sold and serviced by each offeree.[12]

Simply, there is no competent summary judgment evidence that demonstrates the terminated GM dealers suffered zero economic loss as compared to any wind down offers made to them.

## CONCLUSION

The Defendant has previously complained to this Court when it was the on the responding end of its own current litigation tactic. In *Jade Trading*, the United States argued:

> Plaintiffs' attempt to resolve this complex litigation through piecemeal summary judgment motions, on a completely undeveloped record and ignoring the various issues that might ultimately be dispositive, should be viewed with great skepticism. Generally, the Court should decline to address legal questions in a case of this type prior to adequate development of the record and a proper framing of the issues and the subsidiary issues for decision. Thus, plaintiffs' motions are, in their entirety, ill-conceived and should be refused.

App. 223.

This Court agreed: "Clearly the basic inquiry the Court must make is factual, and this case is not capable of resolution on summary judgment at this early stage." *Jade Trading, LLC v. U.S.*, 60 Fed. Cl. 558, 564 (2004).

The Defendant's complaints in *Jade Trading* apply squarely here. The issues in this case are wholly unsuited to a mass resolution without a developed factual record. There are over 1000 plaintiffs. The Second Amended Complaint pleads several subclasses of GM Plaintiffs alone, who stand in potentially different positions with regard to executed/unexecuted wind down agreements, appeals, arbitrations, settlements, reinstatements, and financial activities during wind down. Various potentially dispositive issues such as defenses of duress, fraud, misrepresentation, invalidity of the wind down agreements, insufficient consideration, and the effect of the releases

---

[12] *See* App. 52 (SIGTARP noting that the wind down dealers were not permitted to acquire new GM vehicles).

must be adequately developed and properly framed. The complexity of the issues, and the inherent factual disagreements demonstrated even in the briefing thus far strongly point to the need for resolution by a trier of fact. And significantly, given the complexity of the economic issues involved in this case, its resolution will also require the analysis, testimony and opinions of expert witnesses. *E.g.*, *Starr Int'l Co., Inc. v. U.S.*, 1:11-cv-779-TCW, at Dkt. 282, pp. 2-3 (Wheeler, J., August 25, 2014), App. 279-281. The Defendant here has submitted a summary judgment motion that is premature and ill-conceived, and it should be refused.

For all of the foregoing reasons, the Defendant's motion for summary judgment against the GM Plaintiffs should be denied in its entirety, or rejected at this time without prejudice to refiling once discovery has been completed.

## PRAYER FOR RELIEF

WHEREFORE, the GM Plaintiffs respectfully request that the Court deny the Defendant's motion for summary judgment; or abate it at this time and continue it until after the close of discovery, and order that the parties may engage in full merits discovery without further delay.

Dated: March 7, 2016

Respectfully submitted,

/s/ Jody Rudman
Joe Kendall
jkendall@kendalllawgroup.com
Jody Rudman
jrudman@kendalllawgroup.com
KENDALL LAW GROUP, PLLC
3232 McKinney Ave.
Suite 700
Dallas, TX 75204
P: (214) 744-3000
F: (214) 744-3015

Richard D. Faulkner
rfaulkner@bfslawgroup.com
James D. Blume
jblume@bfslawgroup.com
BLUME, FAULKNER & SKEEN, PLLC
111 W. Spring Valley Rd., Suite 250
Richardson, Texas 75081
P: (214) 373-7788
F: (214) 373-7783

Harry W. Zanville
500 West Harbor Drive
Suite1201
San Diego, CA 92101
P: (619) 400-7164

Steven J. Eagle
3301 Fairfax Drive
Arlington, Virginia 22201
P: (703) 993-8054