UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| COLONIAL CHEVROLET, ALLEY'S | ) | |
| OF KINGSPORT and SPITZER | ) | |
| MOTOR CITY, INC., et al., | ) | Case Nos. |
| Plaintiffs, | ) | 10-647C |
| vs. | ) | 11-000C |
| UNITED STATES OF AMERICA, | ) | 12-900C |
| Defendant. | ) | |
| --------------------------------- | ) | |

Courtroom 8
Howard T. Markey National Courts Building
717 Madison Place, N.W.
Washington, D.C.
Thursday, March 31, 2016
2:00 p.m.
STATUS CONFERENCE - Volume 1

BEFORE: THE HONORABLE NANCY B. FIRESTONE

Linda D. Metcalf, CER, Reporter

APPEARANCES:

ON BEHALF OF THE PLAINTIFF (COLONIAL CHEVROLET):

RICHARD D. FAULKNER, ESQ.
KEVIN BUCHANAN, ESQ.
Blume, Faulkner & Skeen, PLLC
111 West Spring Valley Road, Suite 250
Richardson, Texas 75081
(214) 373-7788
rfaulkner@bfslawgroup.com

ON BEHALF OF THE PLAINTIFF (ALLEY'S OF KINGSPORT):

ROGER J. MARZULLA, ESQ.
NANCIE MARZULLA, ESQ.
M. RHEAD ENION, ESQ.
Marzulla Law
1150 Connecticut Avenue, N.W., Suite 1050
Washington, DC 20036-4162
(202) 822-6760
roger@marzulla.com

--and--

THOMAS A. HOLMAN, ESQ.
Holman Law

99 Park Avenue, Suite 1600
New York, New York 10016
(212) 481-1336
TAHolman@holmanlawoffice.com
--and--
STEVEN H. BLATT, ESQ.
Bellavie Blatt Andron & Crossett, LLP
200 Old Country Road
Mineola, New York 11501
(516) 873-3000
SBlatt@DealerLaw.com

ON BEHALF OF THE PLAINTIFF (SPITZER MOTOR CITY):
M. TODD RATAY, ESQ.
MLG Automotive Law
2801 West Coast Highway, Suite 370
Newport Beach, California 92663
(858) 405-2510
tratay@mlgautomotivelaw.com

ON BEHALF OF THE DEFENDANT:

KENNETH M. DINTZER, ESQ.
JAMES CONNOR, ESQ.
AMELIA LISTER-SOBOTKIN, ESQ.
MICHAEL A. RODRIQUEZ, ESQ.
ELIZABETH M. HOSFORD, ESQ.
U.S. Department of Justice
1100 L Street, N.W.
Washington, DC 20530
(202) 514-5495
alisters@usdoj.gov

P R O C E E D I N G S

- - - - -

(Proceeding called to order, 2:00 p.m.)

THE COURT: Well, welcome, everybody. Please be seated.

COUNSEL: Good afternoon, Your Honor.

THE COURT: Good afternoon. Well, we welcome everyone. We're here to discuss a variety of issues as was set forth in my March 23rd order, since we have a schedule. What I would like to do, though, is just, let's get everybody's name on the record and I'll go in the order that it appears on our sheet.

So, representing Colonial Chevrolet today?

MR. FAULKNER: Richard Faulkner and Kevin Buchanan on behalf of Colonial Chevrolet, Your Honor.

THE COURT: All right. And while I have the two of you there, I got a notice of appearance today.

MR. BUCHANAN: Yes, Your Honor, on my behalf.

THE COURT: On your behalf?

MR. BUCHANAN: Kevin Buchanan.

THE COURT: So, are you sort of switching as lead counsel? Or you're sharing that job?

MR. FAULKNER: Currently sharing it, Your Honor.

THE COURT: Okay. We require somebody to be designated as lead.

MR. FAULKNER: And at that point, Your Honor, it will remain me.

THE COURT: Very good. So, Mr. Buchanan, welcome, and you'll get all the mail as well.

MR. BUCHANAN: Thank you, Your Honor.

And on behalf of Alley's of Kingsport versus the United States?

MS. MARZULLA: Good morning, or good afternoon, Your Honor, Nancie Marzulla on behalf of Alley's. With me is my partner, Roger Marzulla.

MR. MARZULLA: Good afternoon, Your Honor.

THE COURT: Good afternoon.

MS. MARZULLA: An associate with our office, Rhead Enion.

THE COURT: Good to see you.

MS. MARZULLA: Also, co-counsel is Tom Holman, Bellavie.

MR. BLATT: Stephen Blatt, Your Honor, from the Bellavie law firm.

MS. MARZULLA: Right.

THE COURT: Very good. Thank you. Do you have all those names?

MADAM REPORTER: No, but I'll get them.

THE COURT: But you'll get them, okay.

And then for Spitzer Motor City?

MR. RATAY: Good afternoon, Your Honor. Todd Ratay on behalf of Spitzer.

THE COURT: Are you sure you're okay by yourself?

MS. MARZULLA: We'll share.

THE COURT: Okay. All right. Very good.

And on behalf of the United States, where are you? There you are.

MR. DINTZER: Good afternoon, Your Honor. Kenneth Dintzer for the Department of Justice. And I have here at counsel table with me Amelia Lister-Sobotkin.

THE COURT: Good to see you.

MR. DINTZER: James Connor.

MR. CONNOR: Good afternoon, Your Honor.

THE COURT: Good to see you again.

MR. DINTZER: Michael Rodriquez.

MR. RODRIQUEZ: Good afternoon.

THE COURT: Very good.

MR. DINTZER: And Elizabeth Hosford.

THE COURT: Very good. All right. By virtue of the fact that we had so many issues to deal with, I thought I would set this agenda and begin today's -- really status conference is maybe a little too short, sort of a shorthand for what we're going to accomplish

for the rest of this time.

So, the first thing I would like to do is hear the motion for classification with regard to the subclass of Chrysler plaintiffs that had been proposed and one of your team will be arguing.

MR. DINTZER: Mr. Connor will be addressing these issues, Your Honor.

THE COURT: Very good, Mr. Connor.

Please, Mr. Buchanan?

MR. BUCHANAN: Your Honor, may I?

THE COURT: Yes, please.

MR. BUCHANAN: May it please the Court. I would like to say, it's an honor to be here, this is my first trip to D.C. to argue any kind of case in a 26-year career.

THE COURT: Well then, welcome. Okay.

MR. BUCHANAN: And this is an interesting one. I did note and read from your order on the status conference that you asked the parties and Mr. Connor and I to focus in on the issue of predominance.

THE COURT: I thought that you all had briefed the issues of numerosity and so forth, but the sort of more recent case law that we are receiving from the Supreme Court suggesting that predominance is quite important, and as you know, the Government's position is

that in a regulatory takings case, economic issues -- well, there are two economic issues that have to be established, there is an economic harm, and reasonable investment-backed expectations, and I wanted to make sure we're all talking on the same page. So, if you could focus on the 23 Part B test, that would be great.

MR. BUCHANAN: Thank you, Your Honor. The very week that you issued your order on the status conference, the very same week, it was in 48 hours that my co-counsel filed our reply brief to the motion for class certification. The Supreme Court of the United States gave us class, and all within a 48-hour window. So, our papers do not address Tyson; however, I think that Tyson's pretty straightforward and I think that I can, I hope, inform the Court as to the Plaintiffs' point of view as to Tyson.

And also, Your Honor, as a class action lawyer, on and off, mostly on for the last 27 years, Tyson was a surprise to me. I'll just be frank with the Court. It's a 6-2 decision in favor of class certification, and the most important thing about Tyson, I think, is its focus on what Dukes v. Walmart, or Walmart does not mean, because that is a very good case that the Defendant can use, any defendant can use to argue that where there's a question of individualized damages, that

they almost always, perhaps as a matter of law, overwhelm any other issue -- a liability issue, for example -- overwhelm them in the sense that there's no predominance.

And there are a couple of portions of Tyson that -- when I go back, they talk a lot about the Court, about AMCHEM, and AMCHEM is fairly old precedent. It is that -- it is the -- or so to speak, I think of class action juris prudence, certainly within the Federal courts, and to a large extent even in my home state of Texas.

So, on page 13, they wrote, the prior Court, the predominance -- the Supreme Court in Tyson, the predominance inquiry asked whether the common aggregation-enabling issues in the case are more prevalent or more -- or important than the non-common aggregation defeating individual issues. That was earlier, Your Honor.

So, then they go on, in the Tyson case, the Supreme Court, to set out a quotation from I believe AMCHEM, and actually it's coming from Wright & Miller, when one or more of the central issues in the action are common to the class and can be said to be predominant, the action may be considered proper under Rule 23(b)(3), the corollary here, even though other important matters

will have to be tried separately, such as damages.

THE COURT: Okay.

MR. BUCHANAN: That was a little bit of the surprising part to me, because that, as a practitioner, that's not exactly what I had taken away from Walmart. And not exactly what I think one or two other courts have taken away. "Such as damages," reading again, "or other affirmative defenses particular to some individual class members." So, that's sort of, today, for the purpose of argument, sort of the starting point for me. For the Plaintiffs in this particular case.

I want to talk a little bit more during my allotted time about Tyson and what it says Dukes doesn't mean, but I wanted to, in terms of common issues predominating, this is an unusual case. It's got some pretty big questions in it, big enough questions to where the motion to deny dismissal was certified and set up, it came back down with quite a bit of education in it for us.

So, but if I look at your -- if I may, I realize 4, 5 and 6 --

THE COURT: You can come back to it, but I put that there on purpose.

MR. BUCHANAN: Right, the back, and I'm not going to get into those, but I would respectfully point

out that if we look at page 2 of your status report, your status order report, A, that's a huge common issue that I argue predominance in this case; B, again, the very issue that we're going to discuss here today is a common issue that's fairly common as to every member of the putative class.

Turning the page to page 3, again, C part, you know, and I don't pretend to understand Penn Central exactly --

THE COURT: Well, let's just talk about that for a second.

MR. BUCHANAN: Sure.

THE COURT: Because if you're -- what makes a regulatory taking unique is that economic -- individualized economic harm is part of a liability determination.

MR. BUCHANAN: Correct. Yes, ma'am. I'm sorry.

THE COURT: That's okay. Separate and apart from our physical takings cases, of which we have many, in which, if the physical property is taken, even if it's worth a dollar, we know from Loretto, there will be compensation.

In a regulatory takings case, at least the advice and counsel that we have received from the Federal Circuit has suggested is how this -- they are

viewing this case, isn't the issue, though, at the end of the day, for any individual to succeed, they'll have to show that they themselves would have survived.

MR. BUCHANAN: Yes.

THE COURT: They themselves have a reasonable investment -- as I understand this case, we have dealerships all over America.

MR. BUCHANAN: True.

THE COURT: Which I would suggest indicates I can't believe that the economic situation in Wichita was the same in Albany, New York.

MR. BUCHANAN: I see exactly where the Court is coming from.

THE COURT: Okay.

MR. BUCHANAN: So, when I looked at your order on the most recent motion to dismiss, and where you pulled out four different theories or ways, in a new term for me, the but-for world, that the simplest to me was, it just goes into bankruptcy.

In other words, I think that I can prove to this Court that as a matter of law, once we develop the facts, that every single dealer was damaged at least a dollar.

So, where I'm kind of coming from, in Texas, and experience in other jurisdictions, you know, we have a

prohibition against splitting clients. And, so, when I hear the Court and the Court share that with me, that's part of the takings case, a regulatory takings case, I understand where you're coming from, Your Honor.

THE COURT: But a dollar doesn't make a takings case liability. That's your problem. It's not a dollar. If you prove to me you've suffered a dollar, okay, you've suffered a dollar. That is not -- I mean, you know the standard for regulatory taking, it has to be -- it's -- the but-for world here -- I understand -- and this is a confusing case with regard to the fact that you lost -- your clients lost their franchise agreements, and however, if they were going to lose -- I mean, if it was just simply a dollar, I don't think that they will have satisfied the test that the Circuit has identified.

I think the Circuit is saying there was something valuable such that in a marketplace you could sell that item.

MR. BUCHANAN: Right.

THE COURT: I mean, you can sell a franchise for a dollar -- I just, that doesn't make any sense to me.

MR. BUCHANAN: And perhaps it was a poor choice of words. What I meant to say to the Court is that I think that there are damages as a matter of law that

meet the regulatory standard.

THE COURT: Okay.

MR. BUCHANAN: For each and every one of the titled Plaintiffs.

THE COURT: Right, and that is individualized or you're saying that's going to be generically?

