UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| COLONIAL CHEVROLET, ALLEY'S | ) | |
| OF KINGSPORT and SPITZER | ) | |
| MOTOR CITY, INC., et al., | ) | Case Nos. |
| Plaintiffs, | ) | 10-647C |
| vs. | ) | 11-000C |
| UNITED STATES OF AMERICA, | ) | 12-900C |
| Defendant. | ) | |
| ---------------------------------- | ) | |

Courtroom 8
Howard T. Markey National Courts Building
717 Madison Place, N.W.
Washington, D.C.
Friday, April 1, 2016
10:00 a.m.
STATUS CONFERENCE - Volume 2

BEFORE: THE HONORABLE NANCY B. FIRESTONE

Linda D. Metcalf, CER, Reporter

APPEARANCES:

ON BEHALF OF THE PLAINTIFF (COLONIAL CHEVROLET):

RICHARD D. FAULKNER, ESQ.
KEVIN BUCHANAN, ESQ.
Blume, Faulkner & Skeen, PLLC
111 West Spring Valley Road, Suite 250
Richardson, Texas 75081
(214) 373-7788
rfaulkner@bfslawgroup.com

ON BEHALF OF THE PLAINTIFF (ALLEY'S OF KINGSPORT):

ROGER J. MARZULLA, ESQ.
M. RHEAD ENION, ESQ.
Marzulla Law
1150 Connecticut Avenue, N.W., Suite 1050
Washington, DC 20036-4162
(202) 822-6760
roger@marzulla.com
--and--
THOMAS A. HOLMAN, ESQ.
Holman Law
99 Park Avenue, Suite 1600

New York, New York 10016
(212) 481-1336
TAHolman@holmanlawoffice.com
--and--
STEVEN H. BLATT, ESQ.
Bellavie Blatt Andron & Crossett, LLP
200 Old Country Road
Mineola, New York 11501
(516) 873-3000
SBlatt@DealerLaw.com

ON BEHALF OF THE PLAINTIFF (SPITZER MOTOR CITY):
M. TODD RATAY, ESQ.
MLG Automotive Law
2801 West Coast Highway, Suite 370
Newport Beach, California 92663
(858) 405-2510
tratay@mlgautomotivelaw.com

ON BEHALF OF THE DEFENDANT:

KENNETH M. DINTZER, ESQ.
JAMES CONNOR, ESQ.
AMELIA LISTER-SOBOTKIN, ESQ.
MICHAEL A. RODRIQUEZ, ESQ.
ELIZABETH M. HOSFORD, ESQ.
ALISON VICKS, ESQ.
U.S. Department of Justice
1100 L Street, N.W.
Washington, DC 20530
(202) 514-5495
alisters@usdoj.gov

P R O C E E D I N G S

\- - - - -

(Proceeding called to order, 10:03 a.m.)

THE COURT: Good morning, everyone.

COUNSEL: Good morning, Your Honor.

THE COURT: All right. Well, we made some progress yesterday. We will continue, hopefully, to make progress today. I am not going to recap what we did on class action and on the motion to dismiss, but let me just recap where I think we may be on the issue of really what I'm going to call now the nature of the Government action, which is I think what we are talking about.

I think we, in the discussions yesterday, recognized that the Circuit had rejected the Government's argument that it was acting -- not acting in a sovereign capacity, but we have the "yet" language that suggested that the question becomes whether or not it was acting in a regulatory capacity. And, so, I think we should, from here on out, say that's going to be a question.

And it appears as though that dovetails into, I presume -- I actually think what the Circuit may have been trying to do is that dovetails into the question of the Government's coerciveness. We know when the

Government acts in a regulatory capacity, you don't -- you might have a choice, but your choice would be to face the music, if you didn't, and coercive, we have to find some equivalency.

I know the Government had made the argument we are looking for a proxy for agency. I'm not sure that's what the proxy is. I mean, you can think about that. I think the proxy more is what did the Government demand and why and in that sense there's a relevant question about is it doing it simply to secure its loan and hence non-regulatory, or is it doing it for additional reasons, in terms of the coerciveness, I looked at some of those cases.

This is a very unique circumstance, all right? And part of it I mean, obviously the big coercive case is, what is it, B&G and the cigarettes in California. And ultimately, that was decided that the State had done it voluntarily. I'm not sure that's totally analogous to this circumstance, but we're clearly going to have to look at coerciveness in the context of that case, but whether or not the Government is trying to -- I don't know, whether it's the controlling force, but I'm thinking of it as also relevant to the question of the regulatory/non-regulatory question. And that I think's a fair reading of what the Circuit was doing.

I think with regard to -- but we're not going to be discussing sovereignty any longer, whether or not the Government was acting in a sovereign capacity.

I also think that we are going to turn today to the question of economic impact and reasonable investment-backed expectations. I also, in that regard, find that this issue that was raised yesterday with regard to whether or not the Plaintiffs had a property right, as I'm understanding your argument to be free from termination and bankruptcy is how I read it, and therefore if they were terminated in this bankruptcy, the Government didn't take a property interest because you didn't have a property -- you the Plaintiffs didn't have a property interest.

I think that, as Mr. Marzulla was arguing, I do think that to suggest they don't have a property interest in their franchise agreements is foreclosed by the A&D decision. I mean, the Court specifically says the franchise agreements are a valid and compensable property interest.

So, I think if your argument is relevant, it's going to be relevant in connection with whether or not there's an economic -- it has to be tied somehow to the question of economic impact I think is a better way of thinking about it. Whether or not the -- and I think

what it's really sort of relevant is in deciding whether in the event there was a Chrysler liquidation and thus they all lost franchise agreements in bankruptcy, whether or not their franchise agreements had any retained value, which I think is one of the scenarios.

I'm not sure how it fits in anything else. And I think if we go off on that tangent, we could get lost in too many angels on the head of a pin.

So, Mr. Dintzer, yeah?

MR. DINTZER: Can I speak to that, Your Honor, just very --

THE COURT: Please.

MR. DINTZER: I'm not going to argue it at all, but given that -- I think we recognize that it's a legal issue, so it's not going to impact discovery in this case, if we could reserve that issue as something that we could brief, I'm sure I didn't do a good enough job presenting it. We would appreciate that.

THE COURT: What I would say is this, because we're at this, you know, stage and we haven't decided issues fully, you can come back to me, but let's not get diverted from what I think the tests are, and I don't want to go backwards.

MR. DINTZER: Absolutely. And we're not --

THE COURT: I want to go forward.

MR. DINTZER: I would appreciate that, but if you would give us that opportunity, we would definitely appreciate it.

THE COURT: If there's some argument there, in -- I just am not seeing it as a threshold question in the way you presented it, that they don't have a property interest in light of the Circuit's holding, and I don't want us to go down a path where if I were to agree with you, we're both going off a cliff.

MR. DINTZER: I absolutely agree, Your Honor, and we don't want to put you, the Court in a position, of course --

THE COURT: Put yourself.

MR. DINTZER: -- where you agree with us and it turns out we've erred, and so but if we could get a chance to brief that.

THE COURT: Look, if there's something I'm missing and a nuance there, but I do think that the Plaintiffs' argument was -- I don't think I can just come in and say they had no property interest. I think that would be rejected. So, that's my concern.

MR. DINTZER: Okay. And we understand that concern and we will address it -- whenever sort of the time for that to be briefed, which I understand is not right this minute, we will take a look at that.

THE COURT: Very good.

MR. DINTZER: And we will address your concern.

THE COURT: All right.

MR. DINTZER: Thank you very much, Your Honor.

THE COURT: All right. So, now let's turn to what I will rephrase in my paperwork that I handed you, if we look at issue C, if the Plaintiffs are able to establish that the Government acted, and I'm now going to use the words "regulatory capacity" as contemplated by the Federal Circuit, I don't know what non-regulatory versus regulatory, but we're going to say "a regulatory capacity," I'm going to keep "in directing Chrysler to terminate," because I think it was -- I understand there may have been an issue of voluntariness that the Government is arguing that they didn't have to accept it, but in the context of the agreement itself, the deal was you had to accept terminating dealerships. If you wanted the money, I'm seeing a head -- I'm seeing heads being shaken.

I did not realize in reading any of this that that was in dispute. That the Government did not -- the Government -- there is any real dispute that in accepting the deal, they would have to terminate dealerships? I know you're loathe to concede things, but I mean, as we move in life.

MR. DINTZER: Your Honor, the reason I'm loathe, Your Honor, is that the way that you're describing it, I mean, we haven't deposed anybody from Chrysler, we don't know -- so, I mean, we are at a certain stage where we have seen some documents, we haven't seen everything, but let me say that there was a back and forth about some -- about, you know --

THE COURT: Okay.

MR. DINTZER: How this would be done. So, the fact that at some point a term was -- this might be something that we would insist on, that how we got there is not necessarily something that I know the answer to, to the point where I'm going to -- I want to concede that in Court.

THE COURT: All right.

MR. DINTZER: And I'm sure -- I should be standing up.

It should be something that -- so, I understand why you think what you think, Your Honor, and I'm not saying it's wrong, I'm just saying I can't concede that point at this moment.

THE COURT: All right. I'll accept that. Let's say it this way, then: If the Plaintiffs are able to establish that the Government acted in its regulatory capacity and directed Chrysler to terminate franchise

agreements, all right, so they have that obligation in both regards, all right, both that it was -- they were acting in a regulatory type capacity, and they directed it. Okay?

I think then we can move to now the next question is what we believe the Plaintiffs will be obligated to also establish in order to -- if they hope to prevail, with the other regulatory -- I mean the other Plaintiffs for a regulatory taking under Penn Central, which the Circuit indicated would also be similar to their having to -- issues that they would also have to establish to show a categorical taking if under Lucas. That they still have to meet the threshold issues of what the Government did, and then presumably that they had no value. There was no value left, which is their contention.

All right. So, why don't I hear -- actually, Mr. Marzulla, would you be doing the arguing on this still?

MR. MARZULLA: I will, Your Honor.

THE COURT: Why don't we hear from you first now on what you think the economic arguments are, since I first wanted to get -- make sure I understood what the Government's arguments would be with regard to proof.

MR. MARZULLA: Yes, thank you, Your Honor.

THE COURT: Thank you.

MR. MARZULLA: Good morning. I think the Court is directly on point that the test here is the test of Lucas. And we have the benefit of the Horne decision, that applies -- that says that Lucas also applies to personal property. The Lucas test, the Lucas rule is, if you will, a development or an extension of Penn Central.

Penn Central, as you know, established three elements, we speak of them as the Penn Central test, the first of which is what was the economic impact of the governmental action in question.

What Lucas did is to say where that economic impact results in the property having a zero value, or a zero use, then we don't really need to look at the other two elements of the Penn Central test. Economic impact that makes the property valueless is enough.

THE COURT: But let's just stop for a second, because I don't disagree that you could perhaps read Lucas that way, but I think the Circuit was under the impression you would still have to show -- because Lucas dealt with a clear regulatory action by the Government. You would still have to show that the Government was acting in its regulatory capacity. In other words, if the Government -- because we know that if there was

evidence -- if we're going to go back, let's say, to the proprietary argument, if the Government in a proprietary capacity destroyed something, the Circuit is suggesting, oh, well, there's other remedies, potentially, available.

And, so, tell me why you think -- I mean, I don't want to get ourselves in a position where you don't think your clients are going in the first instance, if we have to get to trial, show that there is some governmental action here that fits within the ambit of the takings clause.

MR. MARZULLA: Oh, absolutely, Your Honor.

THE COURT: Okay.

MR. MARZULLA: And I thought you had --

THE COURT: Just drill back.

MR. MARZULLA: We had gone past that and we're discussing that.

THE COURT: Okay, now, so the two test really would be once you show that there's no economic value, you don't have to get into reasonable investment-backed expectations?

MR. MARZULLA: That's true.

THE COURT: Okay.

MR. MARZULLA: And character of governmental action, though, as you suggested, in essence, you sort

of addressed at least in part the character of the governmental action.

THE COURT: Okay.

