## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| COLONIAL CHEVROLET CO., INC., *et al.*, | ) |
| | ) |
| Plaintiffs, | ) No. 10-647C |
| | ) |
| v. | ) Filed: March 12, 2025 |
| | ) |
| THE UNITED STATES, | ) |
| | ) |
| Defendant. | ) |

## <u>OPINION AND ORDER</u>

This 15-year litigation stems from actions that the Government took during the global financial crisis of the late 2000s to stave off the collapse of two of the nation's largest automakers: General Motors ("GM") and Chrysler. The remaining plaintiffs in this case, Duplessis Cadillac Volvo, Vandermeer Chevrolet Buick Oldsmobile, and Huntington Chevrolet, Inc. ("Plaintiffs"), are automobile dealerships whose franchise agreements with GM were terminated through GM's bankruptcy process. Plaintiffs allege that the Government took their property, including the franchise agreements themselves, real and personal property necessary to carrying out those agreements, and certain intangible assets associated with their businesses, without just compensation in violation of the Fifth Amendment. According to Plaintiffs, the taking occurred when the Government directed GM to terminate Plaintiffs' franchises as a condition of the Government's offer to bailout the auto industry. After the Government allegedly coerced GM into filing for bankruptcy, the Government acquired a majority interest in the successor GM entity.

Plaintiffs filed by the Court's leave their Third Amended Complaint ("TAC") on March 20, 2024. The amended pleading removes Plaintiffs' regulatory-takings claim—a claim that the Court previously rejected for a subset of plaintiffs whose franchise agreements with Chrysler were

similarly terminated.  Plaintiffs seek to proceed solely on a direct-takings theory.  Before the Court

is the Government's Motion to Dismiss pursuant to Rule 12(b)(6) of the Rules of the United States

Court of Federal Claims ("RCFC").  As explained below, the Court agrees that Plaintiffs fail to

plead a viable direct-takings claim against the United States.  Accordingly, the Court grants the

Government's Motion and dismisses Plaintiffs' action.

## I.    BACKGROUND

### A.    Factual Background

The "Great Recession" of 2008 caused significant nationwide "financial panic" that

resulted in widespread liquidity shortages.  Pls.' Third Am. Compl. ¶¶ 11–13, ECF No. 639.  In

response to this economic turmoil, Congress passed the Emergency Economic Stabilization Act,

12 U.S.C. § 5201 *et seq.*, which authorized creation of the Troubled Asset Relief Program

("TARP").  *Id.* ¶¶ 13–14.  TARP initially sought to "strengthen the financial sector by infusing

cash into financial institutions through asset and equity purchases."  *Id.* ¶ 14.  Congress provided

the United States Department of the Treasury with regulatory authority to manage TARP.  *Id.* ¶ 15.

On December 19, 2008, the Treasury Department created the Automotive Industry

Financing Program ("AIFP"), *id.* ¶ 18, which aimed to prevent the "uncontrolled liquidation of

General Motors and the collapse of the American auto industry," which in turn would have led to

significant market instability and the loss of significant numbers of Americans' jobs, *id.* ¶ 19.

Through the AIFP, the Treasury Department and GM negotiated for an initial government loan of

$80.7 billion, which was finalized in loan agreements dated December 31, 2008.  *Id.* ¶¶ 25–26.

Under those agreements, the Treasury Department required GM to submit restructuring plans

explaining how it would use the financing it received to "achieve long-term viability."  *Id.* ¶ 26.

On February 15, 2009, President Obama created the Presidential Task Force on the Auto

Industry to "review" GM's forthcoming restructuring plans.  *Id.* ¶ 27.  GM submitted preliminary

plans on February 17, 2009. *Id.* ¶ 28. The Treasury Department created another entity, the "Auto Team," to work with the Task Force to evaluate GM's proposals. *Id.* ¶¶ 29–30. The Task Force and Auto Team then took five weeks to evaluate GM's plans, eventually rejecting them and communicating to GM that the Government sought additional conditions on the financing. *Id.* ¶¶ 32–33. Specifically, Plaintiffs allege that the Government decided that GM should adopt the "Toyota" model—*i.e.*, reduce the total number of dealers in GM's distribution channels—and then "coerce[d]" GM into bankruptcy proceedings aimed at terminating a "large proportion" of dealerships. *Id.* ¶¶ 33–35. GM agreed to propose terminating dealership agreements during bankruptcy proceedings, resulting, Plaintiffs allege, in "dealer terminations without compensation." *Id.* ¶ 40. At some later time, dealers were offered "[w]ind-down" sums for their franchises. *Id.* Some dealers, like Duplessis, rejected those offers. *Id.*

In its initial proposals submitted to the Task Force and Auto Team before it declared bankruptcy, GM proposed allowing roughly 300 dealers per year to close "through natural attrition and purchase payments to reach a total of 1,650 dealers by the year 2014." *Id.* ¶ 52. After the Government rejected those proposals, GM then "identified" 1,454 dealerships to terminate by 2010 "through bankruptcy proceedings." *Id.* GM declared bankruptcy on June 1, 2009. *Id.* ¶ 54; *see also id.* ¶ 58 ("At the direction of and as required by" the Treasury Department and "as approved by" the Task Force, "GM selected dealerships for termination and obtained bankruptcy orders for the divestment of the ownership interests of the Plaintiffs."). After GM filed for bankruptcy, the Government became the majority shareholder of "New GM," the corporate entity that succeeded pre-bankruptcy GM. *Id.* ¶¶ 48, 56.[1] Plaintiffs allege, without providing further detail, that at some

---

[1] "After approval by the bankruptcy court under 11 U.S.C. § 363, the old GM and Chrysler entities sold most of their operating assets to newly created entities commonly called 'New GM' and 'New Chrysler'—in which the federal government, and other entities, acquired specified

point thereafter the Government "targeted and wiped out . . . dealership assets" and "directly took, confiscated, and transferred the underlying GM dealer rights, including exclusive territorial rights." *Id.* ¶ 48; *see also id.* ¶¶ 57, 76 ("The Government assumed, and appropriated to itself as a direct [t]aking, the intangible rights the Plaintiffs owned under the franchise agreements. . . . [T]he franchise agreements . . . were taken and retained by the Government and/or retransferred to others.").