MR. BUCHANAN: I think there is a cause of action, one or more, I picked the example of -- we're going to through bankruptcy, all my clients have parts inventories, all my clients -- those have value. The values are different if my franchise has been terminated versus I continue to offer a franchise even for two or three or four months.

So, that's where I'm coming from with that.

THE COURT: Okay.

MR. BUCHANAN: And I just think this would be the Court's question, and I hope I'm addressing it, which is, yes, I think the -- all of the liability issues, you know, did the Government act, you know, everything you've got to weigh out, everything I've got, and those are serious -- they are common issues. They're common to everyone.

Where I think we run into problems and where the Court's concern is, okay, well, what about this damages side? Is this simply are we going to have 50 --

depending on how many people opt in, I assume the Court will certify this. Are we actually going to have an individualized trial as to each and every single dealer and what they -- assuming everything else is found.

And the answer to the Court's question is, yes. In some manner, the Court will have to address the individualized issues of what specifically Spitzer lost, what specifically Finnin, our client, lost. I think that's true.

So, but the question remains is, is there -- well, as a matter of law, does that overwhelm the common issues of liability. And I would respectfully suggest that it doesn't. I would say it's in your discretion to find that it is. It's also within your discretion to find that it's not. I mean, I think you've got a really wide zone here, Your Honor. And I think what the Court is searching for, and I get it, appreciate it is, what's the most advantageous, the most efficient way of resolving all of these cases, and what the defendant is arguing is that decisions as to -- big decisions as to liability, provided there's some showing that there is damage to each and every one of these plaintiffs, setting aside for a moment whether it's X dollars or Y dollars.

THE COURT: Okay.

MR. BUCHANAN: There are some real advantages in terms of judicial efficiency to be gained by class certification.

THE COURT: All right. Now you do know that it's a common practice in this Court to have those agreements in which people say with regard to common issues, we will agree that we are going to use representative plaintiffs, it happens in many of our cases.

MR. BUCHANAN: Ms. Marzulla has explained that to me.

THE COURT: And we do it for the very reason that it allows those things to proceed but in a context of real individualized determination so that it's not -- it's not abstract. Because even if we have a class certification, we're going to have representative plaintiffs.

MR. BUCHANAN: Right. And so the Court --

THE COURT: Right. And so it's not as if you're going to avoid that procedure. Okay?

MR. BUCHANAN: So the question being is it better or more efficient to simply go with representative plaintiffs and, you know, the surprise on my part was, the Court does have Rule 23, but it was adopted relatively recently. But the courts have

employed this representative process in the past, and so sometimes, I confess, Your Honor, to sensing some sort of conflict or issue there, but I can't put my finger on it. Had it been challenged by co-counsel --

THE COURT: Well, we use class certification a lot in things like pay cases, not all that different than what the circumstances the Supreme Court is doing, in which the individual harm, you can establish -- their hours may be different, but they're all entitled to overtime.

MR. BUCHANAN: Spreadsheets.

THE COURT: And then there's spreadsheets that do it. But again, the issue there is damages, not liability.

MR. BUCHANAN: Right.

THE COURT: And that's really part of the precedent-setting concern. I'm not sure I found, and I was curious of you, of any regulatory takings case that was handled as a class action.

MR. BUCHANAN: Not that I could find.

THE COURT: I couldn't find one either. Okay.

MR. BUCHANAN: There's -- not that I could find. Physical takings cases, yes, but not regulatory cases.

THE COURT: Yeah. And that's -- tell me what else you want, because I thought we would listen to the

Government for a moment and then you can respond to him.

MR. BUCHANAN: I think this is a perfect time for me to sit down and let the Government go.

THE COURT: And, by the way, I appreciate very much the candor that you have actually expressed and the difficulty of doing it in this context, and that is -- it is, it's greatly appreciated.

MR. BUCHANAN: You're very welcome, Your Honor. And I think you can tell that given the precedents that we've had the last couple of years, given the age of this case, that Mr. Faulkner and I, consistent with the duties that we have, on the record, that we have or may owe to the putative class, it's like, you know, we're not looking for an advisory ruling. I'm just trying to -- I hope the Court understands where I'm coming from.

THE COURT: Yeah, I understand.

MR. BUCHANAN: Thank you, Your Honor.

THE COURT: You're very welcome.

MR. CONNOR: Thank you, Your Honor, and may it please the Court. Before I get into the predominance, I just want to walk through briefly the requirements of Rule 23.

THE COURT: Absolutely. You may.

MR. CONNOR: Rule 23, because we do contest all

of the requirements here.

THE COURT: I know.

MR. CONNOR: The first one is numerosity, a class so large that enjoined is impractical. That's relevant here because we already have 200 plaintiffs that are asserting individualized claims. So, there's really no advantage to a class action, particularly where in this case we know --

THE COURT: How many more are left out in that world? I had that in front of me for a moment at one point.

MR. CONNOR: Sure, there are 789 dealership --

THE COURT: Okay.

MR. CONNOR: -- agreements that were rejected. Now, several of those were actually reinstated, but 789 was the number that was rejected. And that's a known universe. We know who those people are. So, there's no reason why counsel could not reach out to them and see if they wanted to join the case. So, they fail to meet the numerosity requirement.

Commonality, which goes to the predominance, and also Rule 23(a), which I will talk about in a moment. Typicality, whether the Plaintiffs' case are typical of the class. We explain in our papers why they don't meet that requirement.

Adequacy, whether Plaintiffs' counsel can adequately represent the case. And superiority, whether a class action is a superior form of litigation. And I think the superiority problem here is very important, because, again, we've already established the model plaintiff route that's been agreed to by the Spitzer plaintiffs and the Alley's plaintiffs. So, there's really no benefit for the Court to proceed with a model plaintiff action on one hand and then also a class action proceed at the same time.

THE COURT: Well, if there were -- I guess the premise is this: If we were to have a class action, and that's one of the things I've been sort of weighing is, or have weighed, is that obviously if I were to do that, we would then have to have a hearing as to who is the best party to represent them and so forth.

I mean, I couldn't separate out. It wouldn't be -- I'm not going to conduct a class action with a third of the people and then a non-class -- it would make no sense. We would have to -- and that is an added complication to all of this. As opposed to individual attorneys representing their clients.

But let me ask you a question about this, because really and truly, the advantage is exactly what the Plaintiff is arguing. There are going to be common

questions about, and for now I'm just going to use the term "the nature of the Government's action," just for lack of -- as a shorthand. What did the Government do, was it acting in its certain capacities? Those are going to be common questions, as well as the economics of the but-for world.

Then we have to get into, though, even all of that aside, what about you? You know, in that but-for world. Is there -- have you discussed with these Plaintiffs joining this concept where they agree that they will be -- if they have individual plaintiffs, that they will agree as I'm not sure the other plaintiffs have agreed, but I assume are willing to, that the common issues of the representative plaintiffs will be binding on the other people in the litigation?

MR. CONNOR: No, we haven't discussed that issue specifically, but --

THE COURT: But you understand that's a big advantage here?

MR. CONNOR: Yes.

THE COURT: Because otherwise we could face 500 different people saying, and the Government doesn't want that either, I have a new but-for scenario, Judge Firestone rejected that one, but I've got new experts and my new experts are going to come in and they have a

new theory and now we have a new theory and I don't like that theory. So, now I have -- that's the dilemma that we have to avoid.

MR. CONNOR: Yes, I understand. And, Your Honor, the case is consolidated, so there are common questions of fact related in the Government context, but what there is not, there's not common questions class-wide regarding the other two elements of Penn Central.

THE COURT: I know, right.

MR. CONNOR: And that's economic impact and reasonable investment-backed expectation. And, importantly, their motion doesn't even allege that there's common questions regarding those two elements of the Penn Central test. So, all --

THE COURT: He's saying it doesn't predominate. That's his argument, not that they don't exist, that's not the -- the predominant issue is the Government's action.

MR. CONNOR: Right, but what the Supreme Court has required in Comcast is a class-wide measure of damages, and in the Tyson case that counsel discussed, there was a class-wide measure of damages that was proposed, and in that case, the reason why the Court granted or affirmed the Court of Appeals' grant of

certification was that there was a way to measure the damages class-wide.

THE COURT: Yeah, right.

MR. CONNOR: And in that case, there was a bifurcation of liability and damages. This case is much, much different, because, again, the liability -- the economic impact prong of it you need to show that in order to establish liability, not just for damages.

THE COURT: I know that.

MR. CONNOR: So, that's why the Tyson Foods case really has no application here.

THE COURT: All right, so what's your proposal to solve how we don't try 18 times different theories of a but-for world?

MR. CONNOR: Well, I think the Plaintiffs are now limited, as a result of Your Honor's September 2015 order, to three scenarios: They have the proposed merger with Daimler Fiat, they have the orderly windout scenario; and they have the cost-cutting scenario. So, they're really the only three scenarios that the Plaintiffs --

THE COURT: There's three scenarios, but have you dealt with experts before?

(Laughter.)

THE COURT: Three scenarios and a multitude of

outcomes.

MR. CONNOR: Yes, and I think that the way the parties -- the Spitzer and the Alley's and the Government propose to go forward is, with the model plaintiffs, and we can, you know, investigate their finances and see if they experienced economic impact potentially. We don't believe they can, because we have a motion for summary judgment ready on that issue, but in the event the Court denies that or we're not able to resolve the case that way, we could proceed on the economic impact prong there, but I think that the purpose of the model plaintiffs is to establish the common questions here, and the common questions here relate to the Government conduct, or the alleged Government conduct.

But there's simply no way for there to be any argument that common issues predominate here in a Penn Central analysis, because again, all of the dealerships are different, as Your Honor noted. Reasonable investment-backed expectation, one of the prongs, one of the things the courts look to is the laws that surrounded the dealership agreements. They make a big deal that they have these state laws protecting the dealership, but, of course, they're different in every state. So, they don't predominate over the common

issues.

Similarly with the economic impact portion, these dealerships range widely in profitability. As we pointed out in our papers, one dealership actually sold three cars in a calendar year. Another dealership sold 500 cars. So, there's no way for a Court to fashion a class-wide measure of damages in this case.

And --

THE COURT: But instead of damages, you mean economic impact?

MR. CONNOR: Yes, economic impact. And I shouldn't say damages, I should refer to it as just compensation, because it's not really damages, it's really just compensation. But the Supreme Court in Comcast --

THE COURT: Well, hold on.

MR. CONNOR: Sure.

THE COURT: Stop. The reason I said that, economic impact as opposed to damages, as you know, sometimes you can have a class certification for the purposes of liability and then separate it out for damages.

MR. CONNOR: Yes, agreed.

THE COURT: And, so, I mean -- so, we have to be careful about the words we're using now.

MR. CONNOR: Sure.

THE COURT: So, where the words we're using now -- what I understand makes this case difficult is that the issue of liability in this case carries with it individualized determinations of economic impact and reasonable investment-backed expectations. In fact, and the later questioning that we'll get into, if they're able to establish that is, in fact, will that be any different than their damage. I mean, as a practical matter.

But as a legal matter, they have to establish that, and in terms of whether -- I agree with you in terms of Tyson. Tyson is dealing with, I thought the question was they could use experts -- tell me what you thought Tyson stood for. I shouldn't speak for you.

MR. CONNOR: Yes, in the Tyson case, the Plaintiffs had an expert, it was a case where -- it was an FLSA case.

THE COURT: Right.

MR. CONNOR: Where the challenge is that they were common -- it was a pork processing plant, and the challenge was --

THE COURT: It was putting on the suits.

MR. CONNOR: Right, putting on the suits and taking off the suits.

THE COURT: Yeah.

MR. CONNOR: And Tyson in that case actually destroyed all the records relating to the time that these employees spent. So, the Plaintiffs got an expert to average that, and say, this is the average time, and apply it to the whole class. And the Court said that that was okay, in that case, because it reasonably applied to all the Plaintiffs.

Here -- and in that case, there was a class-wide way to measure damages. And there, also, liability and damages were bifurcated, which was another point that the Supreme Court made.

Here, the parties agree in a joint preliminary status report that liability and damages should not be bifurcated. So, again, I think really what controls here is really the Comcast case, where it held that class certification is inappropriate unless "damages are capable of measurement in a class-wide basis." And that's simply not the case here.

And Plaintiffs don't even really allege that that's the case here. All they allege is that one prong of the Penn Central test includes common issues. They don't allege that the reasonable investment-backed expectation or the economic impact prong are common as well.

And the class is really dissimilar in a lot of ways. I mentioned that the profitability could be different. There's different annual sales, different market shares, different market sizes, and then also, over 400 of the 789 dealers requested arbitration. Some of those were reinstated.