MR. MARZULLA: At the outset. Usually that character, you know, the Court has defined that in various ways, and it depends on the facts of the case, but often that issue arises in the context of a physical taking, say, or how did the Government act, how closely analogous is it.

THE COURT: Is it to confiscatory behavior.

MR. MARZULLA: Right, precisely.

THE COURT: Right. Although your argument here is that it was 100 percent confiscatory. In a certain regard.

MR. MARZULLA: Well, absolutely. That's what Lucas is about.

THE COURT: Right.

MR. MARZULLA: If the economic impact results in a zero, a zero value at the end, and I would hope there's no disagreement on that point, then the only real issue to be tried under that test is going to be was there value in the before or the but-for condition. That is, absent the governmental action, did these franchises have value.

And as I understand the Government's position

is, well, these franchises had no value, no matter what, absent governmental action, and we believe that we can prove, Your Honor, that they did have value.

THE COURT: Okay. So, let me -- I put a series of tests that I'll have the Government also walk through, one of them, though, Mr. Marzulla, at the end of the day, was I've been a little bit confused, and perhaps we can wait to discuss it later, about this arbitration process that was created by Congress. Do you have enough information to describe that now, and I put in there, if we have franchisees that lost their franchises but then somehow or other they came back and have now their franchises, which may be the case with I think the Government was alluding that to a number of people, but we don't know the number.

Does that make it a temporary taking, and do we have two classes, and I don't want to use that in the class action word. So, two groupings of those who didn't participate, or didn't -- something happened in the arbitration, and those who did.

So, help me understand that in the context of this case.

MR. MARZULLA: Well, I will share, and perhaps like Mr. Dintzer, I will ask for leave to correct my errors later.

THE COURT: Okay.

MR. MARZULLA: But my understanding of the arbitration process is that some time after the termination, Congress enacted a statute that allowed a terminated dealer to request an arbitration, the result of which would be that the arbitrator could require Chrysler to make a -- a letter of intent to offer a letter of intent to the dealer which is sort of like an offer to create a dealership in the first place.

Now, we do understand that there may be a couple, I honestly do not know exactly how many.

THE COURT: Yeah.

MR. MARZULLA: Who did manage to claw their way back and negotiate a new deal with Chrysler. My understanding is that for the most part, the offers that Chrysler made were not acceptable to the dealers. That is that Chrysler required dealers to put up money and put up new property and buy this and that and so forth and so on, so that most of them simply didn't accept that deal.

THE COURT: Okay.

MR. MARZULLA: What I can tell you is there is some litigation on this point, Your Honor. Some of these dealers have brought suit.

THE COURT: Okay.

MR. MARZULLA: And, so, there's some law out there that I have not entirely mastered. But as to the question of whether that creates a ripeness requirement, I don't think it does. I think it was an option and what the cases are very clear on is that all arbitration would get for a dealer is that Chrysler would be required to make this offer.

THE COURT: I see. No, I wasn't suggesting actually ripeness, more I was trying to suggest if we had a number of people in that group, and they accepted it, you know, dealing with a general period of time in which they didn't have a dealership and then they do have an active dealership, then that just was a level of confusion added to this case.

MR. MARZULLA: Well, I think that's right, and if it -- and if those are temporary takings, and I'll tell you there's a Federal Circuit decision called Otay Mesa, which makes it difficult -- it kind of confuses the issue about what's temporary or permanent, but it only goes to measure of damages. It doesn't go to liability.

THE COURT: Yeah, I understand.

MR. MARZULLA: Liability would be the same.

THE COURT: Okay, sorry. That would be helpful. All right.

MR. MARZULLA: Well, I guess -- I don't have a whole lot more to say.
THE COURT: Well, do you --
MR. MARZULLA: About Lucas. We believe Lucas is the test. Now, the other -- if --
THE COURT: But Lucas is the test if you prove zero value. Do you understand? I mean, in other words --
MR. MARZULLA: Well, if the franchise -- the order that was issued by the Bankruptcy Court, Your Honor, prohibited -- affirmatively prohibited the dealers from selling, servicing --
THE COURT: Right.
MR. MARZULLA: Required them to take down their signs, to close their doors, you are no longer a Chrysler dealer. The essence of a franchise is you are a Chrysler dealer. So, I guess we can listen to the Government, but I don't know how a person who has been put out of business by court order and told to shut down his showroom and he can't sell cars and he can't service them, I don't think anybody is going to contend that that has value.
THE COURT: All right, so the question then becomes, though, that -- that's what I'm trying to figure out, in your argument, is -- but you would still

have to show it had value the day before. That's the Government's contention.

MR. MARZULLA: Yes, that the franchises had value in the absence of governmental action.

THE COURT: Yes.

MR. MARZULLA: And the other reason, we sometimes get confused with this before, because what you have to do is isolate the governmental action, and, you know, at some point, the Government, Chrysler announced, we're going to be terminating dealers. Well, that's got to be excluded. That's sort of the --

THE COURT: Yes, I'm sorry, the day before is a bad analogy. The day before this was announced.

MR. MARZULLA: Yeah, but it's not bad in this sense, Your Honor, that the Yellow Book and the cases that analyze economic impact and damages do speak in terms of before and after. So, and in fact, that's the terminology that I think is most appropriate for takings law.

THE COURT: Okay.

MR. MARZULLA: So, we agree with that, so long as we understand that "before" also means "without government action."

THE COURT: Before without government action.

MR. MARZULLA: Yes.

THE COURT: And your view is the after is zero?

MR. MARZULLA: Yes, that's correct, Your Honor.

Now, the Penn Central test, as I say, I think Lucas is sort of a refinement of the Penn Central test.

THE COURT: Um-hmm.

MR. MARZULLA: If the after were not zero, what the Court has really been dealing with, and was dealing with in Penn Central, as you'll recall that had to do with limiting the construction that could be done of an office building at Penn Central Station. The Court said, well, but you still have all these remaining uses. You still have an existing office building there, you actually have transferable air rights that go to other properties. So, it's not as though the Government took everything from you.

That's the Penn Central test. And usually you find that in a case where somebody sues and says, well, a zoning law or maybe the wetlands restrictions have deprived me of the ability to build whatever the developer wanted to build, and the Court says, yes, but you have remaining uses.

Lucas develops that concept by saying, under the statute at issue in Lucas, Mr. Lucas really had no economic value. Granted, he could, as I think the Court said yesterday, he can bring his little picnic blanket

out and sit there and look at the ocean and so forth, but that's not an economic value.

THE COURT: Right.

MR. MARZULLA: So, that's why I see this as a Lucas case, and I would guess the Government would agree.

If we get into -- you did ask about investment-backed expectations.

THE COURT: Right. So, your view would be that would really be the proof that would not be required because we're not balancing -- investment-backed expectation is only valuable to the extent there's something left in your pot.

MR. MARZULLA: Yes, and the Federal Circuit addressed that question directly in Palm Beach Aisle. That was a 404 permit denial taking case, and the Federal Circuit actually took on the fact that in Good v. United States, there was language that said, investment-backed expectations are a part of every taking case. And the Court said, well, that wasn't exactly what we meant, in light of Lucas, investment-backed expectations aren't a part of an analysis when you have a complete loss of all economic value.

So, you know, I think the law there is pretty

clear. But if we -- I did want to make a comment about the Court's characterization of investment-backed expectations here.

THE COURT: Yes.

MR. MARZULLA: And that is that investment-backed expectations are judged at the time of acquiring the property. The inquiry is, when you bought this property, did you know it was a wetland? When you bought this property, did you know that it was a habitat for an endangered species? Did the regulatory scheme, the wetlands scheme, and that's where much of this law has developed, did it exist at the time that you purchased, or is that something that came into effect later? That's the investment-backed expectations.

And the Federal Circuit, in A&D, cites to Cienega Gardens, which I think gives us a good example of how you do this. And the Court says, well, it's a reasonable person test. So, first, you ask in Cienega, of course, was the 20-year low-rent program based on a Government loan, and so you asked the owner, well, when you entered into this program, when you accepted the Government's loan, more than 20 years ago, did you anticipate that the Government at the end of the 20 years would say, no, we won't let you exit the program, you have to continue giving low-rent apartments for

another five years, or another 10 years, or whatever it was.

And the owners actually testified, no, my plan was that I was going to exit the program, and that that was important to me, and I wouldn't have really wanted to enter into the program otherwise. And the Court found that that was reasonable.

THE COURT: Mr. Marzulla, I agree with that. I think, you know, as we've seen throughout the A&D decision, it's a little they give with the left hand and then take away with the right hand, and so in that connection, the concluding sentence with regard to reasonable investment-backed expectation from the Circuit was, the claims court should engage in an objective but fact-specific inquiry into the reasonableness of the Plaintiffs' expectation that their franchise agreements would be continued absent Government action. And we express no opinion on that.

So, that is where I took my statement from. I was trying to take statements from what the Circuit -- I was trying to --

MR. MARZULLA: Understood. Understood.

THE COURT: And I understood that the Circuit had a little -- I appreciate if we want to refine this, but your view is if you do that, it has to be as of the

day you took --

MR. MARZULLA: As of when you acquired the property.

THE COURT: Okay.

MR. MARZULLA: Did the Government change the --

THE COURT: Okay.

MR. MARZULLA: So, I think that's going to be -- I mean, frankly, if the Court wants to hear that testimony, I think the Court could, then there's a reasonableness component, which is really going to be a judgment, I think, by the Court.

THE COURT: Right.

MR. MARZULLA: Was it reasonable for auto dealers to expect that their franchises would continue in force, even in a situation where the Government decided that they should be terminated. Well, no, let me restate that. I didn't state that exactly right.

THE COURT: Yes.

MR. MARZULLA: Did they reasonably -- should they reasonably have anticipated that the Government would direct Chrysler to terminate their franchises? Was that part of the deal when they entered into it? Did they -- was that a reasonable expectation? And I think they will testify, no, it was not.

THE COURT: Okay. Thank you.

MR. MARZULLA: Thank you, Your Honor.

THE COURT: All right.

MR. DINTZER: Good morning.

THE COURT: Good morning, Mr. Dintzer.

MR. DINTZER: Just one second to set up, Your Honor.

THE COURT: Yeah, please.

MR. DINTZER: Okay, Your Honor. If it pleases the Court, I'll go ahead and pick up sort of in the same order that my esteemed colleague addressed.

THE COURT: Yes.

MR. DINTZER: So, we'll start with Horne, which we talked about a little yesterday, and Horne we don't think informs any of the analysis. We're going to get into Lucas. Horne is a physical taking, so it isn't a Lucas taking, and the Court said the Government had the raisins, and it just for a lot of reasons it just doesn't apply here. So, I'm going to go directly into the Lucas, and I'm going to start with what I agreed with what you just heard, it does have to be zero. So, even a smidgeon more than zero would not be in any kind of Lucas taking.

And, so, and I agree that Lucas is sort of an offshoot of Penn Central, and basically what the Court is saying is, there are some instances, for some types

of property, where 100 percent wipeout is enough, we don't really have to look at these other two things. Where the Plaintiffs' argument gets into trouble is the fact that that has never been applied to intangible rights, as the Court in A&D has said, and with good reason, Your Honor.

Because intangible rights, and we're talking about not only contract rights, but there could be intellectual property rights and the like, that is they can be of a different kind in how they're affected in the nature of them. And they may not -- and we don't believe that they are subjected to this truncated analysis.

Not only that, but more broadly, the concept of Lucas was, some cases are pretty clean-cut. There's a regulation, you can't build a beach house, look, we're done. And then some cases, and we heard Your Honor say it, we heard Judge Hodges say it before, for the Federal Circuit said, some cases are like, whoa, we've never seen anything like this. And when you're looking at cases that are like that, cases of first impression, the idea that we -- we've been truncated and follow a path that was worn in this very common, very well understood, you know, building restrictions on property, that would be a huge error.

And, so, we don't believe Lucas, both because it's intangible here and because of the relatively new nature of a claim of this sort, that Lucas has any application here.

So, we would encourage the Court not to go in the direction of Lucas. We believe that that would be an error.