Plaintiffs identify three categories of assets at issue: (1) the franchise contracts; (2) "distinct investment-backed expectation assets" necessary to perform their contractual obligations, including real property, buildings, fixtures, specialized tools, signage, parts inventory, vehicle inventory, and debt collateralization; and (3) "other" investment-backed assets like future options to sell their rights, good will, and present and future profits from "sales of insurance, financing, new and used cars, and retail and wholesale parts." *Id.* ¶ 59. Plaintiffs allege that these assets "were taken" in a "process" spearheaded by the Government. *Id.* ¶ 60. Plaintiffs further allege that, had the Government declined to provide GM any financial assistance, Plaintiffs' assets would have retained value because (1) a restructured GM likely would have continued to manufacture automobiles and related goods, necessitating use of existing distribution dealership channels, and (2) Plaintiffs would have continued to service GM vehicles already on the road. *Id.* ¶ 61. As a result, Plaintiffs allege the Government's actions "totally wiped out and deprived all economically feasible use" of Plaintiffs' assets. *Id.* ¶ 81.

## B.    Procedural History

Colonial Chevrolet Co., Inc. and Mike Finnin Motors, Inc.—since dismissed from this lawsuit—brought this case on September 27, 2010. *See* Pls.' Compl., ECF No. 1. The action

---

ownership interests." *A & D Auto Sales, Inc. v. United States*, 748 F.3d 1142, 1148–49 (Fed. Cir. 2014).

originally included two types of plaintiffs: auto dealerships that alleged a taking of a Chrysler franchise agreement ("Chrysler Plaintiffs") and auto dealerships that alleged a taking of a GM franchise agreement ("GM Plaintiffs"). Proceeding on separate tracks by automaker, this case has been the subject of extensive litigation in this Court and in the United States Court of Appeals for the Federal Circuit.

In June 2011, the Government moved to dismiss the initial Complaint, arguing that this Court lacked jurisdiction over the claims or, alternatively, that Plaintiffs failed to state a plausible takings claim. *See* Gov't's Mot. to Dismiss at 12–13, ECF No. 24. The Court denied the Motion. *See generally* Order & Op., ECF No. 43. The Government then petitioned to certify an interlocutory appeal, a request the Court partially granted. *See* Order, ECF No. 76. On appeal, the Federal Circuit affirmed the Court's denial of the Government's Motion to Dismiss, even though it disagreed that Plaintiffs sufficiently alleged a but-for economic loss of value of their franchises. *A & D Auto Sales, Inc. v. United States*, 748 F.3d 1142, 1158–59 (Fed. Cir. 2014). It remanded to this Court, holding that Plaintiffs should be afforded an opportunity to amend the Complaint to properly allege economic loss sufficient to proceed under a regulatory-takings theory. *See id.*

Plaintiffs—this time, including Duplessis, Vandermeer, and Huntington—amended the Complaint on remand to include additional economic loss allegations and a direct-takings claim.[2] *See* Pls.' Second Am. Compl. at 1, 8, 13, ECF No. 101. The Court again denied the Government's renewed Motion to Dismiss (ECF No. 104), finding that Plaintiffs alleged sufficient facts to show

---

[2] As the Federal Circuit noted in the *A & D Auto Sales* decision, the initial Complaint did "not allege" or "assert facts supporting an allegation of" a "'direct government appropriation or physical invasion of [their] private property.'" 748 F.3d at 1150 (quoting *Lingle v. Chevron U.S.A. Inc.,* 544 U.S. 528, 537 (2005)).

that their dealerships would have had value under either takings theory had the Government not instituted its bailout program. *See* Order & Op. at 12, ECF No. 127. Shortly thereafter, the Court consolidated this case with two other cases brought by similar plaintiffs—*Alley's of Kingsport, Inc. v. United States*, No. 11-100 (Fed. Cl.), and *Spitzer Motor City, Inc. v. United States*, No. 12-900 (Fed. Cl.).[3] *See* Consolidation Order at 2, ECF No. 135 (consolidating for the purposes of case management, discovery, and, if necessary, trial to resolve the Chrysler Plaintiffs' claims).

In December 2015, the Government filed a Motion for Summary Judgment on the GM Plaintiffs' claims, arguing that the Government could not have taken any of the GM Plaintiffs' property because the dealerships agreed to terminate their franchise agreements. *See* Gov't's Mot. for Summ. J. at 11, ECF No. 136. The Court denied that Motion on September 17, 2018, holding that Plaintiffs showed a genuine issue of material fact as to whether the Government coerced Plaintiffs into agreeing to sign wind-down agreements and whether Plaintiffs' dealerships had any economic value in the hypothetical world in which the Government declined to provide financial assistance to GM.[4] *See* Order Den. Mot. for Summ. J. at 18–20, ECF No. 365.

Proceeding in parallel to the GM Plaintiffs' case, the Chrysler Plaintiffs progressed through

---

[3] These two cases were brought in early 2011 and late 2012, respectively, and like this case involved auto dealerships whose franchise agreements with GM and Chrysler were terminated. *See* Pls.' Compl., *Alleys*, No. 11-100 (Fed. Cl. Feb. 17, 2011), ECF No. 1; Pls.' Compl., *Spitzer Motor*, No. 12-900 (Fed. Cl. Dec. 21, 2012), ECF No. 1.