THE COURT: How many?

MR. CONNOR: Four hundred of the 789 requested arbitration. That's not to say that the arbitrator agreed with all 400.

THE COURT: No, I understand.

MR. CONNOR: And several of those were settled. Several of those claims were settled and we don't know what those settlement agreements say. They could include waivers of claims, and we haven't gotten into discovery on that particular issue, but in a sense, you would have a dealership like Finnin Motors, who was not reinstated, attempting to represent another plaintiff that was reinstated.

So, there's simply no way that a representative plaintiff here can adequately represent the class.

Also, the class is too amorphous. The definition in the complaint and the motion for class certification is all dealers terminated, not assigned, not renewed or not continued over a two-year period,

December 2008 through December 2010. The relevant action here happened in June 2009. So, you have dealers that may have been terminated for a completely different reason before or after the rejection of the dealership agreement. So, the class really has no relation to what the alleged Government conduct is.

And, finally, it's simply not superior to other forms of litigation here. The Plaintiffs offer no workable plan to try all proposed class members here, and there's also no reason, again, why they couldn't locate these -- any of these 789 dealers. If you go online and go to the Pacer website in the Bankruptcy Court, you can find a list. And given that unlike district courts, the class certification rules here are opt-in, then there's no reason why Plaintiffs shouldn't have been able to locate these people at this point, given the case has been pending for five years.

Simply put, if class certification is granted, the litigation will not be simplified, it will not be streamlined; instead, the majority of the claims here will proceed on an individual basis, while a smaller number of plaintiffs will proceed in a parallel class action, there's no time savings or efficiency here, so the Court should deny the motion.

THE COURT: Thank you.

MR. CONNOR: Thank you.

THE COURT: Mr. Buchanan?

MR. BUCHANAN: Thank you, Your Honor. If I may, if I recall, I may recall incorrectly, you posed a question to Mr. Connor along the lines of what is the difference between the methodology of having a representative plaintiff who would, as I understand it, bind the group, versus class action, and that's in the context, I believe, of the superiority argument.

So, in the context of the class action, opt-in class action, we have more than -- there's some debate about it, but more than three years left to go on the statute of limitations, because of the effect of American Pipe on this class action, which was filed relatively quickly after the Government's action.

So, as I understand the representative plaintiff model, it would bind the group, assuming everyone agreed, but I don't think it would bind the putative class that's not named as individual plaintiffs.

THE COURT: All right. So, if in the precedent in our Circuit, which usually would happen is, is if class certification is denied, there's an opportunity for people to come in.

MR. BUCHANAN: Yes, Your Honor.

THE COURT: So, I'm not sure that, given as the

Government indicates, I mean, you have a -- there's -- it's the next --

MR. BUCHANAN: Next topic.

THE COURT: -- the next topic, but as luck would have it, they, you know, we have a full procedure exam going, but as it stands right now, it's not as though you would not be able to contact those individuals. You understand that. In fact, the procedure would almost be -- I mean, the burden would be on you.

MR. BUCHANAN: It would be very similar to the procedure that we followed in Altemp if a Court denied class certification.

THE COURT: Right.

MR. BUCHANAN: An opportunity would be granted -- for notice would go out, generally speaking, to where there would be a time period in which those people would join the action.

THE COURT: Could come in.

MR. BUCHANAN: The big difference, though, in this case, is that even though there's a 45-day window to come into this case, it wouldn't require anyone whose statute did not otherwise expire to come into the case within 45 days. Instead, they could show up a year from now, or two years from now, not having been bound by whatever decision of the representative.

So, that is very theoretical answer to the Court's question, but it's also practical.

THE COURT: In what way?

MR. BUCHANAN: In the sense that there is not complete closure through the representative plaintiff model, whereas if you certified the case --

THE COURT: But even if I certified the class, you would have so many days to opt in, or you wouldn't be in.

MR. BUCHANAN: That's correct. I see your point, Your Honor.

THE COURT: You're not going to -- we're not going to stay the -- trust me, we're not going to say you have two years to come in. That would not happen.

MR. BUCHANAN: I understand.

THE COURT: I mean, that would not make sense.

MR. BUCHANAN: And, so, I do appreciate Mr. Connor's point about Tyson and about the Court's -- and Justice Roberts' concurrence is an interesting read, and since he has some real doubts about whether or not this will work when it goes back down, and all it does is illustrate or eliminate the nature of the approach that the plaintiffs in Tyson were taking for a class-wide model there.

But Tyson is noteworthy for the -- you know, the

language in it that says that -- I found it noteworthy, that in Walmart, that they never -- that this current term says that the Supreme Court never got to predominance in Walmart.

THE COURT: They did not.

MR. BUCHANAN: There's a 23(a)(2) issue, merely commonality.

THE COURT: Right.

MR. BUCHANAN: And I think a lot of practitioners in my shoes, particularly when you see cases like Comcast come out, it is -- you know, very easy then to conclude that it really is a predominance issue, just like they're arguing. You can take that 23(a)(2) argument, that there's not commonality, use the exact same facts and circumstances and make one heck of a good argument that it doesn't predominate. Because you can't predominate if you can't meet Rule 23(a)(2).

THE COURT: I will think about that. Thank you.

MR. BUCHANAN: Thank you, Your Honor.

THE COURT: Okay. I appreciate the briefs that I received and I appreciate the argument you've given me today.

MR. BUCHANAN: Thank you, Your Honor.

THE COURT: But in truth, I think that in order for us to move on, I am going to, for our purposes, rule

today from the Bench on the motion so that we can proceed to these other questions.

I believe, given the unique nature of regulatory takings cases, that we do have a situation in which the individual claims will require separate proof such that class certification in this circumstance is not appropriate and that the representative plaintiff model that we have established in the other two cases will work as effectively as well in the third case of your clients.

In that regard, I also recognize that a period of time will have to be set aside to allow what is the functional equivalent of their opting into your litigation. And I would ask for the Government to talk with you about that period of time. You should be aware that I'm thinking in the period of about 45 days, but --

MR. BUCHANAN: I read that, Your Honor.

THE COURT: Okay. And if -- unless I hear some big objection from the Government, that would be what my order would reflect.

MR. DINTZER: That's what we're looking for, Your Honor, yes.

THE COURT: Same thing. Okay. So, I appreciate it, it is an interesting issue, obviously it's been preserved for appeal by virtue of all of the discussion

we've had here today, but I do think that the Government's view is correct and I will write an opinion that reflects that.

Yes?

MR. FAULKNER: Your Honor, Richard Faulkner on behalf of Colonial. We would urge you to make it a slightly longer period of time, because while we all have the addresses, they are over five years old, some of them are not good. I know the Government, I believe, knows that as well. We're happy to discuss a date with them, we would, frankly, suggest maybe 60 days, just to give us a little bit more time so we can try to track down people.

THE COURT: All right, Mr. Faulkner, I'll tell you what, why don't the two of you, we will have a break, if you can come to a stipulation on the days --

MR. DINTZER: We can just say, we'll go with 60 days, Your Honor.

THE COURT: Sixty days.

MR. FAULKNER: That's perfect, Your Honor, thank you very much.

THE COURT: All right.

MR. DINTZER: So stipulated.

THE COURT: All right. So, we will -- and my order will reflect that. All right.

I am hoping that by virtue of that ruling, we can now move to the second issue on the motion to dismiss in the Spitzer case, and deal with the question of the Government's now motion to dismiss, and whether or not if, in fact, the period of time has now been opened for plaintiffs to join the litigation, if I grant the Government's motion to dismiss without prejudice, your client would be able to refile and I would not have to write a second opinion on the topic.

Does that -- am I reading this correctly, the law correctly, and what your concern is?

MR. DINTZER: If I could -- I just wanted to introduce Ms. Lister-Sobotkin.

THE COURT: Oh, I'm sorry, did I take your -- please come to the podium, I don't want to take away.

MR. DINTZER: Counsel, I don't want to say the wrong thing.

THE COURT: All right. So, this is what I was thinking, having denied the class certification but providing a period of time, if their client -- if your motion is granted without prejudice, does that not solve our problem today?

MS. LISTER-SOBOTKIN: Your Honor, it would solve probably most of the problem.

THE COURT: Okay.

MS. LISTER-SOBOTKIN: The Government would have no objection to a dismissal without prejudice with leave to refile. The only continuing issue, potential issue that we see is that the class action tolling doctrine only applies to putative class members, and as we pointed out in our response, they haven't -- Turner Morris Autos has never attempted to join the putative class and hasn't pled that it is a member of the putative class. So, we would want to reserve our rights to raise that issue on a refiling of their complaint.

THE COURT: And that would be in your view, they would have to be, what, one of the 700 or so?

MS. LISTER-SOBOTKIN: They would have to fall within the definition of the proposed definition of the putative class, which I suppose arguably is broader than the 789.

THE COURT: Yeah.

MS. LISTER-SOBOTKIN: That were terminated in bankruptcy, but they would have to establish, you know, at a pleading level that they were, indeed, a member of the putative class.

THE COURT: Okay. And if they -- so, you're reserving your right to challenge it on that ground?

MS. LISTER-SOBOTKIN: Yes, Your Honor.

THE COURT: But assuming that they can establish

that, this issue may go away?

MS. LISTER-SOBOTKIN: Yes, assuming that they can establish that, and they replead after class certification is decided, we have no objection to, you know, the dismissal with prejudice.

THE COURT: Well, I decided that today, but an opinion will follow, and the time will not run until I write something, so that 60-day period comes with a -- an order that people can -- the public can see.

All right. And let me hear from Spitzer's attorney, just on the record, does that satisfy -- you objected, obviously, to dismissal, does this fix your problem with a dismissal without prejudice with the right to refile?

MR. RATAY: Yes, Your Honor. We're fine with that.

THE COURT: Very good. Thank you. All right. Making tremendous progress.

What I did hear, and what I really did want to spend the bulk of our time talking about was making sure that we really do have the legal issues that we think need to be decided clear in our minds. Takings cases are very unique, they're also difficult cases, because it's one of the unique places where we're dealing with Federal common law as opposed to statutes and rules and

regulations.

And, so, as you saw in the Circuit's decision in A&D auto sales, Inc. v. United States, a whole series of tests were laid out for the first time in terms of what would be the proof that would be required. Some of those were issues I'm not even sure, you know, had been totally discussed prior to that decision, but that is now, I think, something we have to deal with.

And, so, I thought that what we would try to do today is try to talk through what I had on page 2 as sort of A, B and C. In Mr. Buchanan's words, the common issues, and tomorrow focus on I guess it's A and B, and then focus on C, which are the individualized issues and do we agree that those make sense in terms of, you know, C, D and E.

So, I thought, if folks didn't mind, I would like to hear from the Government first, if they agree that I have -- you think I've characterized these correctly, and then each of the individual Plaintiffs' attorneys will have an opportunity to talk through whether they're in agreement, where the nuances are, and then the Government can respond.

MR. DINTZER: Thank you, Your Honor. If you could just give us one second.

THE COURT: Absolutely.

MR. DINTZER: Thank you.

So, Your Honor, we understand that the Court is asking us to respond to these issues to be decided, and I've planned to sort of follow along as in the order laid out by the Court. I would like to just start off with two caveats, if I may. The first is that, as you will hear when we get to number 5, we are always thinking ahead, but when we get to number 5, this is not necessarily the order that we think might be the most efficient to do this.

THE COURT: Which is why I have question 5.

MR. DINTZER: Completely understood.

THE COURT: Right.

MR. DINTZER: And, so, I just wanted to put that caveat up front. And a second caveat is, I would like to reserve our rights in the sense that we are very early in the case, and we want to be responsive, this is what we understand the issues are right now, but to reserve our rights, if as we see the case develop, we only have a vague understanding of the Plaintiffs' case, that we may have to raise other issues that we don't anticipate right now. But I want to be responsive to the Court, this is how we see the case as it is right now.

THE COURT: Yeah, just to be clear, it's -- part

of my reasoning for doing this is to figure out with so much potential discovery coming down the path, that we're not all over the map, and you're right, something could come up and we have to raise additional issues, but that we are at least all going forward with what we anticipate the burden will be on the Plaintiff, what you're expecting them, you think, under A&D Auto Sales they have to establish, and that discovery and so forth will flow in that direction as opposed to some other direction.

MR. DINTZER: And we deeply appreciate that, Your Honor. I mean, the effort to narrow it, and then with number 5 to organize it, these are -- I mean, we appreciate that, and I'm sure the Plaintiffs do as well. We all want this to be as efficient as possible going forward.