THE COURT: All right, so, let's just say, in practical terms, what that means is you think that we should do an analysis -- we've already discussed we're going to do an analysis of the Government action, the nature of the Government's action.

MR. DINTZER: Yes, Your Honor.

THE COURT: The threshold issue.

MR. DINTZER: Yes, Your Honor.

THE COURT: You're now saying we're going to have to look at the economic impact and we're going to have to look at reasonable investment-backed expectations. So, tell me what that practically means.

MR. DINTZER: Sure. So, let me start with Penn Central, and, Your Honor, just so I'm clear, there's actually three elements, and Your Honor only captures two of them in your status report, so I wanted to make sure that we understand you. The character of the Government's action, which is the first box on this

chart here, and I would be surprised if my counsel at the bar -- counsel at bar disagrees, this is one of those three prongs, and the Court would have to look at that.

THE COURT: I think we had this discussion where I'm saying we're going to have to look at -- I mean, the nature of the Government action here is what we've been a little bit struggling with.

MR. DINTZER: Yeah. With respect to the regulatory/non-regulatory.

THE COURT: Right. But then it's going to go, what was the regulatory activity?

MR. DINTZER: But there's another question that has to do with the character of the Government action.

THE COURT: And what is that?

MR. DINTZER: And that is, first of all, let me say that not all courts can agree, but it has been described as the question of is this a burden that should be carried by the Plaintiffs, or is this a burden that should be properly carried by the taxpayers.

THE COURT: If it turns out it's regulatory, how does that inquiry help you?

MR. DINTZER: Well, for example, let's say there's a regulation in a neighborhood --

THE COURT: No, no, talk about this case.

MR. DINTZER: Well, in this case, it helps us because the Plaintiffs here had a contract with a company that was going bankrupt. The fact that they ended up -- I mean, they had a business arrangement. They had to have accepted at some point that their business arrangement with this company could lead into bankruptcy, and that they would face a cancellation of the franchise agreement. And the fact that that happened, the question of whether the taxpayers should be the people who pay for that, whether that's the type of burden that should be carried by them, I think weighs in favor of us.

THE COURT: All right, but you do understand they characterize this issue exactly the opposite, which is 500 people or 700 people bore a burden that others did not have to bear. In other words, that the Government picked winners and losers, or enforced a test where -- I mean a system whereby some people did X and Y.

In that regard, that's what I was going to ask you, it's interesting to me that the Government in its government capacity clearly created an arbitration scheme. How does that dovetail into your view as to how the Government action works here? Because clearly that wasn't the Government acting in a proprietary.

MR. DINTZER: No, it created --

THE COURT: Okay.

MR. DINTZER: What I would say is that that falls to the -- and we don't -- we don't even have discovery on how that impacted the Plaintiffs, so I -- but I can say that if, to the extent that the Government created a scheme that helped people out, regardless of what happened before.

THE COURT: Right.

MR. DINTZER: And put money in their pockets or helped put money in their pockets, to help alleviate their harm, not only does that lessen the economic impact, it makes the character of the Government action better. And if these people got their franchises back, it cuts off and terminates any takings claim that they could bring.

THE COURT: Right. But it suggests the Government is acting in a governmental capacity.

MR. DINTZER: As far as that portion of it.

THE COURT: Okay.

MR. DINTZER: I mean, when the Government passes a statute that says -- you know, that says that --

THE COURT: I want to redress my other activity?

MR. DINTZER: What?

THE COURT: Isn't that --

MR. DINTZER: Just because the Government acts doesn't mean its redressing its other activity. I mean, the Government could also just be addressing and trying to help out people.

THE COURT: Okay. It's a new level of factors to consider.

MR. DINTZER: It is, Your Honor.

THE COURT: Okay.

MR. DINTZER: It is. To the extent that this helped out the Plaintiffs, that will create challenges for them on their proof because that's what they got.

THE COURT: Yeah. Well, and -- okay.

MR. DINTZER: And some of our model plaintiffs, we're going to talk about the model plaintiffs.

THE COURT: Yeah.

MR. DINTZER: Some of our model plaintiffs went through the arbitration process, we've tried to capture, so if to the extent we're going to go forward, that would be captured at least in some of the model plaintiffs. We'll talk about that later.

THE COURT: But let's say, the character of the Government action, I mean, and having had the benefit of studying this a little bit in life, is a test that varies.

MR. DINTZER: Yes.

THE COURT: I mean, clearly it was -- it appeared to be originally looking at the extent to which things were totally confiscatory. Okay? Isn't that really the closer it gets to a physical taking, the more likely a taking will be found?

MR. DINTZER: Well, that's on the economic prong.

THE COURT: No, no, no, no. On the character of the economic -- tell me what --

MR. DINTZER: Respectfully, I disagree.

THE COURT: Tell me what cases you're looking at on that test.

MR. DINTZER: It would take me a minute or two to grab the cases.

THE COURT: All right, we'll do it maybe at a break.

MR. DINTZER: But historically, that prong has been where the courts have looked at it and said, you know, is it police power, is the Government exercising its police power, is it trying to keep people safe? Why did the Government do what it's doing? Is it running a program? I mean, in the Rose Acre case, these eggs were tainted with salmonella. Was the Government trying to keep people from getting sick? Why did the Government do whatever it did?

THE COURT: Right, but think about it, if the Government takes all of your property, all right, there is a -- there is an element of this that's nuisance-related, right? It's not a taking if there's a nuisance. At one end. Because you don't have the right to maintain a nuisance.

MR. DINTZER: Respectfully, Your Honor, I -- yes. Yes. That would be --

THE COURT: What I'm trying to figure out -- not to give you a hard time. What am I going to listen to at a trial about the Government action, beyond is it regulatory in nature or just to protect the loan? What other proof do you think will be presented to me to help me understand this factor?

MR. DINTZER: I would anticipate that something like that would -- I mean, it depends -- I have to say, it depends on how this -- I mean, it's supposed to be a broad-ranging test, so I -- so it could be anything. It could be questions of why the government, you know, decided to participate in this. It could be anything. What the test has become more recently, not bought in by every court, but what it has become more recently is the question of is this the type of burden that should have been borne by the taxpayers or by the plaintiffs.

THE COURT: Okay, and that's the test you think

is the correct test?

MR. DINTZER: I think that it is not the whole test, but I think that it is a controlling test.

THE COURT: And it's sort of the Armstrong language taken -- I mean, that was sort of the original -- years ago in Armstrong, the Supreme Court said that coming from the original Penn Coal, where the burden is on a few that the whole should share.

MR. DINTZER: That is something that the Court has -- there are other things that the Court might consider, but I think that --

THE COURT: Okay, that's helpful.

MR. DINTZER: -- that the larger part on the character of the Government action is that. But that is not to be confused with economic impact.

THE COURT: No, I --

MR. DINTZER: Because I'm trying to keep those separate, and I don't want -- I mean, you could say, well, if it's a huge impact, then the character is terrible, but that's actually -- you know, and I just don't want to conflate those two elements.

THE COURT: But this is helpful, thank you.

MR. DINTZER: So, that's the character of the Government. What was the impact of the challenged conduct? So, that's the second question. And a lot of

times, that can be considered as this -- and it comes out as a percentage. And that is typically how courts evaluate the economic impact of -- so, if the value of the property was $1,000 before the Government's -- or would have been $1,000 without the Government's action, and it actually ended up because of the Government's action was worth $800, so you have $200 and then you divide by it, you get to 20 percent. And the Court would say, that's 20 percent and then that would put that in the mix.

Historically, we have found, under 50 percent for regulatory conduct, it's off the table. After that, there is some chances, and the higher it gets -- the Plaintiffs would need to show 100 percent, they would have to show basically that the but-for value was completely lost and that the actual value was zero, and that first of all, that there was a but-for value, and that was above zero, but the actual value was zero, and so it would be 100 percent.

THE COURT: All right, so let me ask you: So, if somebody comes in and testifies that before the Government acted, this franchise agreement could have been sold to Johnny Jones for $100,000.

MR. DINTZER: Yes, Your Honor.

THE COURT: And then the day that the Government

says you can't -- let's assume for the moment they prove that.

MR. DINTZER: Yes. All hypothetical.

THE COURT: This is all hypothetical.

MR. DINTZER: Yes.

THE COURT: It has zero value.

MR. DINTZER: Yes, Your Honor.

THE COURT: All right, so that would be 100 percent.

MR. DINTZER: If it truly had zero value, yes.

THE COURT: Okay.

MR. DINTZER: I would say, on the point of zero value, we know that what the Plaintiffs ended up with was a claim in bankruptcy, and the Plaintiffs -- so, we know it wasn't truly zero. They have a breach of contract claim against old Chrysler in bankruptcy. And I'm not going to stand up here and say whether it has value or not, but I'm going to say that the Plaintiffs have to show that that was a zero -- that that claim had zero value, along with everything else we've talked about with Lucas, before they could possibly bring a Lucas claim.

So, that is a proof that they will have to make. Because if that claim is worth something, then they -- then they can't make a Lucas claim and they would have

to end up in Penn Central.

THE COURT: Okay, well that's helpful to understand.

MR. DINTZER: And if they got something in the arbitration, if they got something in settlement, all of those things, if they ended up with some value, then that would also be part. And that's going to be the burden on them.

THE COURT: Yeah.

MR. DINTZER: So, that's the economic impact of the challenged conduct. They will have to show that. And they'll have to show, if the Court does not put us into a Lucas taking, they will have to show significant economic impact.

THE COURT: Above 50 -- at least about 50 percent.

MR. DINTZER: Historically we're really talking about 70 percent.

THE COURT: Yeah, 78. Okay.

MR. DINTZER: And then it's a balancing test, once they get above that, then it's balanced with the other elements.

So, then the third part is the -- is their reasonable investment-backed expectations. And Plaintiffs must show that -- and I know Your Honor

referred to this and I'm going to refer back, so I am just going to put it up so that we can see it.

THE COURT: The Circuit decision?

MR. DINTZER: Yes, Your Honor. The language that we discussed from the Circuit decision. So, what counsel said about Cienega Gardens is correct, to a certain extent. What happened in Cienega Gardens is we did have people, and I actually tried those cases and I argued the appeal, and that doesn't mean that I may not remember everything verbatim, but to my memory, we tried those cases and with the lot of them and Plaintiffs did come and say, well, you know, I thought -- and we totally agreed with the Plaintiffs, reasonable investment-backed expectation is a question that is asked at the time these franchises were entered into.

And the way the Court frames it is that we're going to look at times and say, look, at that time, if Chrysler was -- was going to go bankrupt, without any assistance from the Government, would these franchise agreements still have value. Or would they be continued, absent the Government action? That's what they have to show. And they have to show that they expected this back then.

But what the Court said is, and the Federal Circuit says, you know, it's not enough for people to

come in and just say it, what about like objective -- because we want objective. You know, were there documents that show that they -- and was this in their agreement? Was there something that we have -- and, so, what the Court really said is, we want an objective approach, an inquiry into reasonableness, would these -- objectively, would people expect that if Chrysler was going to go under, that their franchises would continue, and that subjectively, because we don't want to reward people who didn't personally believe this, subjectively believe that these individuals have this belief.

And that would be the reasonable investment-backed expectation. And that would be something that would be folded in -- there is case law that suggests that if they have no reasonable expectation, they could lose on that prong alone, but otherwise, it gets thrown into the mix as part of the Penn Central, you know, ad hoc balancing test.

And, so, that's the -- and I mean, we're leveraging the language, and I would point out that A&D was written by Judge Dyk, as was the Cienega Gardens Penn decision.

THE COURT: Is that true? I didn't know that.

MR. DINTZER: To my memory, that is.

THE COURT: Okay. That's your memory. Okay.

All right.

MR. DINTZER: And the only other thing is that Your Honor mentions Loretto in your -- I believe --

THE COURT: Did I? I may have.

MR. DINTZER: Maybe I got that wrong.

THE COURT: No, I did. For a per se taking, and I would agree it's not physical.

MR. DINTZER: Okay, yes, because Loretto was physical in nature. Then we're set. Thank you, Your Honor.