[4] Contrary to Plaintiffs' position at the oral argument, the summary judgment opinion did not address whether the Government was entitled to judgment as a matter of law on Plaintiffs' direct-takings theory or whether Plaintiffs provided specific facts showing a genuine dispute for trial on that issue. *See* Oral Arg. Tr. at 24:4–16, ECF No. 651. The factual disputes that Plaintiffs raised on summary judgment were: (1) whether the Government forced Old GM to terminate franchise agreements; (2) whether Plaintiffs voluntarily relinquished their franchise agreements or were forced to do so; (3) whether the parties intended to release the Government from takings liability under Michigan law; and (4) whether Plaintiffs' franchise agreements would have had any value if Old GM had been liquidated in bankruptcy. ECF No. 365 at 5.

the denial of their Motion to Certify a Class (ECF No. 66), through discovery, and then to trial. The Chrysler Plaintiffs' four-week trial took place in April and May 2019. *See* Min. Entry (Apr. 19, 2019); Min. Entry (Apr. 29, 2019); Min. Entry (May 6, 2019). On October 2, 2019, the Court entered judgment for the Government, finding that the Chrysler Plaintiffs failed to prove (1) that the Government coerced Chrysler into accepting a bankruptcy plan, (2) that the Government coerced Chrysler into terminating the Chrysler Plaintiffs' franchise agreements, and (3) that the Chrysler Plaintiffs' franchise agreements would have had any economic value without the Government's intervention. Trial Op. & Order at 167–83, ECF No. 504. The Chrysler Plaintiffs appealed, and on December 29, 2020, the Federal Circuit affirmed. Although the Circuit declined to reach the Court's coercion determination, it agreed with the Court's determination that the dealers failed to prove their franchise agreements would have had value without the Government's financial assistance. *Taylor & Sons, Inc. v. United States*, 841 F. App'x 205, 208 & n.1 (Fed. Cir. 2020) (holding that the Chrysler Plaintiffs failed to meet their burden to show actual loss and noting that the Court's but-for-value determination disposed of the takings claim regardless of whether the claim was characterized as a regulatory taking or direct physical taking), *cert. denied*, 142 S. Ct. 709 (2021) (mem.).

Following the Chrysler Plaintiffs' loss at trial and on appeal, the GM Plaintiffs' claims moved into discovery. *See* Disc. Scheduling Order, ECF No. 537. It became apparent, however, that many GM Plaintiffs had since ceased doing business, become unresponsive to their counsel, or were not interested in continuing the litigation. Ultimately, most plaintiffs voluntarily dismissed their claims, or the Court involuntarily dismissed their claims for failure to prosecute under RCFC 41(b). *See, e.g.*, Stip. of Dismissal, ECF No. 587; Dismissal Order at 3, ECF No. 598. Only three

dealerships—the remaining plaintiffs here—indicated that they want to pursue their claims.[5]  *See* Mot. to Substitute Counsel, ECF No. 616; *see also* Mem. in Supp. of Mot. for Leave to File Am. Compl. at 2, ECF No. 631-1.  Plaintiffs then obtained leave to file a Third Amended Complaint to remove any reliance on a regulatory-takings theory and to rely instead on only a direct-takings claim.[6]  *See* Order, ECF No. 638.  Plaintiffs filed the TAC on March 20, 2024.  *See* ECF No. 639.

On May 20, 2024, the Government moved to dismiss Plaintiffs' claims, arguing that Plaintiffs' allegations do not state a direct taking under the Fifth Amendment because (1) Plaintiffs do not allege that the Government assumed the rights or obligations of Plaintiffs' franchise agreements and (2) Plaintiffs' allegations do not state cognizable property interests in any alleged intangible assets.  *See* Gov't's Mot. to Dismiss at 15–17, 21–22, ECF No. 643.  The motion is fully briefed.  *See* Pls.' Resp., ECF No. 645; Gov't's Reply, ECF No. 647.  The Court held oral argument on December 19, 2024.

## II.  LEGAL STANDARDS

Under Rule 12(b)(6), the Court must dismiss an action if the complaint fails "to state a claim upon which relief can be granted."  RCFC 12(b)(6).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is

---

[5] Because all the plaintiffs in the *Alleys* and *Spitzer Motor* actions either received final judgment, voluntarily dismissed their claims, or had their claims involuntarily dismissed under RCFC 41(b), the Court unconsolidated and closed these other two cases.  *See* Order, ECF No. 615.  Only this case continues.

[6] Not only did Plaintiffs remove their regulatory-takings theory from their amended claims, but they also expressly disclaimed any reliance on it.  *See* ECF No. 651 at 32:1–7 ("THE COURT: I understand that this third amended complaint withdrew the regulatory taking allegations, correct? [PLAINTIFFS' COUNSEL]: Right.  THE COURT: So we're just proceeding on a physical direct taking theory.  [PLAINTIFFS' COUNSEL]: Correct."); *see* ECF No. 631-1 at 2 ("Plaintiffs seek[] to amend their Second Amended Complaint . . . to simplify the dispute between the remaining parties by . . . removing claims for regulatory takings against Defendant.").

plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A complaint need not contain "detailed factual allegations," but a plaintiff must provide "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555.  Indeed, courts need not "accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986). "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable.'" *A & D Auto Sales*, 748 F.3d at 1157–58 (quoting *Iqbal*, 556 U.S. at 678).