THE COURT: Correct. Okay.

MR. DINTZER: So, with those two caveats, what I would like to do, if I have the Court's permission to hand out just a graphic that I have created.

THE COURT: And you have copies for everybody?

MR. DINTZER: I do, Your Honor.

THE COURT: Very good.

MR. DINTZER: Well, actually, I may have underestimated how many people were going to be here,

but I certainly have a number.

THE COURT: Do you have one more in terms of --

MR. DINTZER: Your clerk?

THE COURT: This is what I -- excuse me. Do you want to put it on the monitor?

MR. DINTZER: I was planning on doing that, Your Honor.

THE COURT: All right, so why don't you do that, then you're fine. There's one. You can't see that. Oh, there it is, okay.

MR. DINTZER: Can you see that?

THE COURT: Yes.

MR. DINTZER: Okay. Thank you, Your Honor.

So, what I would like to do is I would like to start off with question 4(a) that Your Honor asked about the Government asking in a sovereign capacity, and we do agree with the Court, that the Plaintiffs will have to establish that the Government acted as the sovereign when it was doing whatever the Plaintiffs ultimately argue was the action that was the taking.

The Plaintiffs must establish that as a threshold issue. If the Court looks at the second slide, there are basically two ways that the sovereign can act, it can act in a confiscatory manner in going and taking somebody's property, and we're talking about

a physical taking or an intrusion, or it can regulate, and if it does that, then we're talking about Penn Central, as Your Honor knows.

These are sovereign acts in the sense that only the Government can do these things. It can do a lot of other things that are not sovereign acts. It can buy stuff, it could sell stuff, it can lend money, and it could try to protect its loans.

And the Plaintiffs will be put to the test on establishing that whatever they say was the taking action was something that was a sovereign act.

And, so, moving on to what Your Honor's question 4(a)(ii), what A&D said was, if the Government sought in whatever action it took to protect its financial interests, that was not acting in a regulatory capacity. That would fail to qualify as a sovereign act.

And the simple way to think about it, Your Honor, is that if there had been somebody else out there who was willing to lend to Chrysler, and I would, in fact, show that there wasn't, but if there was --

THE COURT: Well, but they have an argument that there was.

MR. DINTZER: They absolutely do. That private investor, Berkshire Hathaway, somebody with a lot of money, they could have put in whatever term they're

talking about, a private actor could have put that term in, too. There was nothing unique about that term that was related to the Government. And if that term was put in for whatever to protect that lender's interests, I think what the Federal Circuit is saying in A&D Auto is that's not a sovereign act, it would be up to the Plaintiffs to establish that the actions that the Government took were taken as the sovereign and not -- so, in one of these two big boxes and not as a lender or in that capacity.

So, in that way, Your Honor, we answer the Court's first question on 4(a)(ii), about the sovereign act.

Now, in 4(a)(ii), the Court is asking about how do we think about the larger context about the efforts to save the auto industry and preserve jobs? And there's actually two answers for that. The first answer is when we're talking about the sovereign box, the box that we're looking at right now, it doesn't have a lot to say about it. The Government -- when the Government acts, the Government presumably, hopefully acts always in the public's interest. That's the very nature of it. Whether it's to help with low-income housing, whether it's to buy a tank for national defense.

So, because there's that presumption in whatever

action, whether it's to purchase something, talking in terms of what was the Government trying to achieve, it can always be writ as the government was trying to achieve something in the public's interest. That's not -- as the Federal Circuit recognized, that is not necessarily the question of the difference between sovereign act and non-sovereign act.

So, the bigger picture, it's not important. It becomes -- that bigger picture and all those things become important in the fourth box, which I'm going to get to, if not today, then tomorrow, about with respect to the Penn Central test, because when we're looking at the character of the Government action, that is a broad range or at least it can be a broad range in questioning what was the Government doing and why did it do it, that can involve some of those bigger issue questions, but that is properly siloed in that box and is part of that examination.

So, the question is only did the Government make the loan, did it think the alleged terms made the loan safer for the taxpayer? If not -- if so, then it's not in its regulatory capacity, and we've answered that first box.

So, that's what I've got on box number 1, Your Honor, unless you have any questions about that.

THE COURT: No. I mean, this is not an oral argument on summary judgment, so I just want to see whether or not everybody --

MR. DINTZER: Was that helpful, Your Honor?

THE COURT: Yeah, I mean, it's helpful to me because I'm trying to figure out in terms of question 5 if it's your position that the Plaintiffs cannot meet the threshold question of how the Government -- that the Government was acting in a proprietary capacity as a lender.

MR. DINTZER: Yes.

THE COURT: That may require us to sort of focus on that issue.

MR. DINTZER: It would -- I believe that that's a threshold issue, Your Honor. I believe that focusing on that issue could be one that would resolve the whole case, if that was --

THE COURT: That's what I'm talking about.

MR. DINTZER: Yes. And I don't mean to, you know, this is a spoiler alert here, but when we get to question number 5, we're going to suggest that economic impact might be the --

THE COURT: Instead a different issue.

MR. DINTZER: But yes, this could -- this is definitely a threshold issue for them, as far as if they

can't prove sovereign act, then they're done, because non-sovereign acts are not takings.

So, that would take me to the second question here, that I've got on my box, but actually is not on your outline, so that this is something that we would want the Court to add as far as something that the Plaintiffs would have to consider or address.

And it's regarding the nature of their property right. Now, we do not contest that the franchise agreements are property interest. That's a given. We don't contest that. And that they're protected by the Fifth Amendment. But the inquiry has to be deep, Your Honor. The inquiry has to be what sticks in the bundle of rights did they have with those franchise agreements?

And most important, the thing is they have to show that their bundle of rights included the stick that they're claiming the Government regulated to zero, or that the Government over-regulated.

THE COURT: Took it away. Yeah.

MR. DINTZER: Those two pieces have to meet. It's not just, oh, we have a piece of property, you regulated us, we were doomed, and so you win. No, those two pieces have to meet -- they have to prove that stick in their bundle of rights. So, that would be something else that they have to --

THE COURT: You need to explain that a little bit more thoroughly. What do you mean?

MR. DINTZER: Okay. So, if I can, Your Honor, I would like to use an example, because I anticipated you might need me to explain this further.

THE COURT: Good.

MR. DINTZER: So, if I may, Your Honor.

THE COURT: Yes.

MR. DINTZER: I'm going to simplify this down to two neighbors who share a common boundary. And Fred and Joe are next-door neighbors and Fred has a low fence and Fred decides he wants to build a higher fence. He builds a 10-foot fence to keep out the noise from Joe for whatever reason.

Joe doesn't like the fence, but he doesn't have any property rights about the fenceline. Some places you actually, you have --

THE COURT: You want to -- yeah. You're talking about who owns which fence? Who owns the fence?

MR. DINTZER: Okay, see the fence, Your Honor, it's built on Fred's property.

THE COURT: Yeah.

MR. DINTZER: He wants to build a 10-foot high fence.

THE COURT: Yeah.

MR. DINTZER: There's nothing Joe can do about it, because it's on Fred's property and it doesn't interfere with any of Joe's property rights. In some areas, that some people live, say in view of the ocean, that might be part of their property rights, and if Fred builds that fence, he may face a lawsuit from Joe. It depends on the bundle of rights they have.

So, similarly, if the city comes in and tells Fred, we want you to build a fence, we'll pay you to build the fence, or even if they coerce Fred and say, we won't take your garbage if you don't build the fence. Whatever reason, if Joe doesn't have, in his bundle of rights, the ability to say, I'm not -- you're not allowed to build that fence, this is part of my rights. If that's not in Joe's bundle, the fact that Fred does it, or that the city asks him to do it, pays him to do it, coerces him to do it, none of that matters because it's not infringing on -- now, Joe has property rights, there's no question, he owns his piece of property, but it has to be that stick in the bundle of rights that is interfered with by the alleged Government action that triggers the taking. If those two pieces don't connect --

THE COURT: Back up for a second.

MR. DINTZER: Okay.

THE COURT: Because I mean, that's why we're having this conversation today.

MR. DINTZER: Sure.

THE COURT: You have a fence with Fred and Joe.

MR. DINTZER: Yes.

THE COURT: Okay? If I understand the Plaintiffs' argument, is that the United States jumped into Fred's shoes, and the United States said, Joe, give me the contract that you had that prevents, you know, the contract right not to object to my 10-foot high fence. Where do you see -- I mean, are you suggesting that when you say there's no contract right, you're saying they -- Joe would have -- move now to our case.

MR. DINTZER: Okay. So, let me move. So, this idea -- so, the question is this, did Chrysler, okay, Chrysler is the Fred here.

THE COURT: Yeah.

MR. DINTZER: Did Chrysler have the right to make the decision to terminate the franchises -- some they did, some they didn't -- was that a decision that they had. If we -- if, as the Plaintiffs seem to allege, we took that right, maybe we coerced that right, but if it was Chrysler's right, then Chrysler would have the actual --

THE COURT: All right. Because Chrysler could

always terminate your franchise, the fact that the Government coerced you to do it, you're saying it doesn't matter.

MR. DINTZER: It wasn't a stick in the bundle -- or at least the Plaintiffs would have to show that as part of the franchise agreement, they had the right to not be terminated in bankruptcy. That if the government had never walked in, that they could have said, if Chrysler had gone to the bankruptcy, then they could have said, whoa, you can't do this, that was part of the right that adhered them to their property.

And, so, that will be -- that's the second box we're showing, that would be one of their proofs, that the property interest that they claim cannot collide and connect with what they say was taken from them. And, so --

THE COURT: And you define that as the right not to be terminated in bankruptcy?

MR. DINTZER: I define that vis-à-vis how they have described to the Court, especially in the Federal Circuit, what they claim the taking was. If the taking -- so, whatever -- however they come out, whatever they allege the taking was, the regulatory action that they claim was the taking, they have to match that up with a stick in their bundle of rights.

And it's not enough for them to just say, we had rights, we had a franchise agreement. No, not if you didn't have, in your franchise agreement, the right not to be terminated in bankruptcy, if that's what they claim was the action. Whatever they claim it was, that has to be one of the sticks in their bundle of rights.

And that's sort of the concept of Fred and Joe, you have to have, whatever you're suing for taking, that stick in your bundle of rights.

THE COURT: All right. So, I can anticipate we -- that's why I'm asking you to define what you think --

MR. DINTZER: Sure.

THE COURT: -- was -- what I'm hearing you saying is they -- they may not, right now I'm hearing that they didn't have the right not to be terminated in bankruptcy, meaning if the Government hadn't intervened, they would have gone under unless they can establish somebody could have bailed them out.

MR. DINTZER: That was not --

THE COURT: Okay.

MR. DINTZER: I apologize. That was not in their property right. That, in fact, if we never interfered, and Chrysler had gone bankrupt, they could have done the exact same thing, terminated them, because

this was not a property right that the Plaintiffs had.

THE COURT: All right, let me just ask you. I have no great recollection of this from A&D.

MR. DINTZER: This -- we did not raise this specific issue in A&D.

THE COURT: All right, I just wanted to make sure.

MR. DINTZER: But this grows out of the A&D analysis where the Court says -- the plaintiffs allege that the Government action was requiring dealer terminations as a condition of financial assistance to the automakers. So, they're saying that that termination, if that -- and again, I'm not trying to characterize their case, I'm just saying that whatever they're saying the action is, has to meet up with the property interest. That would be an element of proof.

THE COURT: Okay.

MR. DINTZER: So, if they're saying that that termination was the action, then they have to show corresponding property right not to have that action taken, whatever it is. So, if the Government is grazing on your land, you have to show that you have a property interest in not having the Government graze on your land. If you sold the grazing rights to somebody else, even though it's your land, if you -- then you have to

show that you have that property interest, whatever it is.

And there's a case where people bought a fishing boat and then they got a license, or they tried to get a license for the fishing boat, and ultimately, the license was cancelled and they didn't get the license.

THE COURT: Yeah.

MR. DINTZER: They sued for a taking. And they had -- they actually had a property interest in the fishing boat, but they didn't have a property interest in getting the license. And the fact that they didn't --

THE COURT: But you would admit they have a property interest, as you said, in the franchise agreement. So, I'm trying to --

MR. DINTZER: We do not oppose that, Your Honor. Yes.

THE COURT: Right. So, you say they have a property interest in the franchise agreement. What you're saying is, though, and that's why it's -- so I understand what your theory is, so what you're suggesting is that that right to a franchise -- that franchise agreement was not -- did not include the possibility of it being terminated in some way?

MR. DINTZER: Yes, Your Honor.

THE COURT: That has to be what you're telling me.