THE COURT: All right. Anything more, Mr. Marzulla? He's walking behind you. Wait a second, he's still there, Mr. Marzulla.

MR. MARZULLA: I don't want to run into him.

THE COURT: I don't want you to run into him either. Thank you, Mr. Dintzer.

Okay. Now you can approach.

MR. MARZULLA: Thank you, Your Honor. Only as to counsel's assertion that intangibles are not --

THE COURT: Covered by Lucas.

MR. MARZULLA: -- covered by Lucas, as I think we pointed out to the Court in our memorandum about the Horne case, the Supreme Court relied on a patent case for the Horne -- in saying we have applied the same rule to personal property as to real property. So, the

Supreme Court certainly didn't, you know, at the -- at the Federal Circuit, the Government argued personal property is not covered, it's excluded by Lucas. And Horne comes out, so the Government now slices it down to, well, personal property -- raisins may be covered, tangible property, but intangible property isn't covered.

I think as the Court correctly remembered, Armstrong, which contains the test about balancing the rights of the individuals versus the rights of taxpayers, did involve liens. In fact, there are quite a number of cases in which the Supreme Court or the Federal Circuit has said that where the Government acts to destroy a lien, an intangible interest, that it constitutes a taking.

So, there is no support, there is no case I am aware of to support the Government's assertion that somehow intangible property interests whose value is reduced to zero are not covered by the rule of Lucas.

THE COURT: And help me, Mr. Marzulla, I guess I hadn't really thought this totally through, the Government's argument that the question of zero will turn on whether or not there was some value to the claim in bankruptcy. Help me understand that for a moment.

MR. MARZULLA: I was quite astonished to hear

that assertion as well. I don't think the Government meant to tell you that there was a value to the claim against -- in Chrysler's bankruptcy. I can't tell you what the numbers were, but there were hundreds of millions of dollars worth of claims, and no money. So, I understand, and counsel for the Government can correct me, I think what he's going through is a little checklist to try to force us to address, you know, these are all the things on the little checklist. I don't understand the Government to say that they have any evidence or any argument that that would be valuable.

I would hope we could reach a stipulation on that point. Otherwise, we'll --

THE COURT: Have evidence on it.

MR. MARZULLA: We will find an expert to come in and testify that when you have hundreds of millions of dollars worth of claims and no money in a bankruptcy, that that claim is not valuable. I would think that's pretty self-evident.

THE COURT: Okay. Thank you.

MR. MARZULLA: Thank you, Your Honor.

THE COURT: All right.

MR. DINTZER: Your Honor, if I could just reply?

THE COURT: Yes. I want you to come back and then I also need you to move to item E, which is where I

think we're basically at. We've talked about sort of C and D. We've talked about sort of what will have to be established and we've talked a little bit about the temporary taking, and I think I understand that still is an issue. But then I asked you in E, if they're able to establish liability --

MR. DINTZER: So, if I could just -- the Court -- I believe that I didn't make a note, so if I'm wrong, I believe you asked for a case regarding character of the Government action.

THE COURT: Yeah, I just would --

MR. DINTZER: So, if I could just show you, cite to you the Rose Acre case.

THE COURT: So, Rose --

MR. DINTZER: And what they said is, when considering the character of the Government action, the Court must consider "the actual burden imposed on property rights or how that burden is allocated, and the magnitude or character of the burden of a particular regulation imposed on property rights, and especially whether" -- as I described it -- "whether it was misallocated."

And, so --

THE COURT: I think there may be a consensus on what that is. So, that's good. I mean, I think

that's -- I'm trying to make sure that when we are hearing evidence from each other, we don't go, huh? I didn't even think that was an issue in this case. And that's not helpful to me.

MR. DINTZER: Thank you, Your Honor.

THE COURT: So, that's why I like to make sure, like, are we all on the same page.

MR. DINTZER: And that's at 559 --

THE COURT: It just helps.

MR. DINTZER: -- F.3d, 1260.

THE COURT: That's helpful.

MR. DINTZER: Thank you, Your Honor.

THE COURT: So, why don't you stay up there.

MR. DINTZER: Okay.

THE COURT: I'm going to, I think with regard to this issue of whether or not Lucas applies and so forth, I think we -- there's a legal issue, can it apply to something other than physical property. I will obviously look at Horne. I am familiar, obviously, with kind of our functional equivalent of takings under, what is it, the provision with regard to patents, that Mr. Marzulla alluded to.

I don't think we need to kind of get totally stuck there, because we're going to probably have to have evidence on reasonable investment-backed

expectations, simply because we are not going to do this again, okay?

MR. DINTZER: Unless the Court --

THE COURT: I mean, it's just not -- we don't want to try it four times. So, we're going to go through all the factors, but I think it's helpful that we all understand that there may be legal arguments that may make certain facts not terribly relevant at the end of the day.

MR. DINTZER: Yes, Your Honor.

THE COURT: Okay.

MR. DINTZER: And unless, I don't hear this from them, but unless the Plaintiffs did want the to narrow it and say they're only going to assert Lucas, yes, Your Honor, we would view ultimately discovery would be necessary for all the areas.

THE COURT: On all three prongs?

MR. DINTZER: Yes.

THE COURT: Okay. Now, help me understand in E, because I did have an opportunity, although we're going to deal with GM separately, that you have what you think in GM is a complete defense to liability based upon what happened in the bankruptcy proceeding and releases that were signed and so forth. I asked about the arbitration procedure.

MR. DINTZER: Yes, Your Honor.

THE COURT: And it sounds like we may have some people and we need to figure that out, but do we have the same -- tell me if you feel there are defenses such as accord and satisfaction and so forth, the traditional ones, that would bar this case.

MR. DINTZER: And what I would do is, I would start from the point of view, Your Honor, that these are not affirmative defenses and it is the Plaintiffs' burden --

THE COURT: Well, accord and satisfaction would be.

MR. DINTZER: Accord and satisfaction would be.

THE COURT: Okay.

MR. DINTZER: But it's the way that the Constitution is set up, is that the way it says is, a taking without just compensation. So, they are -- the Plaintiffs actually have to -- to the extent that they're alleging a taking without just compensation, the burden is -- I mean, that's what they have to show.

And, so, the burden would be on them to say -- to prove that second part, which is that they were not justly compensated. Standing here, Your Honor, we have not done discovery, and I can't --

THE COURT: You don't have the same type of

issue you have in GM, to the best of your knowledge?

MR. DINTZER: I do know that there was arbitration. We do know that as part of the bankruptcy proceedings, some of the Plaintiffs agreed to releases, to release the Government, at least we understand that. We don't have these agreements, so I --

THE COURT: All right, so it's too premature at this stage.

MR. DINTZER: Right. But I would say that to the extent that any of these things happened, that unlike a contract case, where I will be the first to say, Your Honor, that would be an affirmative defense, because of the phrasing of the Constitution, that it's part of their proof, actually, to show that they were not compensated for this.

THE COURT: I only mention that I am not sure that that's totally true in terms of that in the context of having done some cases involving most recently a High Line case in which the Government had asserted that there was no liability because there had been a release in the payment scheme that they had received from the State of New York, or the City of New York it may have been, and the Circuit said the Government was entitled to benefit from the release that had been signed.

And, so, I think it was presented by the

Government as a defense to any takings claim.

MR. DINTZER: And I would be happy to look at that, Your Honor.

THE COURT: So, but at the end of the day, regardless --

MR. DINTZER: Burden, yes.

THE COURT: Yeah.

MR. DINTZER: Ultimately, if they were --

THE COURT: If there's a release, yes.

MR. DINTZER: If there's a release, we want it, and we will --

THE COURT: Okay.

MR. DINTZER: And that would be part of the case. If there is any kind of compensation, any kind of benefit -- and to be clear, Your Honor, those -- because I'm going to jump ahead to your next question about compensation, that those -- that any kind of benefit they received, even if it's partial benefit or whatever, goes both to the economic impact and may lessen economic impact, and then ultimately to award of compensation.

THE COURT: All right, so get to that question that I was trying to say, are we really needing, other than the people who aren't going to be representative plaintiffs.

MR. DINTZER: Yes, Your Honor.

THE COURT: Once they establish economic impact, is it to the degree of precision that then there's no reason to have a trial on what were their damages? I mean, is it -- would there be any reason to do it twice?

MR. DINTZER: So, let me start by breaking off anybody who has a temporary taking claim.

THE COURT: Let's do that, because we're going to have to.

MR. DINTZER: Because they are measured in a completely different manner. There are rents and it can get complicated. For otherwise, it should be, unless there's something bizarre, it should be the value of the property interest that was diminished, and the amount of diminishment. And, so, that is compensation, to make that part whole.

THE COURT: So, we wouldn't need a separate trial?

MR. DINTZER: In my experience, in the cases that I have done, Your Honor, no, separate trials are not necessary for damages.

THE COURT: Okay.

MR. DINTZER: I mean for compensation. It is only that piece, but yes, Your Honor.

THE COURT: Okay.

MR. DINTZER: That should be covered by the

other part.

THE COURT: That would be my assumption, I just wanted to make sure we weren't going to then have a separate --

MR. DINTZER: No, Your Honor.

THE COURT: Very good.

MR. DINTZER: Is that it?

THE COURT: Yeah, I think --

MR. DINTZER: You do ask the question, should the Court deal with the Government's defenses if doing so would eliminate the need for discovery in trial, and again --

THE COURT: It doesn't sound that way in this case.

MR. DINTZER: To -- that will be -- sort of -- and we're almost up to number 5, Mr. Connor is going to address that.

THE COURT: Yeah.

MR. DINTZER: But basically a lot of the things we've talked about would be opening up a whole bunch of buckets of discovery that I understand that the Court is hoping to keep as narrow as possible to try to get through the first part of the door. And Mr. Connor is going to address that in number 5.

THE COURT: All right. But there's no immediate

defense, that's what I -- you do not have a brief in the offing like what you have in GM in Chrysler?

MR. DINTZER: The brief that we have in the offing, Your Honor, is on economic impact, and we do believe --

THE COURT: All right, so it's not with regard to release?

MR. DINTZER: It is not.

THE COURT: Okay.

MR. DINTZER: It's a motion for summary judgment, but no, and we do believe that that could, but not in the same nature as the GM claim.

THE COURT: That was really why I put that in there.

MR. DINTZER: We understand, Your Honor. Thank you very much.

THE COURT: All right.

MR. MARZULLA: May I?

THE COURT: Yeah, Mr. Marzulla. He's still standing there, but once he gets away, you can come on up. He's away.

MR. MARZULLA: Okay. Your Honor, only -- I am a little surprised to hear that the Government is asserting an affirmative defense claiming that some of the Plaintiffs signed releases, but the Government

doesn't have any such releases. I am utterly and totally unaware of such releases.

THE COURT: Okay.

MR. MARZULLA: We tried to get information, the Government has refused to give discovery at any point here. I will say that I do not agree with the Government's assertion that it doesn't have to prove accord and satisfaction as an affirmative defense, or release or waiver or any other affirmative defense.

I think, quite the contrary, the Federal Circuit has held that those are affirmative defenses, they're so listed in the -- I think it's Rule -- is it Rule 16 or Rule 8?

THE COURT: It's Rule 8, I believe.

MR. MARZULLA: Yeah, Rule 8, that are listed as affirmative defenses, and I think there's nothing in the just compensation clause that shifts the burden of proof on those issues. I would hope that we could clear away some of this underbrush and would welcome, however the Court may wish to do that, whether by motion or otherwise, but I have the sense that the Government has this checklist that they're going down, assert all affirmative defenses we can think of, but many of them just have no application here.

THE COURT: Sounds good. All right, this is

what I would propose -- yes?

MR. DINTZER: I just want to clarify something that Mr. Connor brought to my attention.

THE COURT: Yes, please.

MR. DINTZER: If I may. So, we don't have the settlements, we don't have the arbitration, but we do know that in bankruptcy, one of the terms of the bankruptcy was that if you voted in favor of it, that you accepted the -- a release, including a release that applies to the Government, and it's our understanding that 17 of the Plaintiffs voted in favor of it and accepted the release. That's our understanding.