When deciding a Rule 12(b)(6) motion, the Court accepts Plaintiffs' "well-pleaded factual allegations" "as true," *id.* at 1147 (citing *Iqbal*, 556 U.S. at 678), and draws all reasonable inferences in the non-moving party's favor, *Sommers Oil Co. v. United States*, 241 F.3d 1375, 1378 (Fed. Cir. 2001).  Where necessary, the Court may also consider "matters incorporated by reference" in the complaint, "items subject to judicial notice," and "matters of public record." *A & D Auto Sales*, 748 F.3d at 1147 (quoting 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 (3d ed. 2004)).

## III. DISCUSSION

Plaintiffs' TAC alleges that the Government effected a direct physical taking of various categories of assets that Plaintiffs owned or own without just compensation in violation of the Fifth Amendment.  ECF No. 639 ¶ 76.  Specifically, they claim the Government's actions injured them because they "had their Assets taken, confiscated, seized, extinguished, nullified, terminated, and/or transferred." *Id.* ¶ 68.  They further allege that the "Government assumed, and appropriated to itself as a direct Taking, the intangible rights the Plaintiffs owned under the franchise agreements." *Id.* ¶ 76.  They also allege that the "governmental actions constituted categorical

taking[s] because they totally wiped out and deprived all economically feasible use of the Dealers' Assets." *Id.* ¶ 81.

Plaintiffs' allegations fail to state a viable direct-takings claim for three reasons. First, Plaintiffs fail to plead sufficient facts to show that the Government assumed any of the rights and obligations provided in the franchise agreements that governed the contractual dealership relationships between GM and Plaintiffs. Such an assumption of rights is necessary to prove that the Government effected a direct taking of Plaintiffs' franchise agreements. Second, Plaintiffs fail to plead that they lost their property rights in the real and personal property that was "necessary to perform their contractual obligations." *Id.* ¶ 59(b). Instead, they plead only that those assets lost their value after Plaintiffs' franchise agreements were terminated or that Plaintiffs could no longer *use* those assets following the agreements' termination. *Id.* ¶¶ 59(b), 67; *see* Oral Arg. Tr. at 35:12–36:13, ECF No. 651 ("[O]nce the dealership is taken, they can no longer use those tools because they can't service the cars on the road . . . . The inventory of specialized parts, . . . they can no longer use those."). And finally, Plaintiffs fail to plead that they suffered a constitutional taking of their remaining property, as intangible assets like "goodwill," "blue sky," and "present and future profits," ECF No. 639 ¶ 59(c), are not cognizable property interests under the Fifth Amendment.

### A. The Fifth Amendment Requires that the Government Provide Just Compensation to Plaintiffs Who Have Suffered a Direct Physical Taking of Their Property.

Under the Takings Clause of the Fifth Amendment, the Government may not take "private property" for "public use" without "just compensation." U.S. CONST. amend. V. "When the government physically acquires private property for a public use, the Takings Clause imposes a clear and categorical obligation to provide the owner with just compensation." *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 147 (2021). The Federal Circuit has developed "a two-part test

for determining whether 'fairness and justice' require compensation for burdens imposed by a particular governmental action." *Huntleigh USA Corp. v. United States*, 525 F.3d 1370, 1377 (Fed. Cir. 2008) (quoting *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 123 (1978)). Under that test, first, "the court must determine whether the claimant has established a property interest for purposes of the Fifth Amendment." *Id.* Only "persons with a valid property interest at the time of the taking are entitled to compensation." *Wyatt v. United States*, 271 F.3d 1090, 1096 (Fed. Cir. 2001). Valid property interests include real property, personal property, and certain forms of intangible property. *Huntleigh*, 525 F.3d at 1377–78. Second, "after having identified a valid property interest, the court must determine whether the governmental action at issue amounted to a compensable taking of that property interest." *Am. Pelagic Fishing Co. v. United States*, 379 F.3d 1363, 1372 (Fed. Cir. 2004). Plaintiffs bear the burden of establishing that they possessed cognizable property interests for purposes of their takings claim. *See Klamath Irrigation Dist. v. United States*, 635 F.3d 505, 519 n.12 (Fed. Cir. 2011).

Real and personal property readily qualify as protectable property interests under the Fifth Amendment. *See Air Pegasus of D.C., Inc. v. United States*, 424 F.3d 1206, 1212–13 (Fed. Cir. 2005) (citing *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1019 (1992); *Andrus v. Allard*, 444 U.S. 51, 65 (1979)). Certain intangible property interests can also qualify. *See id.* (citing *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1003–04 (1984) (establishing that an interest in sensitive data can qualify as a trade-secret property right for purposes of the Fifth Amendment). As relevant here, "contract rights can be the subject of a takings action." *Palmyra Pac. Seafoods, L.L.C. v. United States*, 561 F.3d 1361, 1365 (Fed. Cir. 2009). But "loss of future income" or expected "compensation for frustrated contracts" are not cognizable property interests. *Foster v. United States*, 2 Cl. Ct. 426, 445 (1983). The Fifth Amendment requires only that the Government

11

pay "for what it takes, not opportunities the owner loses." *Id.*; *see also United States v. Gen. Motors Corp.*, 323 U.S. 373, 380 (1945) ("[T]hat which is taken or damaged is the group of rights which the so-called owner exercises in his dominion of the physical thing, and . . . damage to those rights of ownership does not include losses to his business or other consequential damage.").