MR. DINTZER: Yes. Every property interest, and the courts have said this repeatedly.

THE COURT: Well, call it a contract.

MR. DINTZER: Okay.

THE COURT: Every contract --

MR. DINTZER: Okay, contract, but every contract -- but even broader, property interest comes with a bundle of rights, they're like sticks, as the Court has described them. And for each piece of property, whether it's a contract or real property or whatever, it comes with those sticks.

THE COURT: Right, but you know in a regulatory context, the reason that bundle is there is they're trying to figure out what portion of your property interest remains.

MR. DINTZER: That's one of them, Your Honor.

THE COURT: Okay? I mean, that's usually what the theory of that is.

MR. DINTZER: But you also have to show that whether it's a regulatory taking or physical taking, that what you claim is being taken is still in your bundle of rights. So, for example, the property, if you leased out the grazing rights for the next 20 years, the

Government comes grazing on your property --

THE COURT: But the reason the analogies are not good with a physical kind of thing like that is because the regulatory arena is a little bit different. So, the question is, I'm regulating your land.

MR. DINTZER: Yes.

THE COURT: Okay? And then you come to me and you say they took it all away.

MR. DINTZER: Yeah.

THE COURT: And I go, well, let's look at what you have. You still have the sun in the morning and the stars at night and you can go out there and enjoy it. So, you still have that in your bundle. You still have the fact that you can camp on it. All of those things suggest the Government may regulate the fact that you can't build a house on it, but there are other things you can use.

I remember there's a famous Eagle Feathers case.

MR. DINTZER: Yes.

THE COURT: Okay?

MR. DINTZER: And all of those, Your Honor, everything you're saying is correct and I agree with it, on economic impact, but there's a separate question beyond -- that is sort of with economic impact but separate.

THE COURT: Okay.

MR. DINTZER: In that whatever it is that you say that you've lost, so let's -- you're back to that piece of land. Let's say that the people before you gave up an easement of a road right in the middle of it. So, look, you were never really able to -- going to be able to build that gorgeous beach house. And, so, what you really could have built are two little sheds, or maybe you couldn't have built anything because there's this road going through it.

If the stick that you're claiming you lost is not in the bundle that you have --

THE COURT: No, the stick they're claiming they lost is the contract.

MR. DINTZER: Yeah, but they --

THE COURT: They're not claiming a stick.

MR. DINTZER: No, but they are saying that they lost the contract, but they're saying the Government did a specific thing to it. We didn't go -- if we had gone and physically, you know, and taken over the contract, then that would be a separate set of issues. If they're saying, look, you regulated -- in some way you acted to regulate our contract, so that some right that we had with that contract is --

THE COURT: Okay.

MR. DINTZER: -- is diminished to the point of we're going to bring a taking, they would have to show that that stick, and in this case, the right to terminate them in bankruptcy --

THE COURT: Okay, so that's really what this is focused on. Okay.

MR. DINTZER: That's that -- assuming that that's what they're saying, because I don't want to put words in their mouth, the right to terminate them in bankruptcy, if the Government had never gotten involved, there is no question, as I understand it, that Chrysler had the right to terminate them in bankruptcy. And, so, if that is true, if the Plaintiffs never had the right to say, whoa, you can't terminate us in bankruptcy, okay, if they didn't, then the fact that Chrysler did it because as they allege, the Government forced them to, paid them to, whatever, that was something that Chrysler had the right to do. And Chrysler might be sitting in here saying, you know what, you did something to us, you forced us to do something we didn't want to do, that's the taking.

THE COURT: So, you're anticipating, potentially, that you would have Chrysler come in and say, they would, for example, we would have never terminated them?

MR. DINTZER: They might, but that's not the real issue.

THE COURT: Okay.

MR. DINTZER: The real issue is, it's not their property interest to have said, one way or the other. Inhered in their franchise agreement --

THE COURT: So, this is fatal to their case, you're saying?

MR. DINTZER: Yes. If they didn't own the property interest that they're claiming was abused, then yes, then --

THE COURT: So, this is a legal question in your mind?

MR. DINTZER: It is a legal question, Your Honor.

THE COURT: Okay. Thank you. All right, so let's move on.

MR. DINTZER: And I apologize for --

THE COURT: No, no, I'm trying to make sure that we don't -- there's no discovery on this, presumably.

MR. DINTZER: It depends on how they want to build their case, but, Your Honor, I would anticipate it to be a legal question.

THE COURT: I would anticipate it perhaps as well. Okay.

MR. DINTZER: Okay, so the next thing is that the Government coerced or directed Chrysler -- and we're at the third box here.

THE COURT: Yes, we are.

MR. DINTZER: And this is 4(b) on your questions. And first I'd like to just point out, Your Honor, in your order, you indicated several times, and I'd be happy to quote it, Your Honor.

THE COURT: You don't have to.

MR. DINTZER: That -- and this is, for example, in 4(a) -- let's see. Oh, so, for example in 4(a), you write, "The plaintiffs will have to establish as a threshold issue that the Government, in demanding that franchise agreements be terminated, was acting" -- I just want to put a -- that that is contested fact, as to whether the Government demanded, ordered, instructed, whatever, that the contracts be terminated, that that is --

THE COURT: Okay.

MR. DINTZER: That that is not a conceded fact.

THE COURT: And you are contesting that based -- just --

MR. DINTZER: I would just, quite honestly, Your Honor, until we get on to --

THE COURT: Well, you know, it is your client.

MR. DINTZER: It is my client, and the way that they have framed it, we cannot accept that, the way that they framed it. So, at this point, Your Honor, it is a contested fact.

THE COURT: And is it contested generically, or is it contested with regard to any individual one? Help me understand what your issue is on what's contested.

MR. DINTZER: Well, we certainly contest that the Government identifies specific plaintiffs to be -- to be terminated.

THE COURT: All right.

MR. DINTZER: We contest the fact that the Government demanded that franchise agreements be terminated, as a general proposition.

THE COURT: They did not demand that?

MR. DINTZER: Well, Your Honor --

THE COURT: Isn't there admissions of that sort?

MR. DINTZER: From our point of view, the Government offered a loan. So, as far as we're concerned --

THE COURT: Yeah, but wasn't there a condition to that loan?

MR. DINTZER: There were a number of conditions to that loan. I -- I can check. I --

THE COURT: I mean, I was under the impression,

and I may be wrong, maybe things were different with regard to GM versus Chrysler that I don't know well enough. I thought it had been understood -- I'm not talking about individual, and that's why I said in demanding that franchise agreements be terminated. I actually used that phraseology intentionally, not that individual ones, but I am curious -- this is the first I've heard that that is something now being contested.

MR. DINTZER: Your Honor, the entire -- as far as we're concerned, Your Honor, the entire loan is voluntary.

THE COURT: The loan was voluntary.

MR. DINTZER: Every term of the loan was voluntary. So, I mean, we didn't --

THE COURT: That helps me understand what you're saying.

MR. DINTZER: Okay. And, so, we're at -- whether --

THE COURT: That's all right.

MR. DINTZER: Okay.

THE COURT: I now understand what you're saying.

MR. DINTZER: So, then, whether the Government coerced or directed Chrysler must be part of the Plaintiffs' proof. As the Court knows, the Federal Circuit held that Chrysler was not an agent of the

Government, so the Plaintiffs must show that the Government coerced Chrysler to terminate specific dealers, that we were -- that we had that coercion factor. The Federal Circuit lists a series of factors, they say that that is not a conclusive set of factors, but they do list a set of factors. We agree with Your Honor and the Court that they have to establish that Chrysler was acting under the Government's coercion to move forward.

THE COURT: And I listed what I thought were the coercion factors that the Circuit had identified.

MR. DINTZER: And I did not compare your list to the Court's, but unless I'm mistaken, Your Honor, the Court said, "among these factors," and did not --

THE COURT: They did, and I -- the question is among them --

MR. DINTZER: Your Honor, until we understand what the Plaintiffs are alleging and until we see the facts that they are putting forward, and depose some of the Plaintiffs and on and on, I would be reluctant to say that these are -- that this is a definitive list.

THE COURT: The exclusive list. Okay, so you're saying don't make this an exclusive list?

MR. DINTZER: I'm saying I just don't know right now.

THE COURT: Okay.

MR. DINTZER: But I am saying that, you know, you're seeing some of the factors certainly. I mean, in contract law, you know, it's understood that if you're coerced into entering into a contract, you're supposed to identify the coercion as quickly as possible. I mean, there are things that may be raised.

THE COURT: I see. Okay.

MR. DINTZER: And, so, the fact that, you know, two weeks later, three weeks a later, a month later, Chrysler didn't say we were coerced to enter into it, I mean, that would be something we would consider. So, I would say that that would be something that we would have to see how that develops.

THE COURT: All right. So, let's go through the next are the ones that go to --

MR. DINTZER: The Penn Central test.

THE COURT: The Penn Central test, so let's wait on that.

MR. DINTZER: Okay, wait on it. Thank you, Your Honor.

THE COURT: And do that tomorrow, I think. What I would like to do now is take a 20-minute break to allow the Plaintiffs to talk amongst themselves and figure out how you want to approach whether or not you

agree with this, disagree with this, and maybe we can take 15 minutes, but just get back at 3:30, but to give you some time, if you need to allow a bit of time to discuss things, all right?

MR. DINTZER: Thank you, Your Honor.

THE COURT: All right, thank you very much.

(Court in recess.)

THE COURT: Okay, we are back. Please be seated. All right, have we decided who will proceed and to begin?

MR. MARZULLA: I drew the short straw, Your Honor.

THE COURT: Did you, Mr. Marzulla? Okay. So, we -- if you -- I am ready whenever you are, sir.

MR. MARZULLA: Very good, Your Honor.

MR. ENION: And if we can switch over to the Plaintiffs.

THE COURT: Oh, okay. Are we on?

MR. ENION: One moment. And it's the Plaintiffs' table.

MADAM CLERK: Right.

THE COURT: All right, very good. We're up.

MR. MARZULLA: Good. Your Honor, I had thought that we were a little bit closer on these issues, and I think actually there are fewer issues for the Court to

have to decide in this case than perhaps the Government would like to suggest. The starting point -- and all of that derives from the fact that this case has already been litigated at the Federal Circuit, and the Court then has the advantage, or disadvantage, as the case may be, of having rulings that guide this case.

The Government, after all, chose to certify the denial of its motion to dismiss, chose to ask the Federal Circuit to rule on certain issues, the Federal Circuit ruled on them, and the Government is not free at this point to simply disregard those.

So, look at what the Federal Circuit said it was deciding in this case, that the question here is whether the Government is liable when, as a condition of providing the financing, it induces or requires action that eliminates the property right of the Plaintiff. And I think that's what the Court was getting at. No matter how the Government may squirm here, the fact is that Chrysler, in its viability plan submitted on February 17th, 2009, did not propose to terminate any dealers. That was never any part of Chrysler's plan.

The Government required, as a condition of the loan, and I think there's now no fact issue as to that point, required as a condition of the loan to Chrysler that Chrysler would go out and terminate 25 percent of

its dealer network.

So, the Court, I think, discussed with counsel for the Government three issues. The first was this sovereign versus proprietary. Fortunately for Your Honor, the Court has already ruled on that issue and ruled directly against the Government. We argued it, Mr. Dintzer and I, at the Federal Circuit, and the Federal Circuit ruled, that's the paragraph beginning second, "the Government action in this case was not undertaken in a solely proprietary role."

That was the ruling of the Federal Circuit. Had the Federal Circuit ruled, yes, it was in a proprietary role, then, of course, the motion to dismiss would have been granted and this case would have been dismissed. The Federal Circuit ruled on that issue. The Government made exactly the same argument. And you know, that makes sense, Your Honor, since the Federal Circuit, of course, ruled in this case, the Supreme Court decided Horne, and Horne, as you'll recall, dealt with that market order program for raisins.

And interestingly, one of the kind of funny issues, complex little issues in that regulatory scheme, was they were the raisin producers, the people who actually grew the grapes and dried them and so forth, and then they were generally turned over to the raisin

handlers, whose job it was to sort out and put aside a portion of the raisins for the Government.

Nowhere did the Supreme Court say, well, since the United States has had the handler set this aside, the Government isn't liable for a taking because it was the handler that separated out the raisins. That in effect is what the Government argued and lost at the Federal Circuit. That's what I heard the Government arguing to the Court today.

Well, Chrysler could have filed bankruptcy, so the fact that the Government coerced Chrysler into filing this action to terminate these contracts doesn't make any difference. If that were the case, we would have been done at the Federal Circuit. But, of course, the Federal Circuit found quite to the contrary. There is no role, and the Federal Circuit has said that before -- do we have that quote from Yuba Goldfields?