And, so, to the extent that if the Court wanted -- I don't know if it would move the ball very much forward.

THE COURT: No, no, I just wanted to know --

MR. DINTZER: That we do have, but we don't have the other parts that might -- that might enter into.

THE COURT: No, I mean, as you know, the brief that you filed in GM is comprehensive with regard to that argument.

MR. DINTZER: Yes.

THE COURT: And I just wanted to make sure I wasn't going through all of this to find there was the same comprehensive argument you were going to make

whereupon I didn't think so, but I needed to confirm that.

MR. DINTZER: All right, now I understand.

THE COURT: You're suggesting there may be some people who you might assert that defense against?

MR. DINTZER: We might. This part we do have, so I said we don't have any, we do have this piece, but we don't have those other pieces.

THE COURT: Okay.

MR. DINTZER: I just wanted to clarify that, Your Honor.

THE COURT: Thank you. All right, what I would like to do is let's have -- I had in question -- I think we have a fairly close understanding of what the issues will be with regard to what the expectations are with regard to the tests that will be applied. I did ask in question 5 whether or not we have to go through all of this, whether or not there is some way of -- if the Government believed there was, from their perspective, a way of shortcircuiting some of these issues, to hear about that before we then have a discussion as to who might be representative plaintiffs, and equally importantly, what discovery should look like.

So, if the Government -- I would have the Government begin. I then -- we will then take a break,

and if it's earlier than lunch, we will do that, so that the Plaintiffs can then respond, because I don't think you've heard this before. Okay?

And now we're in the case management phase of the case. We're done issue identification, and we're now trying to manage it.

MR. CONNOR: Thank you, Your Honor, and may it please the Court.

THE COURT: Mr. Connor, welcome.

MR. CONNOR: The Court asked whether there was any way to break this case up into discrete segments so as to avoid a lot of discovery that probably will be likely in this case. And we think there is a well-established way that the Court can resolve this case on economic impact. We know the Federal Circuit, and I don't think there's any dispute here, the Federal Circuit held that if the Plaintiffs cannot show economic impact, they lose. So, we don't even have to get into Penn Central or Lucas, we don't have to get into any of those questions.

THE COURT: And in fairness, what you're saying is, tell me -- say these things in plain English.

MR. CONNOR: Sure.

THE COURT: What does that mean to you?

MR. CONNOR: That means that they need to show

that there's a difference between the but-for value of their property and the actual value.

THE COURT: Okay.

MR. CONNOR: They need to show that as a result of Government action, their -- the value of their property interest was lessened. They need to show that under Lucas, and under Penn Central. So, it doesn't matter which test the Court applies, and the Federal Circuit addressed that correctly -- directly, as did Your Honor in the September 2015 order.

So, the nice thing about economic impact is, the Court doesn't need to resolve all these issues regarding what test applies --

THE COURT: Assuming you win.

MR. CONNOR: Assuming we win.

THE COURT: I mean, and if you don't, then we're back.

MR. CONNOR: Yes. We will concede if we don't win, certainly those issues need to be decided.

THE COURT: Okay.

MR. CONNOR: But I think it's important that based on their initial disclosures, which we recently received, Plaintiffs apparently intend to attempt to undertake a massive amount of discovery in this case. I mean, the Plaintiffs listed President Obama on their

initial disclosures and they apparently intend to depose him at some point and use his testimony in this case. And other very high-ranking Government officials.

THE COURT: Well, not with regard to economic impact, though.

MR. CONNOR: We don't know what exactly --

THE COURT: No, well, obviously they're talking about the Government action.

MR. CONNOR: Yes. Yes.

THE COURT: Okay.

MR. CONNOR: And, so, that's why we believe it's appropriate here --

THE COURT: Okay.

MR. CONNOR: -- to focus on the economic impact. And we also have the benefit of the Court's September 2015 order in which Your Honor limited Plaintiffs to three but-for scenarios. So, they need to show that their property had value under one of those three discrete scenarios. But all of these scenarios require a complete suspension of disbelief as to the actual circumstances that existed at the time.

And it's also importantly directly contradicted by those who know best, Chrysler's CEO of the company, when the bailout was happening, submitted a sworn declaration directly contradicting each and every

but-for scenario that Plaintiffs put forward. Alfredo Altavilla, who was the Fiat executive who was in charge of negotiating with Chrysler, has already testified --

THE COURT: Back up two steps for a second.

MR. CONNOR: Sure.

THE COURT: Let's do this. I want to make sure that we do this very clearly. It's your view that before -- what is the date you're picking in your mind that the Plaintiffs' franchise agreements had zero value, meaning they couldn't sell it to their neighbor John?

MR. CONNOR: Well, just to clarify, it's not that it has zero value, it's that it would have had the same value in both worlds. They had an unsecured breach of contract claim when their claim was rejected in bankruptcy. That's what they actually had.

THE COURT: Hold on, see, but that's -- that's what you're -- that's why this is sort of an important scenario. The discussion of termination, right, is outside the world of bankruptcy initially, isn't it?

MR. CONNOR: Not according to the Plaintiffs. They -- they filed -- I'm sorry, maybe I'm not understanding your question.

THE COURT: Well, that's part of what we need to sort of talk about here.

MR. CONNOR: Sure.

THE COURT: And we cannot talk in general terms.

MR. CONNOR: Um-hmm.

THE COURT: You have to tell me what your -- if you've got a summary judgment brief, probably written, you've got some very strong -- you've got an idea in your head. So, be very specific. You're saying to me, Judge Firestone, we believe as of this time and date there was what? That their franchise agreements, you're now converting those into claims in bankruptcy.

MR. CONNOR: Right.

THE COURT: That's what I'm hearing you now say.

MR. CONNOR: Yes. In --

THE COURT: That's your theory?

MR. CONNOR: Yes. In the actual world, what they had was unsecured breach of contract claims in bankruptcy. So, that's what they had in the actual world. The question is, what would they have had in the but-for world if the Government didn't intervene, if the Government didn't provide any financial assistance? They would have had the exact same thing. They would have had an unsecured breach of contract claim against Chrysler.

Why is that? Because Chrysler would have immediately liquidated in bankruptcy but for the

Government's financial assistance. And that's established by overwhelming evidence. We have, again, which I would like to hand out to the Court, we have recently executed declarations from Chrysler's CEO.

THE COURT: Let's hold onto those. We'll get to summary judgment, I will await them with anxious anticipation. But I want to wait for a moment. All right. This is the part I'm really sort of struggling with, and I really want us to make sure we understand this in the discussion today.

You're taking a position, which I don't think the Plaintiffs are viewing the world that way, okay? I think the Plaintiffs are not viewing the world that their property interest was an unsecured claim in bankruptcy. I think they're viewing their interest as a piece of paper, okay, that -- and that's why it's important to figure out if we're talking about -- they learned, it's true, that Chrysler is in a financial tumble, okay? And then, you're saying the only -- that they hold a piece of paper; could they sell that piece of paper to somebody? That's why the dates are important to me. What is your assumption?

MR. CONNOR: Well, the alleged taking is on June 9th of 2009, which is when the franchise agreements were rejected in bankruptcy, but I think it's important that

for Plaintiffs' theories to succeed, however they want to characterize them, they need to show that Chrysler either would have survived, because if Chrysler doesn't survive their own bankruptcy --

THE COURT: No, wait, and I know that, and presumably that will take expert testimony and they'll find somebody -- let's assume for the moment they find somebody to say that.

MR. CONNOR: Well, respectfully, we don't think they can show that.

THE COURT: You don't think they can show it or they can't find anybody to say it?

MR. CONNOR: They can't find anybody to say it.

THE COURT: Okay.

MR. CONNOR: They cannot find anybody to say it. And the reason why they can't, Your Honor --

THE COURT: Okay.

MR. CONNOR: -- that is we already have both sides to that transaction. We have Chrysler saying, but for the Government's financial assistance, we would have immediately liquidated in bankruptcy. We have that in sworn declarations.

THE COURT: Right.

MR. CONNOR: We have Fiat, the other part of that potential merger, which Plaintiffs say if the

Government didn't intervene, Fiat would have merged with Chrysler. We have sworn testimony from Fiat's executive saying, no, we wouldn't have. We under no circumstances would have merged with Fiat. We under no circumstances would have provided any capital to Chrysler. And, in fact, they never did provide any capital to Chrysler.

So, how are Plaintiffs going to hire an expert to come in and contradict both parties to the transaction? They can't do it. And the reason -- their other but-for scenarios, while they're sufficiently plausible to avoid a motion to dismiss, it's a very different standard on summary judgment.

THE COURT: Okay.

MR. CONNOR: They actually have to come forward and produce evidence, not allegations in a complaint, they have to produce evidence.

THE COURT: Okay.

MR. CONNOR: And there is no evidence and they won't be able to do it. There are other but-for scenarios that Chrysler survives through cost-cutting. I mean, this was a deeply, deeply insolvent company. There were $16 billion of liabilities in excessive assets. They lost -- actually $15 billion of liabilities exceeding assets. $16 billion they lost in one year alone. They were losing, as the Second Circuit

said in its opinion, they were losing $100 million a day in value. They had completely shut their factories down. They were not producing cars. But they still had to pay their workers, they still had to pay their pensions.

So, there is simply no plausible --

THE COURT: Well, back up. Did they close all their factories? Is that what you're telling me?

MR. CONNOR: They temporarily shuttered their factories. They shut them down because they didn't have enough money to run them.

THE COURT: And then the Government gave them money before this whole deal, right?

MR. CONNOR: Right. The Government gave them a bridge loan in January of 2009.

THE COURT: All right, and your view about how we should treat that bridge loan is what?

MR. CONNOR: Well, I think the Court held in September of 2015 that that's sort of part of the but-for world. So, Plaintiffs get the benefit essentially of --

THE COURT: So, it wasn't closed down?

MR. CONNOR: Right, but they had blown through all that money. That money was gone.

THE COURT: Okay.

MR. CONNOR: They -- Plaintiffs say that -- again, it's just -- they're just saying they could have cut costs, and we have declarations, again, from the CEO of the company, Robert Nardelli, he was the CEO of Chrysler, says that if the Government didn't provide the financial assistance when it did, we would have immediately liquidated. There was no question that they could not cut costs.

THE COURT: And then the argument they still have is there was value in the liquidated world?

MR. CONNOR: Right, and that is, again, as we'll show, and we would urge the Court to allow us to file our motion for summary judgment.

THE COURT: And we might. So, don't --

MR. CONNOR: But that, again, is directly contradicted by the declarations of the Chrysler executives. And here's why: So, to undergo an orderly winddown, you need money to finance it. Chrysler didn't have any money. So, they needed to get funds from either the Government or some other entity to fund an orderly winddown.

Chrysler's executives have sworn, submitted sworn statements, that they asked for money from all sorts of people and the only entity that would provide the money was the Government.

In their complaint, in Alley's, they say that, well, maybe the secured creditors would have provided some kind of financing --

THE COURT: Well, we know that frequently happens.

MR. CONNOR: It does, but --

THE COURT: You know, there's a 363 sale and a whole bunch of stuff in bankruptcy that --

MR. CONNOR: Right.

THE COURT: That was the reason I studied environmental law, but yes, it's okay.

MR. CONNOR: Mr. Nardelli in a sworn declaration said, Chrysler's secured lenders indicated multiple times that they would not -- that they would not finance a winddown of Chrysler's assets. That's the CEO of the company that was involved.

How are Plaintiffs going to get an expert to come in and say, well, actually, the CEO was wrong. There's simply no -- they don't have any --

THE COURT: All right, so you think the best way to expedite this is that you would like to file a motion for summary judgment that's accompanied with all of these affidavits. How many affidavits do you have?

MR. CONNOR: We have two affidavits -- we have two declarations that were recently executed.

THE COURT: I'm sorry, declarations. Okay.

MR. CONNOR: And we also have a number of other declarations that were in the Bankruptcy Court and we have Bankruptcy Court testimony as well that we're also relying on.

THE COURT: All right, so you want to rely on that testimony?

MR. CONNOR: Portions of it, yes, but we're also principally going to rely upon the declarations executed as part of this case, not the bankruptcy case, as part of this case. These were executed in January of 2016.