When the Government effects a physical taking of private property for a public purpose, "it has a categorical duty to compensate the former owner." *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 322 (2002). But, to show a physical taking, Plaintiffs must demonstrate that "Government action . . . physically appropriates" their property. *Cedar Point Nursery*, 594 U.S. at 149. That inquiry focuses on the nature of the rights Plaintiffs possess to "use [their] own property." *Id.* When Government action "appropriates" one of those rights, "a *per se* taking has occurred." *Id.* Importantly, though, proving that the Government physically appropriated Plaintiffs' contract rights, personal and real property, and intangible assets requires identifying the right that was invaded and how the Government took that right as its own, or compelled a party or agent to take that right as its own. *See id.* ("In 'ordinary English' 'appropriation' means '*taking* as one's own . . . .'" (emphasis in original) (quoting 1 Oxford English Dictionary 587 (2d ed. 1989))); *see also Tahoe-Sierra*, 532 U.S. at 322 ("[W]hen government planes use private air space to approach a government airport, it is required to pay for that share no matter how small." (citation omitted)).

In the case of an alleged taking of contract rights, "courts should distinguish between the claimed taking of the subject matter of a contract and the taking of the contract itself." *Palmyra Pac. Seafoods*, 561 F.3d at 1365. A showing that the "subject matter of a contract has been taken is not sufficient to demonstrate that the contract itself has been taken." *Id.* Indeed, the Government "does not 'take' contract rights pertaining to a contract between two private parties simply by

engaging in lawful action that affects the value of one of the parties' contract rights." *Id.*; *see also Omnia Com. Co. v. United States*, 261 U.S. 502, 509–11 (1923) ("'It is not determinative of the present question that the . . . act . . . will render the contract of no value for the purposes for which it was made.' . . . [T]he performance of the contract was rendered impossible.  It was not appropriated, but ended." (quoting *Louisville & Nashville R.R. v. Mottley*, 219 U.S. 467, 484 (1911))).  The Government takes contract rights only where "there has been an 'acquisition of the obligation or the right to enforce [the contract]' by the [G]overnment." *Palmyra Pac. Seafoods*, 561 F.3d at 1365 (quoting *Omnia*, 261 U.S. at 511); *see also Huntleigh*, 525 F.3d at 1379–80 (rejecting the plaintiffs' theory that the Government's effective elimination of the market for private airport screening services by way of legislation that led to the creation of the Transportation Security Administration, which rendered the plaintiffs' security contracts "worthless," constituted a taking of those contracts).

The same principles apply to alleged takings of real or personal property and any intangible rights Plaintiffs allege the Government took.  Under a direct-takings theory, Plaintiffs must do more than show that the Government's action destroyed the value of those assets.[7]  *See Palmyra Pac. Seafoods*, 561 F.3d at 1365.  They must show that the Government *actually assumed or appropriated* at least one property right inherent in those assets in order to show the Government physically "took" that property within the meaning of the Fifth Amendment.  *See Cedar Point Nursery*, 594 U.S. at 149–50; *cf. Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419,

---

[7] This allegation could instead support a regulatory-takings claim, to which courts apply either "the flexible test developed in *Penn Central*," *Cedar Point*, 594 U.S. at 148–49, or the categorical regulatory-takings rule if the case involves "extensive" limitations on the use of property, *Horne v. Dep't of Agric.*, 576 U.S. 350, 360–61 (2015) (citing *Lucas*, 505 U.S. at 1027–28).  *See also Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 224–26 (1986) (assessing the alleged loss of contractual rights—even an absolute loss—under the *Penn Central* regulatory-takings factors).  As described above, Plaintiffs disavowed relying on such a theory.

435–36 (1982) (noting that a physical invasion by the Government results from the Government's assumption of the rights to possess property and to exclude others from using property).

**B.** **Plaintiffs Do Not Sufficiently Plead that the Government Effected a Direct Physical Taking of Their Franchise Agreements.**

Plaintiffs first allege that the Government took, "confiscated, seized, extinguished, nullified, terminated, and/or transferred" their franchise contracts. ECF No. 649 ¶ 68; *see id.* ¶ 59(a). The Government argues that Plaintiffs' factual allegations are insufficient to state a direct-takings claim because the TAC fails to allege that the Government "step[ped] into the shoes of the contracting parties and assume[d] its contractual rights and obligations." ECF No. 643 at 15. In response, Plaintiffs argue that they sufficiently allege that the Government owned and controlled GM when it "made its governmental decision to reorganize the auto industry," ECF No. 645 at 17, and that the taking occurred prior to the Government "coercing GM into bankruptcy," *id.* at 18.[8] Accepting Plaintiffs' factual allegations as true, the TAC lacks sufficient facts to state a plausible claim to relief. *See Iqbal*, 556 U.S. at 678. Plaintiffs fail to plausibly allege that the Government assumed the rights or obligations of the franchise agreements that Plaintiffs lost. Thus, they cannot show that the Government took those franchise agreements under a direct-takings theory of the Fifth Amendment.

As a threshold matter, binding precedent clearly confirms that contractual rights are protectable property interests within the meaning of the Fifth Amendment. *See Palmyra Pac. Seafoods*, 561 F.3d at 1365 ("[C]ontract rights can be the subject of a takings action."); *see also*

---

[8] There is an inherent contradiction in these allegations. According to the timeline in Plaintiffs' TAC, the Government did not take any ownership share in any GM-related corporate entity until *after* GM declared bankruptcy, which is *after* the Government and GM reached a financing agreement allegedly conditioned on terminating franchise contracts. *See* ECF No. 639 ¶ 56 ("After GM filed bankruptcy, as a condition of providing additional financing and fundamentally restructuring the auto industry, the USA became the majority shareholder of GM[.]").

*Lynch v. United States*, 292 U.S. 571, 579 (1934) ("Valid contracts are property, whether the obligor be a private individual, a municipality, a state, or the United States."). Thus, Plaintiffs have satisfied the first step of the two-step test that this Court applies to Fifth Amendment claims: they have successfully identified a protectable property interest within the meaning of the Fifth Amendment. *See Huntleigh*, 525 F.3d at 1377.