And I think Mr. Dintzer suggested this proprietary versus sovereign concept is one that has application in the context of contracts, government contracting, it has little, if any, application in the context of takings. As the Court said, it's what the Government did, not what it said it was doing that really counts.

So --

THE COURT: Well, Mr. Marzulla, let me just ask you a question.

MR. MARZULLA: Yes?

THE COURT: The Government's argument, that I'm not sure I fully comprehended before, was that --

MR. MARZULLA: I join you in that.

THE COURT: Well, I didn't -- I mean, because I've read through the briefs and so forth, but I -- that's one of the reasons we're doing this.

MR. MARZULLA: Yes.

THE COURT: Is that because the loan itself was a voluntary arrangement --

MR. MARZULLA: With Chrysler.

THE COURT: With Chrysler.

MR. MARZULLA: My clients did not voluntarily agree to terminate their contracts.

THE COURT: All right, so your argument --

MR. MARZULLA: We weren't parties to that at all.

THE COURT: And, so, that's what you're -- and I think that's the important thing you're now taking from Horne. So, the voluntary --

MR. MARZULLA: Precisely.

THE COURT: -- agreement that happened with Chrysler is not a voluntary agreement that happened with

your clients?

MR. MARZULLA: Yes, or to put it another way, the Government cannot enter into a contract with A to take the property of B and avoid the taking clause, by doing it through that contract. If the Government had passed a statute, Your Honor, that terminated 25 percent of the franchises, I think there would be no question it's a taking. Can they do it through this other methodology of simply targeting those contracts and telling Chrysler, go ahead and terminate them through this bankruptcy process, and the process, by the way, was largely driven by this purpose, to terminate the contracts.

Can the Government avoid the just compensation clause in that way? Steven Rattner, the head of the Auto Industry Task Force, suggests in his book that that was exactly the consideration. They were advised, there might be takings liability, and so they decided to use this bankruptcy process instead as a means of trying to get round it.

In any event, I think this has -- this has been decided. And where I think counsel for the Government has taken a wrong turn, is the place where there is some discussion of this proprietary notion is in the context of consequential, or incidental damage, where, for

example -- well, the prime case is the Omnia case, where the Government, during the war, requisitions all the steel output of a mill, and that means people who had contracts to get that steel couldn't get it. They sued for a taking and the Court said, no, the target of what the Government was doing was not your contracts, the Government wanted the steel, they didn't care whether it was under contract or not. The Government didn't take your contracts, that's just an incidental loss. That's the only place where we see the term "proprietary" used in the context of takings.

So, that's the proprietary thing, and fortunately, as I suggest, it was briefed, it was argued, it was decided by the Federal Circuit. That issue is no longer open.

Second, fortunately, once again, the fact that the Plaintiffs have a property right has also been decided. Now, we didn't hear about Fred and Joe and their fences, which, frankly, I wasn't able to follow, but the Federal Circuit has ruled that the -- there is no dispute that the franchises themselves are property rights. And as they suggest, that the issue here is if the Government coerced Chrysler into cancelling those franchises, did that constitute a taking? And that is a fact issue. That is an issue on which we are eager to

do discovery, it's an issue that I think the Court is going to have to try.

THE COURT: Tell me what you think that issue is, Mr. Marzulla.

MR. MARZULLA: I think the issue -- well, the issue is the -- it's the coercion question. And I think that's what the Government is confusing here. What the Federal Circuit did not -- the argument the Federal Circuit rejected, the argument that counsel made here today, is the bankruptcy law has existed for a long time, this contract was made with knowledge, it could be cancelled, in bankruptcy, therefore it inheres in the property right that -- well, it's something that is not part of the property right, not part of your bundle of sticks, not to have your contract cancelled, as Chrysler did.

The Federal Circuit, again, specifically ruled against that. So, that argument is no longer open.

THE COURT: And what did they say in your view?

MR. MARZULLA: We have that quote as well. "It's true that bankruptcies existed, but did not inhere in the property right." It's not a background principle. Now, counsel has used a slightly different argument here, and he said, well, I'm not saying that it was exactly a background principle, but it was something

that Chrysler could do.

THE COURT: Okay. So, that's --

MR. MARZULLA: But it's the same -- it is the same argument. Counsel addressed it as a -- an issue of defining the property right, what's in the bundle of property rights. And the Court rejected the argument that because bankruptcy law already existed, that using bankruptcy rather than, say, legislation, to cancel these franchises, lifted the Government's -- or defeated the Plaintiffs' right to just compensation.

THE COURT: Okay. And tell me on the coercion, which I -- since --

MR. MARZULLA: Well, like the Court, I thought that issue had already been decided and I think we are down to an interpretive question, as I understood the Government. The Government, I think, does not deny that it did require termination as one of the conditions of the loan to Chrysler.

The Government simply makes an argument that because Chrysler voluntarily agreed to it, somehow that --

THE COURT: Okay.

MR. MARZULLA: -- allows the Government to accomplish this end of cancelling these franchises without paying for them. There is no law to support

that. The Government cites no case to you that suggests that. And I think the only -- the only issue is whether there is some factual basis for suggesting, I think as the Court suggested, well, what if it was Chrysler's idea to write this term in the contract? And I suppose if there were any such facts, we don't know about such facts, but we have not been afforded any discovery thus far. The Government hasn't represented that there are such facts.

So, we think the coercion is largely established. If the Government's got some facts, they haven't disclosed them to us. We haven't seen any documents. We've seen nothing to suggest that it was not the Government's idea to require the termination of these contracts.

THE COURT: Well, maybe you can help me. I put down these factors, which I thought the Circuit had said, and having -- which was the Federal Circuit sort of found the circumstances or among the circumstances relevant would be whether or not the Government insisted on terminations, whether the terminations would have occurred absent Government action, whether the Government financing was essential, whether the Government had any role in creating the circumstances, and whether the Government targeted the dealers.

You know, I mean, we are now with this sort of multi-factor issue.

MR. MARZULLA: Yes.

THE COURT: What do you think your clients have to establish in order to satisfy the -- is this the Court trying to get around Omnia by saying the Government is directly involved? I'm going to be honest with you, I'm not quite sure I fully comprehend what the Circuit is doing here. I'm not being clever.

MR. MARZULLA: No. I think -- not at all. I think the -- I think that was sort of a long-winded way of asking was -- did the Government actually require this termination as a term of the contract?

THE COURT: Okay.

MR. MARZULLA: Which side of the table did it come from? If Chrysler came up with the idea and it was Chrysler's motivation, then, of course, it's not attributable to the Government. But, if it was the Government's idea, as we believe it is and we believe we can prove, if the Government said, you're going to have to take the property of these 800 -- 789 auto dealers, and we'll give you $6 billion if only you'll take their property, and do some other things, then that can constitute a taking. That's what the Federal Circuit said, and that's the issue that they've dropped back in

your lap. Is it a taking.

THE COURT: All right. So, the factual issue, you're suggesting, would be if you could establish, as you've alluded to, in Mr. Rattner's book and elsewhere, that people have said that wasn't in the original Chrysler plan, the Government folks came up with that, that you've satisfied that factual burden?

MR. MARZULLA: Yes.

THE COURT: Okay. All right. So, you're -- if I understand you correctly, you think that the Circuit has settled the threshold question that this was not a proprietary act by acknowledging that there was a sovereign act?

MR. MARZULLA: Correct, Your Honor.

THE COURT: All right. And the sovereign act, you're suggesting, is -- well, the Government, I thought there was some discussion in the Circuit about whether or not the Government is acting as a lender would make it distinctive from its governmental capacity. Help me understand that.

MR. MARZULLA: I believe the Court there, Your Honor, was addressing the character of the governmental action, which is one of the three Penn Central elements.

THE COURT: But doesn't it sort of tie in? I mean, when the Government is acting as a lender, what

you're suggesting in this instance, it's also acting potentially as the sovereign in making that lending?

MR. MARZULLA: Oh, sure. And I don't think that that -- that's what I'm suggesting. What the Court said is, we ruled that the Government is not acting in a proprietary capacity. Now, whether the Government was acting as a lender to protect its interests might be relevant on the character of the governmental action. And, frankly, I think it's -- it's perhaps the opposite of what the Government may think. And that is that if the Government was saying, you betcha we're going to require this termination, because we believe that's the only way Chrysler is ever going to be able to pay us back, and by-golly, we're going to insist on it, that helps prove the coercion. That's what I think the Federal Circuit was going at, and I think that's what those five factors that you referenced talk about.

How needy was Chrysler of this loan? How much did they want this loan? How badly did they need it? And how much -- you know, how much were they willing to agree to a term like this?

THE COURT: All right. So, anything else from your perspective, then, the threshold issue as to the Government acting as a sovereign is established, that there is a property interest, and that the sole question

is whether or not, if I'm hearing you correctly, the Government as opposed to Chrysler came up with the idea and that determines whether or not it was the Government who instigated the taking as opposed to Chrysler simply exercising some authority it had?

MR. MARZULLA: Yes, Your Honor. I think that is an accurate summation of our position.

THE COURT: All right. Let me hear from the Government and then we'll move on to the next issue. Thank you, Mr. Marzulla.

MR. MARZULLA: Thank you, Your Honor.

MR. DINTZER: Thank you, Your Honor.

THE COURT: All right.

MR. DINTZER: So, I would like to jump right to where my esteemed colleague at the bar here was talking about sovereignty, if that's okay with the Court.

THE COURT: Yeah, please.

MR. DINTZER: So, the best thing for us to do is to go directly to A&D.

THE COURT: Um-hmm.

MR. DINTZER: And, so, zoom, zoom. Here we go. Zoom.

THE COURT: Okay.

MR. DINTZER: And focus.

THE COURT: It's a little blurry, but I'm

tracking with you.

MR. DINTZER: Okay. Well, I can get off this very quickly. What we're looking at here, Your Honor, is the end of the section on 1156 where the Court is doing what counsel says that they're doing, which is they're rejecting our specific proprietary argument that we made to the Federal Circuit about that this was a -- that this was -- that using the word "proprietary," and they do say that they disagree with the precise thing that we had said, but then, and this is the most important word here, comes the word "yet."

And, so, the word "yet" is directly after the discussion of proprietary.

THE COURT: Hold on, don't move that. Go back, because I'm not seeing -- oh, the "yet" is on the bottom.

MR. DINTZER: Yes. And I've got a bigger version of this.

THE COURT: Oh, do the bigger version.

MR. DINTZER: What I didn't include -- sorry. So, what I didn't --

THE COURT: Okay.

MR. DINTZER: So, what you're seeing is, they're talking about proprietary, and then it says, it says, "While the proprietary action," -- blah, blah, blah,

blah, blah -- "yet." So, let's look at what the Court is yetting, because that is really important, because when you say "yet," what that means is, is you just said something, and now you want to clarify that there's more to be understood.

Let's see here. And, so, this is the "yet." Zoom out.

THE COURT: I've got it actually in front of me. You're good.

MR. DINTZER: Good. So, "Yet the Government's purpose in requiring the dealer terminations may still be relevant to both the categorical takings and Penn Central analysis as bearing on whether the Government's actions were regulatory in nature." And why it matters, regulatory in nature, of course, is it's still talking about the sovereignty issue. And what the Court is saying is, okay, proprietary, maybe not, but still not sovereign, because the actions may not have been, to use their term, regulatory in nature.

And why? Because they were designed to protect the Government's financial interest in repayment. And, so, what the Court is saying, is that there is at least one other way along with the proprietary point we had made, of showing lack of sovereignty, and it is by showing what you and I had discussed, Your Honor,

earlier, and that is by showing that the Government actions were designed to protect the Government's financial interest.

And, so, and the Court goes on to explain what it's trying to do here, and what it says is, I think this is a little farther down, "To the extent the dealer terminations were designed to protect the Government's investment by assuring the availability of new GM and new Chrysler and repayment of the loans and other assistance, that purpose could be viewed as non-regulatory." And again, and this is at 1157, what is -- this is all attached to the same analysis, what it's saying is non-regulatory, i.e., non-sovereign.

And, so, it has provided us --

THE COURT: Sovereign in the context of takings law?

MR. DINTZER: Yes, of course. And all of this is only in terms of that concept. So, I showed you earlier that there are two types of ways the sovereign acts by compulsion or by regulation, and everybody agrees there's no compulsion here as far as going in and grabbing things. So, what it's saying is that they can't show it was -- it is non-regulatory if the -- if it was a loan designed -- and this is one of the terms that might protect the Government's investment.