THE COURT: Okay.

MR. CONNOR: And they address all three scenarios that Plaintiffs put forward.

THE COURT: So, your view is you would like to file a motion for summary judgment on the issue of economic impact, which you think, if you prevail, then ends this case?

MR. CONNOR: Yes. And the Federal Circuit, I think, and Your Honor in the September 2015 order agreed, I mean, if they can't show economic impact, they lose. There's no reason to go through this massive discovery if -- I mean, all these scenarios --

THE COURT: You realize there may be some discovery?

MR. CONNOR: Yes, and the Court's rule --

THE COURT: And there may be, depending on what those affidavits or declarations say.

MR. CONNOR: Right, and the Court's rules allow for a process for that, under Rule 56(d), if we file a motion, if they think they need discovery, then they can seek that discovery.

THE COURT: Okay.

MR. CONNOR: But at this point, we think given all the complex legal issues, the most efficient way forward, we have the motions ready to be filed, if the Court allows us to file it, we can file it right away, and if Plaintiffs need discovery on the motion, then they can seek to have some of that discovery.

So, that's the way --

THE COURT: Right, and this avoids, in your view, discovery into the issue of the nature of the Government action, and questions relating to that?

MR. CONNOR: Yes. It will avoid a massive amount of discovery, and if granted, will save a massive --

THE COURT: I understand.

MR. CONNOR: -- amount of time.

THE COURT: All. Right, your colleague has a note to send, and then --

MR. CONNOR: Right, and if the motion were denied, if the Court --

THE COURT: You could still narrow issues.

MR. CONNOR: We could still narrow the issues and also we could still proceed to resolving economic impact through some sort of limited proceeding where the Court would just decide the economic impact issue and not proceed to the other prongs of Penn Central.

THE COURT: Okay. That's helpful. Thank you.

MR. CONNOR: Thank you.

THE COURT: Would you folks like to break and discuss amongst yourselves this proposal? I see your colleagues, Mr. Marzulla, at the table, shaking their heads saying yes. We were planning -- what we can do is why don't we come back here at 1:15. That gives you two hours, and lunch, to discuss things. Okay? That was very helpful. Thank you.

COUNSEL: Thank you.

(Lunch recess, 11:15 a.m. to 1:21 p.m.)

AFTERNOON SESSION

THE COURT: All right, everyone, welcome back. Please be seated.

COUNSEL: Good afternoon, Your Honor.

THE COURT: All right. So, who would like to speak for the Plaintiffs? I will speak for the Plaintiffs, Mr. Marzulla said.

MR. MARZULLA: Thank you, Your Honor. Yes, we thought we would give you a change of face here.

All right. I think that this exercise has been extremely helpful, Your Honor, in that I think you have helped to narrow down the issues for discovery and trial in this case.

As I understand the Court's rulings and analysis of the case at this point, even though we believe that it is a Lucas case in which there is but one issue of economic impact, the Court would plan to also try the other two Penn Central issues of reasonable investment-backed expectations and character of the governmental action. We believe that can all be accomplished in one trial, that there is no reason for dividing this case up into segments and bits and pieces.

We also oppose, and I think we made this clear to the Court earlier in our JPSR, oppose the Government's filing of what we think will be a

completely wasted motion for summary judgment. We understand the Government has a theory that the dealerships in this case had no value in the before condition or in the so-called but-for world --

THE COURT: Except for one second, Mr. Marzulla, let me just ask a question. When you were speaking, Mr. Connor, he mentioned the fact that he saw the property interest as a claim in bankruptcy, all right. So, discuss with me what you -- we agree the franchise agreement is the property interest.

MR. MARZULLA: Yes, Your Honor.

THE COURT: But what do you understand the Government is suggesting there?

MR. MARZULLA: Oh, I think the Government -- the Government has an overly simplistic analysis, Your Honor, I'm afraid. The Government's analysis is, if Chrysler were going to file bankruptcy, and, by the way, that's not entirely clear, but bankruptcy is a complete and immediate death of the company, apparently, everything is at that point worth nothing.

Now, what does that ignore? It ignores the fact that on the date Chrysler filed bankruptcy, it had $407 million in cash. According to the bankruptcy records, the consultant on whom the Bankruptcy Court relied, Mr. Manzo, Chrysler had between $1.6 and $2.8 billion

worth of assets at the time it filed bankruptcy. In short, bankruptcy is not the same as destitute.

In addition, among the scenarios, if we were to take, let's say the least value of the scenarios that the Court has approved for the dealers to assert here, that scenario is, let's assume that Chrysler went into bankruptcy, closed its doors, and never made another automobile. There were over 30 million Chrysler cars on the road at that time. Who was going to service those automobiles? Who was going to provide parts? Who was going to provide repairs for those automobiles?

We know from the example of Suzuki, which did exactly that, Suzuki closed down but it kept its dealerships open to do repairs and parts, that there was a value to the dealers, an economic value to the dealers to continuing to perform that work.

Moving up the scale, we know that there is such a thing as an orderly bankruptcy, and we know that, in fact, when Chrysler filed, the intention, and I think this will be borne out by the evidence and by the bankruptcy record, the intention was that it would be an orderly bankruptcy, so-called orderly bankruptcy. That is a bankruptcy in which the parties such as the dealers would be given a reasonable period of time to liquidate their stocks of automobiles, to liquidate their parts,

to amortize some of the costs associated with their servicing and so forth. That is not what happened.

What happened in this case was that the Government required, directed -- I'm not going to use the C word -- directed Chrysler to obtain an order immediately requiring that the dealerships be shut down and no longer be able to function as dealers either in terms of selling automobiles or in terms of servicing or repairing those automobiles, so that at that point, as of July 1st, 2009, the dealers were instantly and immediately out of their franchises, out of their dealerships, and they had no value at all.

The Government's -- so, what we heard from Government counsel about what they plan to file in its summary judgment motion doesn't address those scenarios. The other thing it doesn't address is this, and the Court made this point yesterday, what happens when we present an expert affidavit in this hypothetical summary judgment motion that says, yes, these dealerships did have value in the before condition? You now have a trial issue of fact on a material question, the most material question, the central question in this case, and that is what was the economic impact of the Government's action, and summary judgment can't be granted. Meanwhile, we will have wasted an enormous

amount of time on summary judgment.

THE COURT: Well, let me just ask you a question about that. The value potentially on summary judgment would be your ability to sort of target your discovery. If you understood what the Government's position was, I don't envision there not being discovery following that motion. I can't imagine the Plaintiffs are --

MR. MARZULLA: Absolutely, Your Honor.

THE COURT: -- are just going to say we agree, and you've got us there, okay?

MR. MARZULLA: Yes. I think that's fair to assume, Your Honor.

THE COURT: Right, but does that help in any way? In other words, is it -- is there a value in the fact that that might limit some of the -- target some of the issues so you see what your burden from their perspective is on the question of economic impact? That's the other thing I've been thinking of.

MR. MARZULLA: I don't think so, Your Honor. From what I've heard, in theory, a summary judgment motion could perform that function, but from what I've heard, the Government has a very sort of narrow view of how they see a path to prevailing in this case. And their narrow view is, you have to accept the premise that as of the date of take, which, by the way, is some

time in March or April, we'll find out in discovery.

THE COURT: Right.

MR. MARZULLA: March or April of 2009, it's not the date of issuance of the order --

THE COURT: You see it as the date that the agreement was reached requiring this to happen?

MR. MARZULLA: Yes, that the Government directed or required Chrysler to terminate dealers. I think that has to be the date of take, Your Honor.

THE COURT: So, the deal itself is struck before the bankruptcy is filed?

MR. MARZULLA: Correct. So, the Government's notion is, well, at that point in time, in March or April of 2009, that these dealerships were utterly worthless. Well, as we -- as the Court may recall from the motion to dismiss, we provided information that as it turns out, March of 2009 was the largest month of sale of Chrysler automobiles for the entire year of 2009. 2009 wasn't the best year that Chrysler had, of course, but dealerships were operating at a profit. And anybody who has an ongoing profitable business has something to sell.

If you have a stream of income, the immediate shutoff of that income is a loss. Even if you had 24 months or 30 months and that was going to be the end,

there's a difference between telling someone, I'm firing you today and not paying you a single penny, and your position is going to be phased out 24 months from now and I'll pay you from now until then. To say those are the same things is to sort of create a false world.

THE COURT: Okay.

MR. MARZULLA: So, the Government's analysis, in short, literally ignores most of these scenarios. And they did, two days ago, provide us the two declarations.

THE COURT: So, you have those.

MR. MARZULLA: We do. Needless to say, Your Honor, we're scratching our heads about them, we're wondering about the context. We're wondering if these people are experts that the United States has hired to testify for them. What is the context? These were not disclosed, although they're dated -- at least Nardelli is dated in January. They were not disclosed until two days ago. Counsel has referenced other declarations. I haven't seen those. He talks about filing with these courts -- this Court, declarations that were filed in the Bankruptcy Court. Well, those declarations are hearsay. They're not competent evidence in this Court.

So, in short, what's going to happen if this summary judgment motion is filed, is first we're going to go into discovery on the issues raised, because we

haven't had any discovery. The Government has refused discovery, the Government even refused our Freedom of Information request several years ago, saying they simply would not comply with the Freedom of Information Act because the case was in litigation.

THE COURT: In litigation.

MR. MARZULLA: If the case was in litigation they didn't have to comply with discovery requests. So, we have seen nothing and have had no opportunity to look at the documents.

So, all we know is what is provided in those two declarations, and we know that they sure don't cover all of the scenarios that we have set forward.

THE COURT: Right.

MR. MARZULLA: All of the theories and facts that we have set forward. So, we're go to into discovery, we're going to file a 56(d) motion, put the whole summary judgment motion on hold to go to discovery, and then you know what the next thing is going to be, we're going to be quarrelling over whether this discovery really deals with economic impact, which is all we're entitled to discover, or whether maybe it deals with --

THE COURT: Reasonable --

MR. MARZULLA: Yeah, reasonable expectations.

THE COURT: Yes.

MR. MARZULLA: Some other -- no, you're not allowed to --

THE COURT: So, that's what you're concerned about?

MR. MARZULLA: Well, it is, and particularly, Your Honor --

THE COURT: Because there will be discovery. I mean, I know.

MR. MARZULLA: And in the Government's disclosures, they indicate, for example, that they have, at the Justice Department, collections of Treasury Department documents from the Auto Task Force. Are they going to sort those into these are the ones that deal with economic impact and these are the ones that deal with character of the governmental action? Are we going to have to sort through one by one the documents and then quibble over what is and is not discoverable there? And similarly at deposition.

THE COURT: All right. So, what's your proposal?

MR. MARZULLA: Our proposal, Your Honor, is that we have a reasonable period of time for fact discovery, both written and deposition discovery.

THE COURT: And then do expert?

MR. MARZULLA: Then we do expert reports.

THE COURT: And what has your thought been in terms of scheduling?

MR. MARZULLA: We're thinking that probably nine months for fact discovery.

THE COURT: Okay. Nine to a year? Okay.

MR. MARZULLA: Yeah, something on that order. Followed by Rule 26 disclosure of expert reports, Your Honor.

THE COURT: Okay.

MR. MARZULLA: And discovery.

THE COURT: Okay. All right, so that's what you would propose?

MR. MARZULLA: Yes, Your Honor, it is.

THE COURT: And as you know, you know, there's limits on the number of depositions and so forth. What is this I'm hearing about the Obama deposition?

MR. MARZULLA: That was news to me.

THE COURT: Okay.

MR. MARZULLA: We have never said anything about taking the President's deposition.

THE COURT: Well, hold on, Mr. Faulkner is about ready to stand up behind you.

MR. MARZULLA: I suppose if I were Mr. Dintzer, though, I would say, but, Your Honor, I'm not in a

position to concede that.

THE COURT: All right. Well, wait one second, let Mr. Faulkner just talk for one second.