But Plaintiffs fail to satisfy the second step of the two-part takings test in this Circuit: that the government action at issue "amounted to a compensable taking of that property interest." *Huntleigh*, 525 F.3d at 1378 (quoting *Am. Pelagic*, 379 F.3d at 1372). While they provide several conclusory allegations about the Government taking their contract rights, *see* ECF No. 639 ¶ 68, Plaintiffs do not allege, as is necessary to support their direct-takings claim, that the Government stepped into the shoes of the dealerships and directly assumed any rights or obligations of their franchise agreements. *See Palmyra Pac. Seafoods*, 561 F.3d at 1365; *Huntleigh*, 525 F.3d at 1379; *Omnia*, 261 U.S. at 511; *see also Brooks-Scanlon Corp. v. United States*, 265 U.S. 106, 120 (1924) (holding that plaintiffs suffered a direct taking of a contract where the Government "put itself in the shoes of claimant and took from claimant and appropriated to the use of the United States all the rights and advantages that an assignee of the contract would have had"). Nowhere do Plaintiffs describe how or under what mechanism the Government purportedly "confiscated, seized," "transferred," or took specific rights and obligations under those agreements. The only facts clearly alleged in the TAC are that *GM* "substantially accelerated" franchise terminations "through bankruptcy proceedings," ECF No. 639 ¶ 52; that *GM* "selected dealerships for termination," *id.* ¶ 58; that *GM* "[gave] these 1,454 dealerships only until October 2010 to wind down operations completely," *id.* ¶ 53; and that *New GM* "assumed" Plaintiffs' "exclusive territorial rights," ECF No. 651 at 30:17–18.

However, the TAC recognizes that GM is and was a third-party, not the Government. *See, e.g.*, ECF No. 639 ¶¶ 40, 53. And Plaintiffs fail to allege that GM (either "Old GM" or "New GM") was itself a governmental actor sufficient to bring it within the ambit of Fifth Amendment takings jurisprudence. *See id.* ¶ 76 (pleading only that, "[a]s majority shareholder of GM, the Government had a substantial interest in acquiring the underlying rights that gave franchises their value, such as the exclusive right to sell and service specified brands of vehicles in designated areas"). That is likely for good reason. The Federal Circuit has already determined, on materially similar facts, that both Chrysler and GM were not acting as the Government's agents in terminating the franchise agreements, noting that an agency relationship typically requires that a company (or other third-party) is hired or granted legal authority to carry out the Government's business. *See A & D Auto Sales*, 748 F.3d at 1154. Even after amending their Complaint, Plaintiffs fail to plead anywhere in the TAC that GM exercised the Government's legal authority as the Government's agent. *See generally* ECF No. 639.

Moreover, allegations that the Government "terminated," "extinguished," or "nullified" the franchise agreements do not state a compensable taking within the meaning of the Fifth Amendment's direct-takings jurisprudence. *See Omnia*, 261 U.S. at 512–13. Indeed, where "the effect of [a governmental action] was to bring the contract to an end, not to keep it alive for the use of the government," the Government has not "appropriated" any of the contractual rights for its own use. *Id.* at 513. "Frustration and appropriation are essentially different things." *Id.* That makes sense because in cases where a contract is terminated, nullified, or frustrated, the Government has not assumed any of the contractual interests that the private party possessed and put them to the Government's own use. Any downstream consequences—like "transferr[ing]" Plaintiffs' former territorial rights to other GM dealers, *see* ECF No. 639 ¶ 48—likewise cannot

qualify as a direct taking.  *See Palmyra Pac. Seafoods*, 561 F.3d at 1365 (drawing a distinction "between the claimed taking of the subject matter of a contract and the taking of the contract itself").  Without any plausible allegation that the Government assumed performance of Plaintiffs' franchise agreements, only that its actions effectively ended the agreements, Plaintiffs' allegations fail as a matter of law to establish that the Government physically took the agreements.

At argument, counsel attempted to distinguish the contracts at issue here from the contracts in *Palmyra Pacific Seafoods*, *Huntleigh*, and *Omnia* by arguing that GM franchise agreements have "so much more value to these dealerships" than the corresponding contracts at issue in those cases.  ECF No. 651 at 30:9–13.  But, for a physical appropriation of property, the level of "economic loss" does not bear on whether a plaintiff suffered a physical taking under the Fifth Amendment.  *See Cedar Point Nursery*, 594 U.S. at 151 (citing *Loretto*, 458 U.S. at 423); *see also Huntleigh*, 525 F.3d at 1379 (no direct taking even where congressional action rendered the going concern value of the plaintiff's business "worthless"); *Horne v. Dep't of Agric.*, 576 U.S. 350, 360 (2015) ("[A] physical *appropriation* of property [gives] rise to a *per se* taking, without regard to other factors." (emphasis in original)).  What matters is whether the Government actually appropriated the property.  For a contract, that question necessarily implicates the exercise of the contract's rights or obligations.  *See Palmyra Pac. Seafoods*, 561 F.3d at 1365; *Omnia*, 261 U.S. at 511; *Brooks-Scanlon*, 265 U.S. at 120.  And Plaintiffs have failed to plausibly allege that the Government stepped into Plaintiffs' shoes as the party to exercise any of the franchise agreements' rights.

Rather, the Court agrees with the Government that, at best, Plaintiffs allege that the Government coerced GM into taking various actions that allegedly constitute takings of their constitutionally protected property rights in the franchise agreements.  For instance, Plaintiffs

allege that the Task Force coerced GM to "conform" to the Government's preferred model for the auto industry, coerced board changes, and coerced GM into filing for bankruptcy. ECF No. 639 ¶ 33. Plaintiffs also allege they were offered "coercive" wind-down sums for their contracts—presumably by GM. *Id.* ¶ 40. And Plaintiffs allege that the Treasury Department's funding conditions coerced GM into accelerating the termination of the agreements. *Id.* ¶¶ 52, 66. These coercion allegations fail to save Plaintiffs' claims from dismissal.