So, we are back --

THE COURT: All right, let me just ask a question. That's why I had question two on my list.

MR. DINTZER: Sure.

THE COURT: Okay? Which is, it was out of that context.

MR. DINTZER: Yes, understood, Your Honor.

THE COURT: And I said in demanding termination has to be viewed in the larger context. If what you're arguing is it's non-regulatory.

MR. DINTZER: Yes, Your Honor.

THE COURT: Because it was protecting a financial interest.

MR. DINTZER: Yes.

THE COURT: And Mr. Marzulla can bring in an expert or brings in fact witnesses, excuse me, who come in and say, no, the reason we did this is because we thought that would be the only way to preserve the auto industry, is that regulating the auto industry as opposed to saying, as a byproduct, it's helping the loan?

MR. DINTZER: No, Your Honor. I think that -- I mean --

THE COURT: So, in other words, why do you think they asked for the termination?

MR. DINTZER: Your Honor, that --

THE COURT: Isn't that -- that's a -- clearly the Circuit thinks it has to be viewed as something.

MR. DINTZER: Yes.

THE COURT: It's either regulating the auto industry, which they want to preserve, or just -- or if it's just the loan.

MR. DINTZER: Yes, Your Honor. I think -- I think, as a starting point, respectfully, Your Honor, the burden is on the Plaintiffs to try to show you.

THE COURT: Oh, I understand that.

MR. DINTZER: And I -- to try to speak for what a number of people working around the clock in a number of ways, I'm not going to try to put a gloss on it, Your Honor. What I will say is that any effort to try to preserve the auto industry was an effort to make sure that the United States taxpayer got paid back, because if they don't exist, then they're not going to get -- I mean, one of the elements was, you know, part of the ownership, and that's how in some way that the taxpayer was compensated.

And, so, the short answer is that once they made this loan, once they provided this money, that the ability of Chrysler to continue was necessary for the Government to get paid back on the loan. And to get its

money back.

And, so, what the Federal Circuit is saying here is that if that's one of the reasons why the Government is asking for this term, then that is -- and I would say, Your Honor, more broadly, just the very act of making the loan is not necessarily --

THE COURT: But, you know, it's interesting. That wasn't being disputed. So, obviously the Circuit believes that this issue has not been fully developed. To the extent the deals were -- to the extent the terminations were designed to protect the Government's investment, that purpose could be viewed, but the implication is that may not have been the only -- that may not have been the sole design.

And, so, you're saying as long as it's one purpose, you view that as making it non-regulatory?

MR. DINTZER: Yes, Your Honor. If the goal of the Government here is to protect its loan, if that is its primary goal, or if that is its -- is a significant goal, then it's non-regulatory. It is -- and I think the fact that this term could have been asked for by anybody, Berkshire Hathaway, anybody who, if they had decided to come forward with it, it is not the type of thing that only the Government can do. That also demonstrates that it is non-regulatory.

If, on the other hand, they put a term in the loan that, look, you're going to go on the lots of your franchisees, and you're going to take the cars, and --

THE COURT: Do they actually in Chrysler --

MR. DINTZER: -- drag them off the lot.

THE COURT: -- though, take -- the terminations took place -- because -- and I don't want to bring in GM, particularly.

MR. DINTZER: I understand.

THE COURT: But I was not fully aware of that, but when I was reading that other summary judgment brief, in Chrysler, were those terminations -- didn't they take place in advance of the bankruptcy?

MR. DINTZER: My understanding, and people will grab me and hit me if I'm wrong, Your Honor, but my understanding is they took place in the bank -- I mean, if you're talking about --

THE COURT: As part of the bankruptcy?

MR. DINTZER: The rejections took place, I mean, to use the actual term, they were rejected in bankruptcy.

THE COURT: Okay.

MR. DINTZER: So, they got left behind in bankruptcy, and so then they ended up with a claim in the bankruptcy estate. I believe that that is the --

THE COURT: And they were identified in advance? I'm just kind of curious. How did that work?

MR. DINTZER: I think a list was provided to the Bankruptcy Court. So, I mean, the court had to rule on it, so as part of --

THE COURT: Okay.

MR. DINTZER: As part of the bankruptcy process they were identified, yes, Your Honor.

THE COURT: Okay.

MR. DINTZER: They're nodding, so I'm on safe ground here.

THE COURT: Okay. Well, that's good. Okay.

MR. DINTZER: So, that -- so, the sovereign question is something the Plaintiffs will have to prove. They will have to prove that the Government -- I mean, just more broadly, that the Government was acting in a regulatory capacity when it sought whatever terms they are challenging. That --

THE COURT: I know, but I want to get beyond broader terms, because if we -- those don't mean anything.

MR. DINTZER: They have to show -- they have to show that the Government was acting in a regulatory capacity when it made the loan.

THE COURT: Okay.

MR. DINTZER: I mean, that is their burden.

THE COURT: Okay, and which to you means they weren't trying to simply protect their financial interest? They had a different governmental purpose?

MR. DINTZER: The --

THE COURT: They would have -- tell me what that -- because I need to decide this. I would be wrong if I concluded --

MR. DINTZER: I think, Your Honor, what -- I mean, the Government is the Government, so it's always acting to a certain extent with some broader purpose. I mean, of being the Government, but I mean, did it ask for these terms as part of its effort to make sure that it got paid back? If that is the case, then it was a non-regulatory capacity, and as the Federal Circuit is saying, then it's -- then --

THE COURT: Right, but clearly they say it has to be developed. So, somebody could come in and say there was a governmental purpose.

MR. DINTZER: Somebody could, yes.

THE COURT: Okay.

MR. DINTZER: And but that would be a -- that would be an element of proof for the Plaintiffs.

THE COURT: Yeah, yeah, yeah, I understand. But it would likely come from one of your clients. Or

former clients, right?

MR. DINTZER: Your Honor, all I can say is that -- I just, what I'm afraid of, Your Honor, is for me to speak loosely and to have it quoted back to me some day, so I want to be careful. What we're saying is that the Government had its purpose in deciding to make this loan, obviously, okay? Decided to make the loan. That is the Government purpose. It asked for certain terms in the loan, presumably, so that it could be paid back. I think those were the nature of the terms, so that they would be paid back.

THE COURT: Okay.

MR. DINTZER: So, that is -- that is on the sovereign issue. Counsel quoted Horne, which as the Court knows, is a physical taking. The Government had ownership of the raisins. In fact, the Supreme Court said, these words, and I'm quoting, "The reserve requirement imposed by the raisin committee is a clear physical taking, actual raisins are transferred from the growers to the Government." I mean, that case just doesn't apply here. No franchise agreement was transferred from anybody to anybody.

The Government never took physical possession of anything. This is not a physical taking. Horne, I mean, I know it's a recent case, but Horne just doesn't

have any application in this case. So, respectfully, Your Honor, that does not help the Plaintiffs on the sovereignty issue.

Unless the Court has questions, I'll move on to the coercion issue.

THE COURT: Yes.

MR. DINTZER: So, on the coercion issue, the Court listed the terms in -- and I'm at page 1155 here, the Federal Circuit listed the issues, and it kept a caveat in saying, we're not making a final decision, we don't have enough facts, this is on a motion to dismiss.

THE COURT: It does not, yeah, right.

MR. DINTZER: And it says, the circumstances relevant -- relevant -- to the issue of coercion include but are not limited to whether the Government insisted on the termination. But one of them is, is whether the terminations would have occurred in any event, absent Government action. Well, of course, that refers to the but-for world where the Government doesn't offer any action, and I believe even the Plaintiffs are alleging in one of their three worlds that the terminations occur in the but-for world, because Chrysler goes bankrupt. But whether the Government financing was essential to the companies, whether the Government had any role and on, and I mean, after looking at what the facts are,

there may be other relevant factors, but I mean, clearly the Federal Circuit did not make a decision about coercion, it said that the Plaintiffs will have to prove it.

THE COURT: And the coercion goes to the issue -- it's tied to this issue of regulation. It has to be.

MR. DINTZER: It is -- I mean, all of this is tied together --

THE COURT: No, no, no, but what is -- to be honest with you, I have never heard of coercion in a takings case.

MR. DINTZER: Yes.

THE COURT: This is a new concept.

MR. DINTZER: It --

THE COURT: So, what does it mean?

MR. DINTZER: And to us it means, Your Honor, the more common way we see something like this, is where a third party is acting as the Government's agent. And then it's a lot simpler.

So, if we -- in Loretto --

THE COURT: Right. So, Mr. Marzulla said the coercion issue is who came up with the termination idea.

MR. DINTZER: I don't believe that that is the issue. The issue is, is whether Chrysler was put in a

position where they were acting not as the Government's agent, because the Federal Circuit found that they weren't, but something -- you know, by proxy the Government's agent because of coercive factors.

And that is one of the issues, because if --

THE COURT: Tell me how that works in a taking.

MR. DINTZER: I would say, Your Honor, that if -- that more generally, that if Chrysler was making its own decision -- I mean, the Court knows in contract law, it's a pretty high bar to show coercion. I mean, you really have to -- and I believe that that would be true here, too. You really have to show a lot.

The fact that you were financially in a difficult position; not enough. The fact that you really needed the money from under this agreement; not enough. You really, to be in a coercive environment, really take something very high, and it would take something here.

And basically, that would take the place of an agency. So, if you have the case, for example --

THE COURT: Right. All right, so you're saying -- so, Mr. Marzulla is wrong because he doesn't go far enough? Tell me what he -- how is his interpretation wrong? He's basically saying who comes up with the termination? Chrysler comes in and says,

nope, we haven't even thought of this concept. All right?

MR. DINTZER: Right.

THE COURT: I mean, you know, we now have the Government saying I'm only going to give you the loan if you get rid of 25 percent of the dealerships. His contention is, that was the Government's idea.

MR. DINTZER: Even if that was the Government's idea.

THE COURT: Okay.

MR. DINTZER: I mean, what the Federal Circuit is saying here, and what we agree with is that that's not enough. The Government has to -- had to have acted in such a way that we took away all volition by Chrysler and they became -- they became not an agent, because it's not agency, but they became, you know, the hand of the Government. That Chrysler couldn't sit there and say, no, should we do it or should we not? You know, let's just stick with this and let's go do this. That they had -- that we took away their volition. And thus --

THE COURT: So, we're on summary judgment -- let's say we're on a summary judgment. They file an affidavit from the chairman of Chrysler, whoever was doing the negotiating, and that individual says, we

would have never in a million years asked for the termination. That was what the Government demanded. And the Government says, that's true. That's not enough?

MR. DINTZER: No. No, Your Honor.

THE COURT: Okay, so tell me what's missing in your analysis.

MR. DINTZER: If you look at coercion law for contracts.

THE COURT: Yeah.

MR. DINTZER: The fact that somebody says exactly what Your Honor said is not enough. In fact, I mean, that's why the Court -- the Court could have said that, but it listed these other factors. I mean, it is a variety of factors. Well, what you need is it goes -- something beyond the pale. People sign contracts all the time that they really would rather not sign. I wouldn't have signed this contract, if you had -- if I wasn't in such financial straits. It happens all the time. A threat of bankruptcy is not enough to coerce somebody into signing a contract.

In fact, that is -- there is specific case law on that. The threat of bankruptcy is not enough of a coercive factor to be deemed coercion. That you still have your free will.

And, so, it has to -- it is broader ranging consideration, but it has to be something that actually -- now, I'll give you an example. There's a case where the Government put the entity in -- by making certain promises, in such a position that the entity itself was robbed of all the other choices that it could have had if the Government hadn't put them in that position, and in that case, then --

THE COURT: But am I going to have a trial that if the Government had been doing certain things, we wouldn't have had an economic crisis and they would have been able to loan money and everybody would have been able to buy cars?

MR. DINTZER: No way. We don't think that that -- that wouldn't have been --

THE COURT: And then we wouldn't have been in this circumstance?

MR. DINTZER: No. I mean, Your Honor, we don't think Chrysler was coerced. I mean, if your bank offers you a loan to buy a house, and you really, really, really want to buy that house and you take the loan, and it turns out, look, that wasn't such a good deal, because it was in 2008 or 2009. Were you coerced? No, you had the choice. You decided to buy the house. At the time it looked like a good decision.

THE COURT: All right, but part of it is, and that's why -- part of it is we're having this discussion because I am -- I'm trying to figure out --

MR. DINTZER: How to narrow. And I respect that.

THE COURT: How to narrow these issues. And one of the -- the issue is the -- that's why I have the context question, okay? Which is -- and I am struggling with this issue of coercion. The Government wanted to save this industry, okay? It did not want Chrysler to go under, it didn't want GM to go under, it didn't want 10,000 people unemployed.