MR. FAULKNER: Your Honor, I would address it very briefly so that Mr. Marzulla can stay at the lectern, and that is, according to Mr. Rattner, if he is a credible source of information, certain decisions were made directly by the President relating to what would be done with regard to Chrysler. There is in his book an allegation that there was a memorandum, I think he calls it a bonus memorandum, which outlined various and sundry things, and that the President made the decision. And, in fact, Rattner comments in his book, assuming it's accurate, that when Chrysler was ready to file the bankruptcy, they did, and they were ordered to unfile it and hold it back until the President announced what he was doing. And, so, we do not anticipate attempting to depose the President, obviously.

THE COURT: But you want a stipulation as to certain facts?

MR. FAULKNER: Yes, ma'am, if we can get a stipulation, that solves our problems. Thank you.

THE COURT: All right.

MR. MARZULLA: Thank you, Your Honor.

THE COURT: Yeah, Mr. Marzulla, thank you.

So, let's hear back from the Government, and --

MR. CONNOR: Thank you, Your Honor.

THE COURT: Go ahead, Mr. Connor.

MR. CONNOR: Just in responding to Mr. Marzulla's points, what we didn't hear was any defense of the three but-for scenarios. Again, the only but-for scenarios that are at issue in this case. And I'll note that one of the but-for scenarios is not even being alleged by the Alley's Plaintiffs. This is the cost-cutting scenario, in which Chrysler, despite being $16 billion in debt and having shut down its factories, somehow cuts enough costs to proceed as a viable company in the future.

Again, we have a declaration from the CEO of the company saying that that never would have happened. Those sorts of threshold issues should be resolved before we go to litigating the entire auto bailout, which is apparently what Plaintiffs want to do.

And counsel misstates what the economic impact inquiry is. Counsel states that the question is what was the value of the dealership agreements in March of 2009. That's not the inquiry. Precedent is clear that the date of the taking is when the Government action happens, and here, their property was taken -- according to them, was taken on June 9th, 2009. That is the date

of the taking. Not in March or April.

THE COURT: Yeah, because that's the date of the -- that's what you were saying, because that's the date of the bankruptcy.

MR. CONNOR: That's the date of the bankruptcy.

THE COURT: I know, but that's actually an interesting point, because you do know that that is not necessarily the case. In other words, if the Government has talked for five years about we're going to take this building, we're going to take this building, it can't let the value of the building diminish and then go in and say, it's worth $5.

MR. CONNOR: Right.

THE COURT: So, we haven't resolved yet the date of the taking. In other words, I have -- because you've got me thinking when you're saying you think the value -- the property take, and let's discuss this for a moment, is the bankruptcy claim. They're saying, and the Circuit seemed to think it's the bankrupt -- what do I want to say -- it's the franchise agreement, right?

MR. CONNOR: It is the franchise agreement.

THE COURT: So, they hold a franchise agreement, and then they lose a franchise agreement. Right? So, the day -- I mean, they had -- presumably, are we talking about the claim in bankruptcy or are we talking

about the franchise agreement?

MR. CONNOR: We're talking about the franchise agreement and the claim here.

THE COURT: Whoa, whoa, whoa, what's the second part about?

MR. CONNOR: It's actually, in some ways both. So, if the Court would just hear me out for one second.

THE COURT: Okay.

MR. CONNOR: In the actual world, they had a franchise agreement. Chrysler entered bankruptcy, and as a result of that, under the bankruptcy laws, they got an unsecured claim in bankruptcy against Chrysler.

THE COURT: And why was that?

MR. CONNOR: That's just the way bankruptcy works. Their contract was rejected in bankruptcy, and as -- by operation of law, they get an unsecured breach of contract claim.

THE COURT: And it was rejected in bankruptcy, how?

MR. CONNOR: It was -- the executory contract --

THE COURT: To any --

MR. CONNOR: It was not assumed by new Chrysler. So, it was rejected and they had a claim against old Chrysler.

THE COURT: Okay.

MR. CONNOR: But in the but-for world --

THE COURT: In a but-for world --

MR. CONNOR: The same thing would have happened.

THE COURT: Why?

MR. CONNOR: Because Chrysler would have went bankrupt and immediately liquidated in bankruptcy. So, in the but-for --

THE COURT: But you know there wouldn't be an immediate liquidation.

MR. CONNOR: There absolutely would have been an immediate liquidation.

THE COURT: Day two there's a liquidation? We don't have to hold a sale, we don't have to call people, we don't have to arrange things?

MR. CONNOR: There would not have been a 24 to 36-month orderly winddown. There was no money to fund it.

THE COURT: Would there have been 24 hours?

MR. CONNOR: We're not certain exactly what it would be.

THE COURT: Okay.

MR. CONNOR: But it would have been the same as it was in the actual world. Of course, it wasn't day one rejected in that actual world either, there was a period of I think they filed bankruptcy on -- I'm not

sure of that exact date of the petition for bankruptcy, but the inquiry, and the Federal Circuit said this, they have to show -- the Plaintiff must also allege sufficient facts in its complaint to show what use or value the property would have had in the but-for world.

THE COURT: Right, and he envisions the but-for world, you're right, the Government does not have -- does not bail them out. We all understand that.

MR. CONNOR: Right.

THE COURT: Right. Their argument, Mr. Marzulla's argument, five minutes ago was, in the but-for world, what would have happened is, there would have been an orderly -- at a minimum an orderly liquidation. There would have been -- there would have been a period of time, and he references the Suzuki matter, which I haven't heard you dispute, that there would be 10 months, 20 months, maybe 36 months, in which they're getting rid of the cars on the lot, they're still servicing Chrysler products, and they were making money.

If I recall, earlier on the Plaintiffs made an argument that they make their money actually from servicing automobiles much more so than from selling them.

MR. CONNOR: Well, I'll address the Suzuki point

first, that is a totally inept comparison. Suzuki, when it entered bankruptcy in the United States, still manufactured cars overseas. So, of course, when you're manufacturing cars overseas, it makes sense to keep the dealerships open here. In the but-for world, Chrysler was going into bankruptcy and was not going to manufacture any other cars.

So, the Suzuki comparison is just a totally inept comparison.

THE COURT: All right, so what if somebody comes in -- part of my dilemma is this: I don't mind finding a way to cut back on issues, but I don't want in the context of a summary judgment motion to start getting more issues. So, that is my -- so, the question is, Mr. Marzulla's proposing, let's have a period of time with regard to discovery, and try to figure out a way, after all of this discussion that we've had, that the parties sit down and they say, all right, here's who we think are the critical fact witnesses we each need to depose.

Here we've spent a lot of time trying to get through what the factual issues are that we're trying to get to with regard to what happened exactly, and then we can figure out where are we in terms of, you know, are there facts, are there -- I mean, that are major facts in dispute, or do we have a timeline which I would

imagine we could actually all agree to. Because this is -- this was all played out in a public arena, this isn't -- you know, we have some -- I think there would be some sense of what happened.

And then move to the question in nine months or so to what experts do we need, and then set it up for a trial. Isn't that going to advance us as opposed to taking this dance for six months that gets us off schedule?

MR. CONNOR: Respectfully, we don't think that's the best approach. Again, there's three but-for scenarios in this case. One of their but-for scenarios says --

THE COURT: You think you can kill two of them at least. Is that what you're trying to do?

MR. CONNOR: We think we can kill -- I mean, we have a declaration from the CEO of the company --

THE COURT: I know, but the CEO -- let's say that falls apart. Let's say he's -- it's his opinion. Mr. Marzulla said, too, he may not be an economic expert. He says that was my opinion that we were going to go under. I don't have a Ph.D. in economics. That's what I thought. That's what my people told me.

MR. CONNOR: He may not have a degree in economics, but what he does have is he was operating the

company. And when Plaintiffs say that absent the government financial assistance, they would have -- Chrysler would have merged with Fiat, and we have sworn testimony from Chrysler and Fiat saying that wouldn't have happened, there is no reason for the Court not to resolve that on summary judgment. That's a perfect issue to resolve on summary judgment.

So, that would knock out one of the scenarios. The only other scenario the Alley's Plaintiffs have is bankruptcy. So, in the actual world, they went into bankruptcy; in the but-for world, they go into bankruptcy. So, all we're really talking about there is how long are they open in bankruptcy. That's a much different claim than their other claim where they're saying we would have continued to serve as licensed dealers for years and years and years.

So, we have this one threshold issue about the three but-for worlds and we have a motion for summary judgment ready to file, in which we have, again, evidence that we believe establishes -- if Plaintiffs want to respond and want to file a motion under Rule 46(d) for discovery, we can do that.

THE COURT: So, and your position is that the Government's position, then, there should be no discovery until that's resolved?

MR. CONNOR: Yes.
THE COURT: Okay. And thank you.
MR. CONNOR: Thank you, Your Honor.
THE COURT: Okay. All right, well, we were doing so well, and this is sort of where I am. I have the authority, presumably, but not necessarily the need to stop the Government from filing a motion for summary judgment, if they're so inclined. However, I am not going to do that and say there's no discovery during that period of time. This case has been pending for years. It is no -- I have no justification to say that a case that is this -- old is too strong of a word, but old enough, one was filed in 2010, 2011, 2012, evidence starts getting old, memories start to fade, maybe some people's memories are improving. You know, and I think it's a question of we have to figure out how do we control the discovery that's going to take place.
I am not interested in having big fights about deposing famous people who were involved in this proceeding, okay? I just don't think that's necessary. I do think there's a fair number of public documents that -- some of which I have seen that lay out certain issues that I'm not sure the Government necessarily wants to dispute, and I think on the one hand the Government has a big choice here as to how much do you

really want to fight the issue of the nature -- not so much the nature of the Government action, but whether it's acting to protect itself as a lender, or whether or not it was acting in a governmental capacity, and if that's what you -- how much you want to focus on that, that level of dispute that you want to make vis-a-vis the Plaintiffs, opens up a lot of discovery into a lot of history, if they have to establish what they believe to be the Government's actions, and what is this issue of the -- the first issue we talked about yesterday.

With regard to the other issues that are the more traditional Penn Central factors, I do think we need discovery on all three. We're going to need fact discovery, and I think Mr. Marzulla is correct, after a period of time, we'll have to look at what expert discovery we need. On the issue principally on economics, but that economics may be, was the Government also acting only as a lender, was the Government acting in a different capacity.

And, so, I need -- there are -- I am very happy to come up with -- work with you with proposed and competing if necessary discovery schedules in the sense of identifying those people as I noted in question 7, who is it that you need to depose, who is it that, you know, how many depositions do you need, how often -- how

long will it take to get all the documentation. I am hoping that in this period of four or five years that the Government has collected some of this stuff and has it available.

Mr. Dintzer?

MR. DINTZER: I would be happy to answer that, Your Honor.

THE COURT: Yeah.

MR. DINTZER: Your Honor, we have made a real effort to collect.

THE COURT: That's what I would figure.

MR. DINTZER: But we have -- and just so the Court knows, we have not made, at least we haven't read all of the documents. We haven't privilege reviewed because that obviously would have been an effort every day, but that, depending on the scope of what they're asking for, and what the Court is going to allow.

THE COURT: Right.

MR. DINTZER: That will -- I mean, that tends to be in cases such as this, a very, very significant variable.

THE COURT: I know.

MR. DINTZER: And so I just want to let you know where we're at. We have made an effort to put our arms around the documents that we could, but there's still,

depending on what they're getting and what they're asking for, there's still a significant amount of work to be done.

THE COURT: And, so, we will not today be able to sit down and resolve all of that. Based upon the issues and based upon what I'm ruling is to say I am now lifting any stay on discovery, we have to figure out what the schedule is going to be. With regard to filing a motion for summary judgment, you can -- I won't stop you from filing it. Will I stay consideration of it? Unless the Government -- unless the Plaintiffs read it and say, we agree, and we don't need any discovery, I would imagine that it's going to take a while to deal with it. It may be helpful, however, to the Plaintiffs to sort of see what the Government is thinking in these scenarios, just so they know how to target some of their thinking.

I probably -- I don't know how optimistic Mr. Marzulla's schedule is, I think nine months is probably too optimistic for the fact discovery. I would hope it could be done in a year from now. But you're going to have to -- the two of you -- the two of you, the two sides, sit down and really figure out how much material is there from each of you.