Plaintiffs have disavowed reliance on a regulatory-takings theory in this continued litigation, and their coercion allegations do not bear on whether they suffered direct takings of their contractual rights. Indeed, as the Federal Circuit explained earlier in this litigation, although the question of coercion is "complex," it bears only on determining whether the Government's actions "were regulatory in nature," a question that courts ask in assessing regulatory-takings (including per se categorical takings) claims. *A & D Auto Sales*, 748 F.3d at 1154–56. As explained above, Plaintiffs now assert only a direct-takings theory in the TAC. Necessary to that claim, as applied to contracts, is that the Government assumed Plaintiffs' contractual rights and obligations. *See Palmyra Pac. Seafoods*, 561 F.3 at 1365. Here, no entity allegedly assumed Plaintiff's contractual rights or obligations. GM merely *terminated* the contracts.

In sum, Plaintiffs fail to plead that the Government physically appropriated the franchise agreements Plaintiffs contracted with GM to obtain. Plaintiffs therefore fail to allege a direct taking of those agreements without just compensation in violation of the Fifth Amendment.

**C.    Plaintiffs Do Not Sufficiently Plead that the Government Effected a Direct Physical Taking of Their Real or Personal Property.**

Plaintiffs next allege that the Government took, "confiscated, seized, extinguished, nullified, terminated, and/or transferred," ECF No. 639 ¶ 68, various "other investment-backed expectations assets which were necessary to perform their contractual obligations," *id.* ¶ 59(b).

Those assets include real property, enhancements to real property, buildings, fixtures, specialized tools and servicing equipment, signage, inventory of specialized parts, inventory of new and used vehicles, and debt collateralization. *Id.* ¶ 59(b).  The Government argues that Plaintiffs fail to "identify the Government conduct that would constitute a taking of the real and personal property" identified in the TAC.  ECF No. 643 at 22.  The Court agrees.  Nowhere do Plaintiffs explain how or when the Government physically appropriated any of Plaintiffs' real or personal property.  Nor do Plaintiffs meaningfully respond to the Government's argument.  They merely restate several times that they have "alleged the Government took their valuable private property and made it its own."  ECF No. 645 at 16.  The absence of specific allegations means they cannot state a viable claim that they suffered an unconstitutional taking of property without just compensation.  *See Twombly*, 550 U.S. at 555; *Papasan*, 478 U.S. at 286.

As with the above claim, Plaintiffs have successfully identified, as a threshold matter, a protectable set of property interests that may be the subject of a constitutional-takings action.  The real and personal property interests Plaintiffs identify in the TAC are protected by the Fifth Amendment.  *Air Pegasus*, 424 F.3d at 1212–13.  Plaintiffs have therefore successfully cleared the first step of this Court's two-step test for determining whether a governmental action is a taking that requires just compensation.  *See Huntleigh*, 525 F.3d at 1377–78.

But, as above, Plaintiffs' personal- and real-property claims fail at the second step of the test.  Plaintiffs have failed to plausibly allege under a direct-takings theory that the Government physically invaded or appropriated any of their real property.  Nowhere in the TAC do Plaintiffs allege that they lost their ownership interests or rights in any of the physical property identified.  Indeed, Plaintiffs allege only in a conclusory manner that their "assets"—without specifying which assets—"were taken in a process" beginning with the Government's choice to "restructure the auto

industry." ECF No. 639 ¶ 60. They similarly allege that their "assets" were "taken, confiscated, seized, extinguished, nullified, terminated, and/or transferred." *Id.* ¶ 68. And, in the only other part of the TAC that appears to mention real or personal property, Plaintiffs allege that their "[a]ssets would have been valuable in the event of a GM orderly liquidation or Bankruptcy," *id.* ¶ 61(b), in essence alleging that the Government's actions had "totally wiped out and deprived all economically feasible use" of those assets, *id.* ¶ 81. Indeed, at argument, Plaintiffs' counsel acknowledged that the Government (or any other entity) ever took over or physically seized any of the real or personal property identified in the TAC. ECF No. 651 at 41:11–14. As counsel conceded, the only thing the Government did—assuming the truth of Plaintiffs' factual allegations—was to make those assets "useless." *Id.* at 41:13.

Without alleging facts supporting a physical appropriation of Plaintiffs' personal or real property, Plaintiffs cannot succeed in stating a claim that they suffered a direct physical taking of that property. *See Horne*, 576 U.S. at 360–61 (stating that, under the Fifth Amendment, proving a physical taking of property requires showing that there was a physical "appropriation" of that property, meaning that Plaintiffs must show the property was "actually occupied or taken away"); *Cedar Point Nursery*, 594 U.S. at 147–48 (explaining that direct-takings claims include the use of eminent domain to formally condemn property, the Government's physical possession of property without taking title to it, and the Government's occupation of property—"say, by recurring flooding as a result of building a dam"). Rendering property worthless is not a basis for a direct-takings claim. *See Huntleigh*, 525 F.3d at 1379; *see also Horne*, 576 U.S. at 361 (explaining that "*Lucas* recognized that [a] 'possibility that new regulation might even render his property economically worthless'" is a compensable taking under the Fifth Amendment but that such a claim is "about regulatory takings, not direct appropriations"). Because Plaintiffs affirmatively

20

plead only a direct-takings claim here, and because Plaintiffs have failed to provide plausible factual allegations that the Government—or any other party—assumed physical control of or appropriated any of Plaintiffs' real or personal property, they have failed to sufficiently plead that they suffered a constitutional taking.