MR. DINTZER: I think that that's true.

THE COURT: Is that a fair statement?

MR. DINTZER: I think that's fair with every person in the country, Your Honor. So, yeah.

THE COURT: Yeah, okay. So, I am confused -- the conversion issue is, is that -- and that's why, is this really something we're going to be fighting about as opposed to when you said to me we're going to get to the economics issue, but I'm trying to figure out, is it really something -- Chrysler doesn't -- I mean, Chrysler is a company, was a company. Chrysler could have gone under.

MR. DINTZER: Sure.

THE COURT: Why didn't Chrysler want to go under? We the people didn't want it to go under.
MR. DINTZER: When you say "go under," just so that we're clear, they could have filed --
THE COURT: Liquidated. Liquidated.
MR. DINTZER: They could have filed for bankruptcy and liquidated.
THE COURT: Liquidated.
MR. DINTZER: Okay.
THE COURT: Okay? So, there was some discussion as to why that didn't happen.
MR. DINTZER: Sure.
THE COURT: And I'm not suggesting that's a bad thing, I'm just suggesting that when I hear this coercion, I'm just perplexed as to what this trial on coercion in your mind would look like.
MR. DINTZER: In my mind, Your Honor, the Plaintiffs would have to show that -- because if Chrysler did whatever it did of its own volition, okay, and that is the --
THE COURT: And what if somebody said, you know what, just I'm walking away. We don't care, we'll go under.
MR. DINTZER: And Chrysler totally could have done that.

THE COURT: And Uncle Sam grabs them by the throat and says, all right, this is what you're waiting for them to say, you can't go under. Is that what --

MR. DINTZER: It's the Godfather offer. It's the offer that they can't refuse. And it's not because --

THE COURT: So, the Government -- so, they would have to show the Government wasn't going to let them go under?

MR. DINTZER: They have to show that they did not have -- that they had no volition, they couldn't -- they couldn't make a different choice. Not because this was the better choice, but because they simply couldn't, because the Government threatened them, the Government -- the Government came in and ordered them, and occupied their offices, and they --

THE COURT: Well, let's not get to -- we don't have to be, you know, back to the '60s. Okay? We're not occupying the offices.

MR. DINTZER: But the coercion -- but to be fair, Your Honor, the cases that deal with coercion genuinely are, they put the bar --

THE COURT: Is there any case in which the Government has been accused of coercion?

MR. DINTZER: I just described it. So, in that

case --

THE COURT: Where is that?

MR. DINTZER: And I'm going off my memory, Your Honor.

THE COURT: That's okay.

MR. DINTZER: But I'm trying to remember, the case, the Government had made a series of promises that had put the Plaintiff in a -- because they relied on the promises, in a series of consistently more tenuous position. And, finally, when the Government said, sign this or else, that because of these series of promises that were broken, that the Plaintiff was then in such a position that they had no other choice and the Government had manufactured -- I don't believe intentionally, but for whatever, had ended up manufacturing this situation, and the plaintiff was in a position where they had to sign. And the Court found that they were coerced.

So, I mean, but it is a high bar because the reality is, in every contract, in every negotiation, that one side is feeling like, you know, they want to get what they're getting, and sometimes distressed lending. I mean, if you're in a distressed -- you pay a lot more.

THE COURT: But this is a unique circumstance.

This isn't a distressed lending. I mean, that's what I'm saying. That's why I'm asking the relevance of the context. And I'm not sure -- I'm not quite sure -- I understand these are principles that come from traditional coercion. I'm also not sure what the evidence will show as to whether or not the United States would have allowed Chrysler to simply liquidate. That that was not on the table.

MR. DINTZER: And that would be a -- I --

THE COURT: I don't know if --

MR. DINTZER: My sense is, Your Honor, that that would be a -- that this would be something that the Plaintiffs may have some trouble proving.

THE COURT: Okay.

MR. DINTZER: So, this is something that we will put them to their proofs on.

THE COURT: Okay. That's what you're saying.

MR. DINTZER: No, I understand.

THE COURT: You're saying that the coercion --

MR. DINTZER: To answer your question --

THE COURT: -- is a little different in this case.

MR. DINTZER: Yes.

THE COURT: Okay.

MR. DINTZER: But I -- this is something that we

believe --

THE COURT: Because you're voluntariness is that they could walk away.

MR. DINTZER: They could always walk away.

THE COURT: And Ford walked away.

MR. DINTZER: And Ford did walk away. And thank you, Your Honor.

THE COURT: Yeah.

MR. DINTZER: Yes. And they proved that there was a door that was open. And, so, in our mind, there's the sovereignty, which the Court breaks down, it tells us exactly how it wants us to proceed. There's the issue that --

THE COURT: Okay.

MR. DINTZER: -- that we understand, and ultimately we would like an opportunity to brief that, the issue about the --

THE COURT: Economic.

MR. DINTZER: Yes. And then there is coercion, which the Plaintiffs will have to prove, because, quite simply, if Chrysler was acting -- was making its own decisions and was not acting as a hand of the Government because it was coerced, then their independent decisionmaking is enough to break the causation chain before you.

THE COURT: Thank you. Mr. Marzulla is right behind you.

MR. DINTZER: Excuse me, Your Honor, I'm a little slow, I apologize.

THE COURT: Mr. Marzulla?

MR. MARZULLA: Yes. Thank you, Your Honor. I think we've gotten a bit far afield on a term, the more colorful term "coerced." What we could have said in the complaint is the Government caused Chrysler to terminate. The issue we are discussing is simply the causation question in the context of the taking. And all we were trying to address was whether it was the Government that caused Chrysler to terminate these franchises, or whether it was something Chrysler decided to do on its own.

THE COURT: And who introduced the word "coercion" in this litigation?

MR. MARZULLA: It's in our complaint.

THE COURT: I see.

MR. MARZULLA: So --

THE COURT: Maybe you want to amend it.

MR. MARZULLA: Who wrote that complaint? I think it was my partner, Your Honor. In any event --

THE COURT: All right.

MR. MARZULLA: We're certainly sorry we

introduced the word "coercion."

THE COURT: But it's now taken on a life of its own.

MR. MARZULLA: Well, what I'm saying is, Your Honor --

THE COURT: You see it as causation?

MR. MARZULLA: This is not -- yes. This is not about coercion in the context of criminal activity, nor in the context of trying to invalidate contracts, all we were saying is that the Government caused Chrysler to do this. Chrysler did not do it on its own.

THE COURT: But Mr. Dintzer is saying that in a situation like this, where the Government did not act directly with regard to your clients, but instead acted through a party, and if that party could have said to the Government, nevermind, then why should the Government be liable for the actions of Chrysler in agreeing to do certain things?

MR. MARZULLA: Well, if I --

THE COURT: In a voluntary capacity? So, I mean, the issue -- yeah, go ahead.

MR. MARZULLA: So, if I understand that, what the Government is saying is, if -- I can go up to somebody, and say, Rhead, I will give you $6 billion if you will go knock down Nancie's house, and the

Government is not liable if Rhead accepts that offer, because he acted voluntarily. His voluntariness in that transaction is not relevant.

The Government can't hire somebody, or contract with somebody, rather, to take property and then say, we're not trying to -- and escape the just compensation clause. That's the Government's argument here.

We could tell Chrysler to take this property, if we did it ourselves it would be a taking and we would have to pay just compensation, but if we make Chrysler do it, if we get Chrysler to do it, it's our idea, we're the ones who want to terminate, but if we can get Chrysler to do it, then we don't have to pay for it. And that's exactly what happened here, as best we understand it.

So, it's really a causation issue. You know, we have these cases, the Court may be familiar with Hendler.

THE COURT: Correct.

MR. MARZULLA: A Super Fund case which the Court has some acquaintance with, in which the action was funded by the Federal Government, by Super Fund, but it was the State of California that went in and drilled wells on the Hendler property. And the Government made this same argument, it wasn't us, it was the State that

did it.

And the Federal Circuit said, well, EPA issued the administrative order, and set up the RIFS to do the testing, to determine the water contamination. This was really a Federal program. The fact that the State walked in and did the Federal drilling isn't the issue. It was a government action, this is what the Government wanted to happen. The Government wanted those wells drilled.

And I think it's the same principle here.

THE COURT: Okay.

MR. MARZULLA: It's just a causation question. Enough on that?

THE COURT: I have enough on that, if you want to go back to proprietary.

MR. MARZULLA: Just that other thing about the paragraph, I'm confused how counsel takes the paragraph. The "yet" paragraph.

THE COURT: Yeah.

MR. MARZULLA: Do you have the "yet" paragraph?

THE COURT: We'll go back to yet.

MR. MARZULLA: It says --

THE COURT: This is the proprietary one, isn't it? Yeah.

MR. MARZULLA: Well, it says, "may still be relevant to both the categorical -- categorical taking and Lucas taking." It doesn't say maybe it will, maybe it's proprietary. In the paragraph before, they say, "we reject the argument that it's proprietary," and then according to the Government, in the next paragraph they take that back and said, yet, well, maybe it is relevant.

But the sentence doesn't say it's relevant as to whether it was proprietary. You don't get to the Lucas or the Penn Central test in which one to use, until you've decided we're talking about a taking. The Government says, we're not even talking about a taking, because we weren't acting in a sovereign capacity.

So, what the Court, and I --

THE COURT: So, you only get to "yet" if there had been a concession? You're telling me that it was a sovereign act and now the question is, is we're in the three-part test.

MR. MARZULLA: He says -- well, not the three-part test, Your Honor, and we'll talk about that tomorrow.

THE COURT: Okay.

MR. MARZULLA: But where it says, "yet it may be relevant to Lucas," which is a one-part test.

THE COURT: Yeah.

MR. MARZULLA: Or Penn Central, which is a three-part test, but what the Court does not say is, well, maybe relevant to whether we're going to apply a takings test at all.

THE COURT: Okay.

MR. MARZULLA: And, so, it's that simple. And it would be nonsensical, I think, for the Court to say explicitly we reject the Government's argument that it acted in its proprietary capacity and then in the next paragraph to say, yet, we think maybe it could have acted in its proprietary capacity. They didn't say that, and they wouldn't.

THE COURT: Thank you.

MR. MARZULLA: Those are my only two points.

THE COURT: Thank you.

MR. MARZULLA: Thank you, Your Honor.

THE COURT: Last word from the Government, and then we're going to -- we'll break for the evening.

MR. DINTZER: Thank you, Your Honor, and I promise not to repeat myself.

THE COURT: No, no, it's --

MR. DINTZER: And first of all, I wanted to say that I've got A and B up here, and I'm going to relieve counsel's conscience that they accidentally used the

word --

THE COURT: Coerce?

MR. DINTZER: Coerce, because actually what the Court says here is "the Plaintiffs have not alleged coercion flowing from an existing relationship." So, that's -- they didn't actually, but then -- so, we know who brings it in, it's the Federal Circuit, and they say, "the question here is whether the auto makers were coerced by the Government's offer of financial assistance."

So, I mean, the culprits are four flights up, maybe two flights above, they brought it in. They say the Plaintiffs, if they want to make this connection, have to show coercion. And, so, it's not a causation thing, they have to show that there was -- and they don't use that term lightly, coercion.

The second point is, with respect to I understand counsel's reading of that paragraph, the "yet" paragraph, all I can say is, it ends with the Court explaining non-regulatory. If it's non-regulatory, we're not in a regulatory taking, it's not a Lucas, it's not a -- it's not a Penn Central, it's not a taking.

So, once you get to that "yet," if the way he reads it is correct, there's no reason for them to use

the term "non-regulatory," unless -- I mean, that just doesn't make any sense. But if you use that word "yet" to mean, it's not proprietary, but it's some other form of non-sovereign action that we're going to call lending, and protecting the loan, and that is non-regulatory, then our reading is much more reliable than theirs.

And with that, Your Honor, we appreciate your time and patience on this.

THE COURT: No, that's fine. All right. We will meet tomorrow morning and continue to work our way through the issues with the goal in mind of figuring out how do we proceed and which ones we should hear first, and spend our resources on, and so I believe I suggested that we would meet tomorrow morning at 10:00 a.m.

See you then. Thank you very much.

COUNSEL: Thank you, Your Honor.

(Whereupon, at 4:24 p.m., the proceedings were adjourned.)

CERTIFICATION OF TRANSCRIBER

I, Sally Jo Quade, court-approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-titled matter.

DATED: 4/15/16 s/Sally Jo Quade
Sally Jo Quade