All right. In that connection, we also need, I

believe, to figure out who can be representative plaintiffs here, and how many do we need. I am hoping that perhaps just each of the Plaintiffs' side having one or two would be the better way to go so that we're not getting too far afield in every individual Plaintiff's circumstance.

I also think we need to think long and hard, as the Government is suggesting, that we don't need necessarily do we want to pick the -- you know, do you need one person who plays the part with regard to having gone through the arbitration and gotten their dealership back, and so we're dealing with one of those.

In other words, I don't know your Plaintiffs' group well enough, but I don't think we want 20 of these folks, and I think if we could limit that to somewhere around, I'm going to say five to 10, tops, we would be able to move along so that we're not on the other side of discovery going crazy with regard to that as well. And if it can be fewer, I'm not sure that hurts the Government terribly.

MR. DINTZER: As long as -- and I mean, as long as we feel like there's a -- I mean, earlier we hedged on the question of whether we're going to be -- agree to be bound by cross-cutting issues.

THE COURT: We're going to have to have that

agreement.

MR. DINTZER: And I understand we'll have that conversation, Your Honor, but just right now, regardless of whether we end up -- how that ends up, we would -- the more representative across the various issues these Plaintiffs are, the better I'll -- the better spent all of our time is.

THE COURT: All right, so now help me understand what you think fits in that category so the Plaintiffs have a sense.

MR. DINTZER: And just so Your Honor understands, Ms. Lister-Sobotkin is going to address this.

THE COURT: Please, why don't you do that. That would be really helpful as we move -- yes, go ahead.

MR. DINTZER: But all I wanted to say is that we have actually worked with the Plaintiffs while --

THE COURT: You had some -- you had 10 I think in one group.

MR. DINTZER: And, so, she will be addressing that.

THE COURT: And maybe the 10 isn't -- you tell me what you think is best.

MS. LISTER-SOBOTKIN: Okay, Your Honor, I'll just go through briefly and give you a summary of where

the representative plaintiffs stand now.

THE COURT: Yeah, let's do that. Good.

MS. LISTER-SOBOTKIN: There are 10 representative plaintiffs from the Alley's group. Those were the first representatives chosen, which is why there are so many.

THE COURT: And you did that through a negotiated agreement?

MS. LISTER-SOBOTKIN: Yes. Each side those five, and the Alley's Plaintiffs provided some limited -- limited information about the Plaintiffs to help us choose which five representatives the Government would choose.

THE COURT: And is there anybody -- what's the scenarios of the five -- to the 10, to the best of your knowledge?

MS. LISTER-SOBOTKIN: Well, they range -- we looked at a number of different issues. We looked at the Section 747 arbitration, we looked at geographic location, market size, urban versus rural locations, annual sales, a number of other factors. Right now, in Alley's, we have six that participated in arbitration, four that did not. Of the six that participated in arbitration, two prevailed and -- let me see, and four settled in arbitration.

THE COURT: So, they were all arbitrated people?

MS. LISTER-SOBOTKIN: For six of the 10, I believe, were arbitrated.

THE COURT: Six, and I'm sorry, because I thought you said six prevailed and four --

MS. LISTER-SOBOTKIN: I meant two prevailed and I believe four settled.

THE COURT: So that's the six.

MS. LISTER-SOBOTKIN: And four of them did not participate in arbitration.

THE COURT: And hence the 10. Okay.

MS. LISTER-SOBOTKIN: We don't have that information from the Spitzer and the Colonial plaintiffs yet. We don't know which ones arbitrated and which ones didn't. We do know, based on current belief, that one of the Colonial Plaintiffs did vote to accept the bankruptcy plan, which is another relevant factor that we want to have included.

THE COURT: That would be a good one.

MS. LISTER-SOBOTKIN: In the mix. Other than those, the rest of the factors have to do with --

THE COURT: Why don't you for our purposes on the record list the factors you looked at.

MS. LISTER-SOBOTKIN: Okay. So, amongst some other things, I'm not sure I have all the factors here,

but we did look at the arbitration, whether they participated, settled, lost, prevailed or did not participate; we looked at geographic location.

THE COURT: Is there an area that was more dramatically hit than others?

MS. LISTER-SOBOTKIN: I would have trouble saying from the Bench or from the podium.

THE COURT: Yeah.

MS. LISTER-SOBOTKIN: We do have representatives from all across the country.

THE COURT: Okay.

MS. LISTER-SOBOTKIN: Right now. But I'm not sure, just from memory, there were a lot of dealerships in Detroit, I know, but I'm not sure that there was one area of the country that was harder hit.

THE COURT: Okay.

MS. LISTER-SOBOTKIN: We do have large cities and small cities. We've got Las Vegas, Louisville, San Diego, right now, and then we have some very small cities, and rural areas. We looked at annual sales. Right now, the sales for the 2008 year, the sales range from a high of over a thousand cars to a low of 24 cars in a one-year period.

We looked at how their sales lined up against what Chrysler projected their sales to be, what their

sort of sales goals were, and so those range from over 100 percent down to I believe the lowest is about 24 percent of meeting their sales goals.

We looked at the range of brands sold, because Chrysler is Jeep, Dodge, Chrysler, and then they have a separate truck line, or they list it separate. So, some of these dealerships only sold one line of cars. For instance, they just sold Jeeps, they just sold Chryslers. Some sold the whole -- all, the entire brands, all four different brands.

So, we looked at those, and I believe there were some other factors. We actually had an expert assist us on the Alley's decisions, and they may have looked at some other financial factors. But those are sort of the primary things that we looked at.

THE COURT: And do you have an agreement as well with the Spitzer folks?

MS. LISTER-SOBOTKIN: Yes. So, for Spitzer and for Colonial, the parties agree to add two additional representative plaintiffs for each group.

THE COURT: Okay, that's how you --

MS. LISTER-SOBOTKIN: One chosen by the Government and one chosen by the Plaintiffs' groups.

THE COURT: And has that been, again, have they been identified?

MS. LISTER-SOBOTKIN: Yes, they have been.

THE COURT: Okay. So, we've fixed that, that part is done? From the Government's perspective?

MS. LISTER-SOBOTKIN: Yes, that part is done. I guess the only question is whether or not we want to reduce the number of representatives from the Alley's group, because there are 10 from Alley's right now. So, the total right now is 14 that the parties have agreed upon.

THE COURT: It would strike me maybe in the Alley's group, one could, so long as, you know, you look at who the other groups are. It's very expensive for everybody just to have these 14 plaintiffs. I mean, it's not necessarily -- maybe not necessarily, but potentially, deposing them and having to do all of that.

The Alley's group is Mr. Marzulla's clients?

MR. MARZULLA: Yes, Your Honor.

THE COURT: Have you given some thought to reducing the number?

MR. MARZULLA: We have, Your Honor, and indeed we had discussed with the Government reducing to six, which would be fairly proportional, I think, to the other groups. We have 176, I believe there are roughly 35 or 40 in Colonial, and I forget how many on Spitzer, but that was our thought, that we could then bring it

down to 10, and I would be willing to talk to the Government about reducing it further.

THE COURT: That sounds like an excellent idea. Let's do that. All right. And in terms of identifying those representative plaintiffs in which we will stipulate that rulings as to representative plaintiffs on common issues will be controlling for all.

MS. LISTER-SOBOTKIN: I'm not -- we can't --

THE COURT: You can't do that?

MS. LISTER-SOBOTKIN: We can't stipulate to that at this point in time.

THE COURT: Why don't we revisit that issue when the trial time comes.

MR. DINTZER: We would appreciate that, Your Honor, after we've had -- I mean, if we are going to sift through all of this, it would probably behoove us to sift through it further.

THE COURT: We will do that, right, but put it this way, that should be in the back of everybody' head.

MR. DINTZER: And, Your Honor, just so that -- I mean, for whatever it's worth, and obviously we will plan on that, even if, to the extent that there are not binding, you know, having done the Cienega Gardens case where it was hundreds and hundreds of plaintiffs, none of us are in the interest of retrying issues that we

believe are resolved.

THE COURT: I agree with that.

MR. DINTZER: So, whether we can commit to that or not, we are hoping that we will resolve these issues and get the cases resolved as quickly as possible.

THE COURT: We will revisit that every time we meet.

MR. DINTZER: We look forward to it, Your Honor.

MR. MARZULLA: Understood, Your Honor. And we would like to urge the Court to have that on the agenda every time we meet.

THE COURT: And we will.

MR. MARZULLA: Because it seems quite a waste if what the Government is saying is we're going to try 200 and some odd cases.

THE COURT: And we're not. All right. So, now we have to do some sort of scheduling. I guess the question really is this, why don't I give both sides 30 days to come back to me with a final list of representative plaintiffs, and with, if you can, an agreed-upon proposed discovery schedule that seeks to really be reasonable with regard to the number of depositions and so forth.

I would imagine that one would begin sort of in order of this, and we will take a look at

interrogatories and figure out first, before we start running around deposing people, so I would like to see that in a schedule first. Okay?

MR. DINTZER: If I may, Your Honor?

THE COURT: Yeah?

MR. DINTZER: As part of that in 30 days, or if they need more time, that if the Plaintiffs could provide us with what they see as their document requests.

THE COURT: Even if that's in preliminary.

MR. DINTZER: Right. If they do that, then we could noticing all the different things, because that will be the -- you know, the driver of this.

THE COURT: I think that that's right. So, what is -- you -- so, they need -- you want to get a schedule first for the document requests, and then from there you can begin --

MR. DINTZER: If they give us a document request that shows us a document collection that will take us six months to process and we don't have any objection and we can agree on that, then that will tell us how much time we need for -- and then we can negotiate the number of depositions and the like, but the starting point for any of this, just if we want to get a realistic schedule, is how many custodians are they

looking for, what's the nature, and we will -- in electronic, in this era, it starts with the document request, we negotiate custodians, we negotiate search terms, and that, assuming we can get to something on that, that will drive everything else that we're talking about.

THE COURT: All right. And you will enter into an appropriate agreement under 502(d)?

MR. DINTZER: If we can reach one, Your Honor, absolutely. I mean, that's what we would be looking for.

THE COURT: I would urge the parties to do that so that we're not too worried about what happens -- I mean, obviously attorney/client material is going to be reviewed, or at least a search term will be in there. But beyond that, and we're probably likely potentially going to need a protective order.

So, let's do it this way, I still think by the time -- there's so many people kind of involved. Let's do 30 days for a proposed schedule.

MR. DINTZER: Thank you, Your Honor.

THE COURT: Okay. That goes through the discovery process, taking into account -- and so you probably want -- the Plaintiffs probably want to get that document information to the Government within the

next 10 days.

MR. MARZULLA: We have been waiting years to serve them with a request for production of documents, Your Honor.

THE COURT: Have you?

MR. MARZULLA: We have.

THE COURT: Okay. Then you can do it, 10 days should be more than enough.

MR. MARZULLA: Certainly. Thank you.

THE COURT: All right, and I will issue an order reflecting that understanding. And I do urge you to work on the agreement you will need for protective orders and the inadvertent disclosure issues under 502.

All right? Is there anything else before we separate that we want to talk about this afternoon?

MR. MARZULLA: Nothing from Plaintiffs, Your Honor.

MR. FAULKNER: Nothing from Plaintiff, Your Honor.

THE COURT: Thank you.

MR. RATAY: Nothing, Your Honor. Thank you.

THE COURT: Very good. And for the United States?

MR. DINTZER: We're good, Your Honor. Thank you.

THE COURT: Very good. All right, listen, thank you, everybody, for your patience. I actually think we tried to learn a lot. And hopefully we'll keep narrowing the issues down, and it was a pleasure seeing all of you. Take care.

COUNSEL: Thank you, Your Honor.

(Whereupon, at 2:03 p.m., the proceedings were adjourned.)

CERTIFICATION OF TRANSCRIBER

I, Sally Jo Quade, CERT, court-approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-titled matter.

DATED: 4/15/16 s/Sally Jo Quade

Sally Jo Quade, CERT