### D. Because the Intangible Assets Plaintiffs Allegedly Lost Are Merely Consequential Damages Resulting from Termination of the Franchise Agreements, Those Assets Are Not Protectable Property Interests.

Finally, Plaintiffs allege that the Government took—or extinguished, nullified, or terminated—various "specific distinct investment-backed expectation assets," such as "blue sky including future options to sell their rights," "good will," and "present and future profits from sales of insurance, financing, new and used cars, and retail and wholesale parts." ECF No. 639 ¶ 59(c). The Government argues that such interests are not compensable property interests under the Fifth Amendment. ECF No. 643 at 22–23. Plaintiffs also fail to respond meaningfully to this argument, noting only that they have alleged in the TAC that the Government "assumed" the "intangible rights" Plaintiffs owned, ECF No. 645 at 11 (quoting ECF No. 639 ¶ 76)), that the dealers "owned a valuable future option as part of a 'hold and wait' economic strategy," *id.* at 12 (quoting ECF No. 639 ¶ 89), and that the Government "took their valuable property and made it its own," *id.* at 16.

For this class of assets, Plaintiffs' claims fail at the first step of the two-step Fifth Amendment test. *See Huntleigh*, 525 F.3d at 1377–78. The assets that Plaintiffs identify in the TAC are not cognizable property interests because they represent merely the consequential losses of frustrated contracts, the loss of future profits, and lost business opportunities. *See Foster*, 2 Cl. Ct. at 445 ("As a general rule, there is no compensation for frustrated contracts or for loss of future income."); *Gen. Motors Corp.*, 323 U.S. at 378–79 ("[T]he Fifth Amendment concerns itself solely with the 'property,' i.e., with the owner's relation as such to the physical thing and not with other

21

collateral interests which may be incident to his ownership."); *United States v. Grand River Dam Auth.*, 363 U.S. 229, 236 (1960) ("The frustration of respondent's [prospective business opportunities] which resulted when the United States chose to undertake the project on its own account did not take property from respondent in the sense of the Fifth Amendment.").

The longstanding rule makes clear that the "sovereign must pay only for what it takes, not for opportunities the owner loses." *Foster*, 2 Cl. Ct. at 445. The rule ensures that the mere speculative use to which a property interest *might* be put cannot confound the Government's authority to exercise its takings power. In that sense, the owner of taken property "is to be put in the same position, from a monetary standpoint, as he would have been without the taking; he is to be made whole, but he is not entitled to more." *Id.*; *see also United States v. Va. Elec. & Power Co.*, 365 U.S. 624, 633 (1961). Consequential damages, and other prospective injuries that result from the loss or frustration of a business, are not property interests within the meaning of the Fifth Amendment. The Amendment's "just compensation clause refers only to a direct appropriation of property, not to consequential injuries which result from the exercise of lawful power." *T.O.F.C., Inc. v. United States*, 231 Ct. Cl. 182, 192 (1982). Pleading that such injuries are themselves separate and distinct property interests would essentially read out of the Fifth Amendment any limitation on the meaning of "private property."

At argument, Plaintiffs' counsel cited *Kimball Laundry Co. v. United States*, 338 U.S. 1 (1949), for the proposition that a plaintiff is entitled to just compensation for intangible rights—in *Kimball*, the plaintiffs' laundry service trade routes—that are directly taken by the Government. ECF No. 651 at 38:22–39:1. *Kimball* fails to persuade in several different ways. First and foremost, in that case, the Government clearly and indisputably physically appropriated the plaintiffs' physical property rights—*i.e.*, the laundry business that they operated. The "United

States filed a petition" to "condemn the plant of the Kimball Laundry Company" for "use by the Army for a term" of several years. *Kimball*, 338 U.S. at 3. The Army "took over the plant" and "ran it as a laundry for personnel in the Seventh Service Command." *Id.* There is no similar appropriation in this case. Second, as the Government correctly argues, *Kimball*'s holding applies only to the proper calculation of the just compensation that the plaintiffs should be awarded for the occupation of the laundry business. *Id.* at 10–16; *see id.* at 10 ("The value of all property, as we have already observed is dependent upon and inseparable from individual needs and attitudes, and these, obviously, are intangible."); *id.* at 16 ("We conclude, therefore, that since the Government . . . preempted the trade routes, it must pay compensation for whatever transferable value their temporary use may have had."); *see also Cienega Gardens v. United States*, 503 F.3d 1266, 1281–82 (Fed. Cir. 2007) ("[T]he Supreme Court in *Kimball Laundry* applied the return on equity approach when determining just compensation and not when determining whether a taking had occurred in the first place."). The holding does not support the conclusion that the Government can directly appropriate an intangible asset in and of itself, apart from the contract rights or physical property to which it is associated. And since Plaintiffs have failed to plead allegations sufficient to state a direct taking of their franchise agreements or physical property, their intangible asset claim likewise fails.

## IV. CONCLUSION

Plaintiffs fail to sufficiently plead a plausible claim to relief under a direct-takings theory of liability because they fail to sufficiently allege that the Government appropriated their contractual rights or their real and personal property and because the intangible assets they allege were taken are not cognizable property interests under the Fifth Amendment. For these reasons, the Court **GRANTS** the Government's Motion to Dismiss (ECF No. 643). This matter is

**DISMISSED** under RCFC 12(b)(6) for failure to state a claim upon which relief can be granted.

The Clerk is directed to enter judgment accordingly.

      **SO ORDERED**.


Dated: March 12, 2025                        */s/ Kathryn C. Davis*
                                                KATHRYN C. DAVIS
                                                Judge